# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

MENG HUANG,

                Plaintiff,

    v.

THE OHIO STATE UNIVERSITY, *et al.,*

                Defendants.

**Case No. 2:19-cv-1976**

**Judge Graham**

**Magistrate Judge Vascura**

## OPINION AND ORDER

This matter is before the Court for consideration of the Motion to Dismiss filed by Defendants The Ohio State University ("OSU" or "Ohio State") and Giorgio Rizzoni (collectively, "Defendants") under Fed. R. Civ. P. 12(b)(1) and (6). (ECF No. 12.) For the reasons that follow, Defendants' motion is **GRANTED IN PART and DENIED IN PART**.

## I.    BACKGROUND

### A.  Factual Allegations

In 2014, Defendant Giorgio Rizzoni, a tenured professor at Ohio State's College of Engineering and director of OSU's Center for Automotive Research ("CAR"), recruited Plaintiff Meng Huang from China as an automotive engineering PhD candidate. (Compl. ¶¶ 1–2, ECF No. 1 at 4.) Dr. Rizzoni served as Ms. Huang's PhD advisor. (*Id.* at ¶ 2.) From August 2014 until December 2017, Ms. Huang also worked as a Graduate Research Associate under Dr. Rizzoni's supervision. (*Id.* at ¶¶ 31–32, 131.) Ms. Huang asserts that as a Graduate Research Associate, she was an Ohio State employee during the events at issue. (*Id.* at ¶¶ 31, 186–87.)

Dr. Rizzoni assigned Ms. Huang a research project, sponsored by the Ford Motor Company ("Ford"), to develop a model to predict battery aging for electric vehicles. (*Id.* at ¶ 15.) Dr. Rizzoni

holds the Ford endowed Chair in Electromechanical Systems. (*Id*. at ¶ 24.) Ms. Huang's participation in the assigned project required regular communication with the associated Ford research team via phone, email, and bi-weekly conference calls. (*Id*. at ¶ 16.)

Ms. Huang claims that shortly after their first encounter in China, Dr. Rizzoni began a systematic pattern of unwanted sexual harassment that escalated over the course of their three-year working relationship. (*Id*. at ¶ 2.) Ms. Huang alleges several instances where Dr. Rizzoni inappropriately touched her during meetings in his office, at his home, and during car rides to Dearborn, Michigan, where Ms. Huang presented her research to Ford. (*Id*. at ¶¶ 33–34, 37–40, 44, 48–52, 77, 87–88, 91, 95, 107, 110.)

According to Ms. Huang, Dr. Rizzoni's persistent harassment created a sexually hostile environment at the CAR building, where she performed her PhD research in close proximity to him. (*Id*. at ¶ 181, ECF No. 1 at 49.) Ms. Huang also claims that OSU knew Dr. Rizzoni harassed her and remained deliberately indifferent to his alleged misconduct. (*Id*. at ¶ 183.) Ms. Huang avers that because OSU failed to take action against Dr. Rizzoni, she avoided the CAR building for fear of being subjected to further harassment. (*Id*. at ¶ 181.) Ms. Huang additionally claims that her forced absence from the CAR building precluded her from accessing her research, which in turn, jeopardized her educational and career opportunities. (*Id*. at ¶ 184.)

Ms. Huang alleges that Dr. Rizzoni threatened to cut her monthly stipend and remove her from the PhD program if she did not comply with his demands. (*Id*. at ¶ 46.) According to Ms. Huang, Dr. Rizzoni warned, "Your job is to make me and Ford happy and I am much harder to please than Ford. I am ready to cut your funding anytime if you do not obey." (*Id*.) Ms. Huang contends that when she refused to submit to Dr. Rizzoni, he retaliated by terminating her monthly

stipend without notice and sabotaging both her PhD candidacy exam and future employment relationship with Ford. (*Id.* at ¶¶ 4–5, 105.)

Ms. Huang states that throughout her work on the Ford-sponsored project, she developed a close working relationship with the Ford research team. (*Id.* at ¶ 17.) Ms. Huang maintains that she received excellent feedback on her project, and that key decision makers at Ford expressed their intention to hire her upon completion of her PhD. (*Id.* at ¶¶ 17, 103, 237.) During the summer of 2016, Ms. Huang worked as a visiting scholar at Ford. (*Id.* at ¶ 54.) Ms. Huang claims her Ford supervisors gave her positive reviews and promised to bring her back the following summer for an official internship. (*Id.* at ¶ 56.)

On September 18, 2016, Ford employee, Lori Herman, emailed Ms. Huang to encourage her to apply for full-time employment following graduation. (*Id.* at ¶ 58.) On September 21, 2016, Dr. Rizzoni responded to Ms. Herman's email by calling Ms. Huang "self-centered and stubborn" and "the worst PhD student I have ever had" and asking Ms. Herman to "[p]lease stop paying attention to Meng." (*Id.* at ¶ 60.) Fifteen minutes later, Dr. Rizzoni sent Ms. Herman a second email stating, "After two years of dealing with this, I have concluded that she does not even begin to understand what a special opportunity it is to be my PhD student. The other 11 think I am next to God, and act accordingly." (*Id.* at ¶ 61.) Ms. Huang alleges that Dr. Rizzoni also sent her an email demanding a meeting and threatening her continued participation in the PhD program if she failed to listen to him. (*Id.* at ¶¶ 62–63.)

During the meeting that followed, Ms. Huang states that Dr. Rizzoni squeezed her shoulder and upper arm and stared her in the eyes while reiterating that any failure to listen would result in her removal from the program. (*Id.* at ¶ 63.) According to Ms. Huang, when she attempted to pull away, Dr. Rizzoni moved his hand and began rubbing her back. (*Id.*) Ms. Huang soon equated her

continued participation in the PhD program with her submission to Dr. Rizzoni's unwelcome advances. (*Id.*)

Ms. Huang claims that Dr. Rizzoni continued his pattern of inappropriate touching for the remainder of 2016. (*Id.* at ¶ 66.) On December 3, 2016, Dr. Rizzoni allegedly emailed Ms. Huang to remind her, "Do not forget I am the one who pays the bills." (*Id.* at ¶ 71.) According to Ms. Huang, Dr. Rizzoni's behavior soon escalated during private meetings in 2017. (*Id.* at ¶ 66.) As a result, Ms. Huang avoided meeting with him alone. (*Id.* at ¶ 93.)

During the summer of 2017, Ms. Huang interned with Ford. (*Id.* at ¶ 100.) Ms. Huang asserts that she received "extremely positive reviews from Ford" and was promised the opportunity to present her project to Ford's Chief Engineer the following spring. (*Id.* at ¶ 102.) She further claims that the Ford Principal Investigator on her project, Dyche Anderson, told her that Ford wanted to offer her full-time employment upon completion of her PhD. (*Id.* at ¶ 103.)

In August of 2017, Dr. Rizzoni terminated Ms. Huang's supplemental stipend without notice. (*Id.* at ¶ 105.) Dr. Rizzoni also purportedly emailed members of the Mechanical Engineering Department accusing Ms. Huang of being a stubborn student, who wouldn't comply with his directives, and was uninterested in graduating. (*Id.* at ¶¶ 106, 113.) Ms. Huang agreed to meet with Dr. Rizzoni alone in his office on August 22, 2017. (*Id.* at ¶ 107.) While Ms. Huang was sitting in his office, Dr. Rizzoni allegedly stood, walked behind her chair, and grabbed her breasts. (*Id.*) He didn't release his hold on her until she forcibly stood up and left his office. (*Id.*)

Disgusted by Dr. Rizzoni's alleged behavior, Ms. Huang refused to meet with him on Labor Day. (*Id.* at ¶ 109.) After weighing Dr. Rizzoni's threatened retaliation against being so close to finishing her PhD, Ms. Huang agreed to meet with Dr. Rizzoni on September 10, 2017. (*Id.*)

During the September 10, 2017 meeting, Dr. Rizzoni and Ms. Huang discussed Ms. Huang's PhD candidacy exam committee. (*Id.* at ¶ 110.) Throughout their meeting, Dr. Rizzoni purportedly held Ms. Huang by the waist and rubbed her back, shoulder, and arm. (*Id.*) A week later, Dr. Rizzoni told Ms. Huang her PhD candidacy exam proposal was well-written and thanked her for "listening" to him. (*Id.* at ¶ 111.)

On October 4, 2017, Dr. Rizzoni invited Dyche Anderson from Ford to sit on Ms. Huang's candidacy exam committee and sent him a copy of Ms. Huang's research proposal. (*Id.* at ¶ 112.) According to Ms. Huang, Mr. Anderson emailed her, stating her proposal was "quite good in general" and that his comments were "pretty much all minor." (*Id.*)

Dr. Rizzoni continued requesting private meetings with Ms. Huang. (*Id.* at ¶ 113.) When she avoided his requests, he emailed her, blind copying the Mechanical Engineering Department staff, asking, "Are you interested in graduating?" (*Id.*) Ms. Huang claims that her refusal to meet with Dr. Rizzoni wasn't due to lack of initiative but for fear of being alone with him. (*Id.* at ¶ 114.)

On November 15, 2017, Ms. Huang dialed into a conference call with the Ford research team remotely, instead of from Dr. Rizzoni's office. (*Id.* at ¶ 115.) This infuriated Dr. Rizzoni, who reprimanded Ms. Huang for not being in his office. (*Id.* at ¶ 116.) The Ford research team overheard Dr. Rizzoni's comments. (*Id.* at ¶ 116–17.) Ms. Huang defended herself by retorting, 'I don't care about complaints or accusations; I only care about finding solutions and making progress on this project. Why can't we discuss [] the project now since everybody is online and ready to help?" (*Id.* at ¶ 117.)

According to Ms. Huang, Dr. Rizzoni furiously responded, "I cannot talk online; I need to meet in person! If you do not want to finish your PhD, we can quickly terminate it!" (*Id.*) This

humiliated Ms. Huang in front of her Ford colleagues. (*Id.*)  Dr. Rizzoni then announced that he would not allow Mr. Anderson to serve on her candidacy exam committee. (*Id.*)

Dr. Rizzoni emailed Mr. Anderson soon after, calling Ms. Huang's behavior "inexcusable" and stating, "If she does not offer an apology and starts [sic] behaving like a respectful and cooperative PhD student, and meeting with me like all other students do, I don't think I can continue being her advisor." (*Id.* at ¶ 118.)  Mr. Anderson replied by indicating his support if Dr. Rizzoni "elect[ed] to drop Meng," but offered that Ms. Huang may not want "to be alone in a man's office with no one else in the building," and that Ms. Huang may be exhibiting signs of depression. (*Id.* at ¶ 119.)

Ms. Huang met with Dr. Rizzoni on the morning of November 17, 2017. (*Id.* at ¶ 122.)  Dr. Rizzoni purportedly decreed, "Meng, if you are unable or unwilling to meet with me over the weekend, we cannot continue with your PhD." (*Id.* at ¶ 120.)  Though Dr. Rizzoni previously confirmed in writing that Ms. Huang's written dissertation proposal would suffice as her written candidacy exam, he assigned Ms. Huang a written qualifying exam, which she was now required to take in addition to her oral exam. (*Id.*)

Later that day, Dr. Rizzoni copied Ms. Huang on an email to her candidacy exam committee. (*Id.* at ¶ 121.)  Ms. Huang noticed that Dr. Rizzoni's email omitted one of their previously agreed upon committee members. (*Id.*).  When Ms. Huang confronted Dr. Rizzoni via email, he seemingly replied, "This is what happens when you never meet with me and never reply to my emails . . . things change." (*Id.*)

A few days later, on November 21, 2017, Dr. Rizzoni added two new faculty members to Ms. Huang's candidacy exam committee. (*Id.* at ¶ 123.)  Ms. Huang claims that the new members were not selected for their research areas, but instead, for their close relationships with Dr. Rizzoni.

(*Id.*)  Dr. Rizzoni urged Ms. Huang to immediately submit the updated committee to the Graduate School for approval. (*Id.* at ¶ 124.)

On December 6, 2017, Mr. Anderson asked Dr. Rizzoni about scheduling the 2018 Ford conference call meetings for Ms. Huang's research project. (*Id.* at ¶ 125.)  Dr. Rizzoni declined to do so, stating that Ms. Huang's candidacy exam was two days later, and that he would instead meet with Mr. Anderson the following week when he visited Ford. (*Id.*)

Ms. Huang took her oral examination on December 8, 2017. (*Id.* at ¶ 127.)  Ms. Huang claims that rather than highlighting her accomplishments to the candidacy exam committee, as Dr. Rizzoni is known for doing with other PhD candidates, Dr. Rizzoni treated her harshly and derisively. (*Id.* at ¶¶ 128–29.)  Ms. Huang states that Dr. Rizzoni ordered her from the room before one of the professors could even ask her final questions. (*Id.* at ¶ 130.)

On December 11, 2017, Dr. Rizzoni informed Ms. Huang that the committee not only failed her, but that she could not retake the exam. (*Id.* at ¶ 131.)  Dr. Rizzoni supposedly declared, "Meng, you didn't meet with me over the weekend and you take [sic] that statistics class against my advice.  If you had met with me over the weekend on a weekly basis, you could have passed the exam.  Now you cannot continue your PhD study and you will not be funded in spring 2018." (*Id.*)

On December 12, 2017, Ms. Huang filed a complaint with the Ohio State Mechanical Engineering Department Human Resources representative and the Department Chair. (*Id.* at ¶ 138.)  The following day, she also filed a report with OSU's Title IX office. (*Id.*)  On February 2, 2018, Ms. Huang filed a discrimination charge with the Equal Employment Opportunity Commission. (*Id.* at ¶ 139.)  Ms. Huang has not received a right to sue letter.

Ohio State investigated Ms. Huang's complaint and suspended Dr. Rizzoni during its investigation. (*Id.* at ¶¶ 141, 146.) Ms. Huang claims Defendants retaliated against her for filing a complaint against Dr. Rizzoni by suspending her access to the CAR building and denying her access to her research. (*Id.* at ¶ 145.) Though Ohio State eventually gave Ms. Huang a new appointment and funding and allowed her to complete her dissertation research, Ms. Huang was no longer assigned to the Ford project. (*Id.* at ¶ 150.) According to Ms. Huang, Dr. Rizzoni allowed another student to complete the Ford project and present the corresponding research to Ford. (*Id.*) Ms. Huang claims her "dissertation was reduced from an important project intended to be incorporated into future Ford vehicles to something that would languish in a dusty file upon her graduation." (*Id.* at ¶ 151.)

Ohio State later permitted Ms. Huang to retake her PhD candidacy exam under the supervision of a new advisor and committee. (*Id.* at ¶ 149.) A Graduate School faculty representative witnessed Ms. Huang's oral exam. (*Id.*) After purportedly presenting the same proposal from her previous exam, Ms. Huang passed her PhD candidacy exam on March 23, 2018. (*Id.*)

On March 28, 2018, Ohio State detailed its investigative findings in a thirty-eight-page report. (*Id.* at ¶ 152.) Ohio State concluded there was insufficient evidence to support Ms. Huang's complaint. (*Id.*) Ms. Huang now brings suit against Ohio State and Dr. Rizzoni.

**B. Procedural Background**

This case was originally filed in the United States District Court for the Eastern District of Michigan on August 31, 2018. (ECF No. 1.) On November 11, 2018, Defendants filed their Motion to Dismiss, or in the Alternative, Motion to Transfer Case to United States District Court for the Southern District of Ohio. (ECF No. 12.) On April 4, 2019, Ms. Huang voluntarily

dismissed several of her claims with prejudice. (ECF No. 25.) On May 14, 2019, the Eastern District of Michigan granted Defendants' alternate motion and transferred the action to this Court. (ECF No. 26.) In granting Defendants' alternate motion, the Eastern District of Michigan reserved judgment on the substantive bases for the motion, leaving Defendants' Motion to Dismiss under Fed. R. Civ. P. 12(b)(1) and (6) for this Court's consideration. (*Id.* at 431.)

Ms. Huang's remaining claims are: 1) Count B: a Title IX hostile environment claim against both Defendants;[1] 2) Count C: a Title VII sexual and racial harassment claim against both Defendants; 3) Count D: a Title IX retaliation claim against both Defendants; 4) Count E: a Title VII retaliation claim against both Defendants; 5) Count F: a sexual and racial harassment claim under Michigan's Elliott-Larsen Civil Rights Act against Dr. Rizzoni; 6) Count G: a retaliation claim under Michigan's Elliott-Larsen Civil Rights Act against Dr. Rizzoni; 7) Count H: a due process claim against Dr. Rizzoni in his personal capacity; 8) Count M: a tortious interference with a prospective contractual relationship claim against Dr. Rizzoni; and 9) Count N: a defamation claim against Dr. Rizzoni, pertaining to statements Dr. Rizzoni made to Ford employees about Ms. Huang.

## II.     STANDARD OF REVIEW

Defendants move to dismiss Ms. Huang's state law claims, pursuant to Federal Rule of Civil Procedure 12(b)(1), for lack of subject-matter jurisdiction. (ECF No. 12 at 108.) Defendants categorize their challenge as a facial attack. (*Id.*) When reviewing a facial attack, courts take all of the allegations in the complaint as true. *McCormick v. Miami Univ.*, 693 F.3d 654, 658 (6th Cir. 2012).

---

[1] Ms. Huang admits that her complaint erroneously references race in her first Title IX claim (ECF No. 1 at 49), and as Title IX does not provide any cause of action based on race, she withdraws any race-based claim under Title IX. (ECF No. 19 at 248, n. 5.) Further, based on Ms. Huang's allegations, the Court construes her hostile environment claim as a deliberate indifference claim and will analyze it accordingly.

Defendants also move to dismiss Ms. Huang's remaining claims for her failure to state a claim for each under Federal Rule of Civil Procedure 12(b)(6). When considering a motion under Rule 12(b)(6), a court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A court should construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. *Iqbal,* 556 U.S. at 679; *Erickson v. Pardus,* 551 U.S. 89, 93–94 (2007); *Twombly,* 550 U.S. at 555–56. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.

## III. DISCUSSION

### A. Plaintiff's State Law Claims

Ms. Huang, a citizen of the People's Republic of China, brings several claims for violations of either Michigan or Ohio statutory or common law. (ECF No. 1 at 7, 48–58, 60–62.) Defendants argue that under the Eleventh Amendment of the United States Constitution, Ohio State and Dr. Rizzoni, in his official capacity, are entitled to the defense of sovereign immunity against Ms. Huang's state law claims. (ECF No. 12 at 118.)

The Eleventh Amendment provides immunity for states, arms of the state, and state employees in their official capacities from suits for money damages. *Rodgers v. Banks*, 344 F.3d 587, 594 (6th Cir. 2003). Specifically, as is the case here, the judicial power of the United States, exercised through the federal courts, does not extend to a suit against a state brought by a citizen

of a foreign state. *McCormick v. Miami Univ.*, 693 F.3d 654, 661 (6th Cir. 2012).[2] Moreover, the State of Ohio has not waived its Eleventh Amendment immunity for violations of state law in federal court. *Mixon v. State of Ohio*, 193 F.3d 389, 397 (6th Cir. 1999).

As an Ohio public university, Ohio State is considered an arm of the State of Ohio. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 571 (6th Cir. 2000). As an arm of the state, Ohio State enjoys Eleventh Amendment immunity from federal suits against it. *McCormick*, 693 F.3d at 661. Consequently, the Eleventh Amendment bars Ms. Huang's state law claims against Ohio State.

Ms. Huang argues that despite Defendants' assertions, Eleventh Amendment immunity does not apply to Dr. Rizzoni, because she has sued him in his individual capacity rather than his official capacity.[3] (ECF No. 19 at 275.) Nevertheless, Ohio Revised Code § 2743.02(F) mandates that lawsuits seeking damages against state employees "shall first be filed against the state in the court of claims that has exclusive, original jurisdiction to determine, initially, whether the officer or employee is entitled to personal immunity under section 9.86." Thus, "Ohio law requires that, as a condition precedent to asserting a cause of action against a state employee in his individual capacity, the Court of Claims must first determine that the employee is not entitled to the immunity provided for in Revised Code section 9.86." *Otte v. Kasich (In re Ohio Execution Protocol Litig.)*, 709 F. App'x 779, 784 (6th Cir. 2017) (quoting *Haynes v. Marshall*, 887 F.2d 700, 704 (6th Cir. 1989)); *see also McCormick*, 693 F.3d at 665. Here, Ms. Huang has not first filed her state law causes of actions against Dr. Rizzoni in the Ohio Court of Claims. This procedural misstep therefore bars Ms. Huang's state law claims against Dr. Rizzoni.

---

[2] The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

[3] Claims against state officers in their official capacity are "no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). If sued in his official capacity, Dr. Rizzoni would also enjoy Eleventh Amendment immunity.

As this court lacks subject-matter jurisdiction to hear Ms. Huang's state law claims against both Defendants,[4] the Court grants Defendants' motion pertaining to Ms. Huang's state law claims against Ohio State and Dr. Rizzoni.  Counts F, G, M, and N of Ms. Huang's complaint are therefore dismissed.

## B.  Plaintiff's Title VII Claims

Ms. Huang also brings suit against Ohio State, as her claimed employer, and Dr. Rizzoni, as her alleged supervisor, for violations of Title VII of the Civil Rights Act of 1964. (ECF No. 1 at 50.)  Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1); *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993).  Ms. Huang claims she experienced discrimination because of her sex, race, color, and national origin. (*Id.*)  Specifically, Ms. Huang alleges she suffered repeated sexual harassment by her supervisor, Dr. Rizzoni, and that Dr. Rizzoni's actions created a quid pro quo environment, where she was required to submit to his unwelcome advances to complete her PhD and secure employment with Ford. (*Id.*)  Ms. Huang further claims that she experienced retaliation for filing a complaint against Dr. Rizzoni by receiving limited and reduced access to the CAR building, suffering a delay in earning her PhD, denial of the benefits and privileges of participation in the CAR program, the opportunity to complete her PhD under Ford's auspices, and interference in securing employment with Ford. (*Id.* at 50–51, 53.)

---

[4] Ms. Huang, a resident of Columbus, Ohio and claimed Ohio State employee, also brings Michigan employment law claims against Dr. Rizzoni, a resident of Columbus, Ohio, and employee of Ohio State.  Ms. Huang provides no valid basis for the application of Michigan's employment law statutes. To the extent she wishes to bring state employment law claims against Dr. Rizzoni, she must do so under Ohio's employment law statutes.  As this Court lacks subject-matter jurisdiction to hear Ms. Huang's Ohio state law claims against Dr. Rizzoni, any Michigan employment law claims refiled as Ohio employment law claims would also be dismissed.  Therefore, Ms. Huang's Michigan employment law claims are also dismissed.

### 1. Title VII Claims Against Dr. Rizzoni

As an initial matter, the Court sua sponte raises the issue of whether Ms. Huang's Title VII claims against Dr. Rizzoni, as her purported employer, must be dismissed for lack of subject-matter jurisdiction. Title VII defines an employer as "a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person." 42 U.S.C. § 2000e(b). Though Title VII does not define "agent," the Sixth Circuit has interpreted "agent" as "an individual who 'serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment.'" *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803 (6th Cir. 1994)).

Upon further examination of Title VII, however, the Sixth Circuit concluded that, "the statutory scheme and remedial provisions of Title VII, convinces us that Congress did not intend to provide for individual employee/supervisor liability under Title VII." *Wathen*, 115 F.3d at 405. Therefore, "an individual employee/supervisor, who does not otherwise qualify as an 'employer' may not be held personally liable under Title VII." *Id.* at 404; *see also Akers v. Alvey*, 338 F.3d 491, 500 (6th Cir. 2003); *Hiler v. Brown*, 177 F.3d 542, 546 (6th Cir. 1999).

In the present case, Dr. Rizzoni, an individual Ohio State employee and Ms. Huang's alleged supervisor, does not satisfy the Title VII definition of "employer." The Court therefore finds that he cannot be held individually liable for Ms. Huang's Title VII claims. Accordingly, Ms. Huang's Title VII claims against Dr. Rizzoni are dismissed for lack of subject-matter jurisdiction.

## 2. Title VII Claims Against Ohio State

The Court now turns to Ms. Huang's Title VII claims against Ohio State. Ohio State insists that Ms. Huang cannot pursue her Title VII employment claims against the university, as her allegations relate to her degree-seeking activities as a student and not as an OSU employee. (ECF No. 12 at 136). Ohio State offers an abundance of case law in support of this contention, where courts in other circuits found allegations of protected activity concerned the plaintiff's status as a student and not as an employee warranted dismissal. *See, e.g., Stilley v. Univ. of Pittsburgh,* 968 F. Supp. 252, 261 (W.D. Pa. 1996) (holding all issues pertaining to completion of plaintiff's dissertation related to plaintiff's role as a student and not as employee).

Ms. Huang counters that courts in this circuit look at the economic relationship between the alleged employer and employee to determine an individual's employment status. *Ivan v. Kent State Univ.*, 863 F. Supp. 581, 585 (N.D. Ohio 1994) (concluding that a graduate student performing research was an employee where she had university contracts outlining her scope of employment and monetary compensation through a monthly graduate assistant stipend). Indeed, "this circuit employs an economic realties test to determine whether an employment relationship exists." *Lilley v. BTM Corp.*, 958 F.2d 746, 750 (6th Cir. 1992); *see also Armbruster v. Quinn,* 711 F.2d 1332, 1340 (6th Cir. 1983) ("[O]ne must examine the economic realities underlying the relationship between the individual and the so-called principal.")

Here, Ms. Huang alleges that she received an offer letter for a Graduate Research Associate position and a supplemental stipend for her research. (Compl. ¶ 31, ECF No. 1 at 10.) These are not "naked assertions devoid of further factual development." *Iqbal,* 556 U.S. at 697. Her allegations support an inference that although she was a PhD student, she separately obtained an employment position as a research assistant and received monthly compensation in that role.

Given the current procedural posture of this case, the Court must presume Ms. Huang's allegations to be true and permit discovery to shed further light on her employment status.[5]

As Defendants do not contend that Ms. Huang cannot proceed on her Title VII claims against it because she cannot establish the elements of a prima facie case of either discrimination or retaliation, Defendants' motion is denied as to Ms. Huang's Title VII claims against Ohio State.

### C. Plaintiff's Title IX Claims

Title IX of the Education Amendments of 1972 provides that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The duty not to discriminate on the basis of sex "encompasses a teacher's sexual harassment of a student." *Williams v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 366 (6th Cir. 2005). Here, Ms. Huang advances two Title IX claims against both Ohio State and Dr. Rizzoni for: 1) Dr. Rizzoni's creation of a sexually hostile environment that Ohio State was deliberately indifferent to, which denied Ms. Huang valuable educational and career benefits and opportunities and 2) retaliation for filing a complaint against Dr. Rizzoni by receiving limited and reduced access to the CAR building, suffering a delay in earning her PhD, denial of the benefits and privileges of participation in the CAR program, the opportunity to complete her PhD under Ford's auspices, and interference in securing employment with Ford. (ECF No. 1 at 48–49, 51–52.)

#### 1. Title IX Claims Against Dr. Rizzoni

Defendants argue that Dr. Rizzoni is not subject to personal liability under Title IX, because he is not a recipient of federal funding. (ECF No. 12 at 130.) Ms. Huang responds that

---

[5] The Court also notes that discovery should provide Ms. Huang's right to sue letter, which remains unaccounted for at this juncture.

she is suing Dr. Rizzoni in his official capacity and relies on the Supreme Court's decision in *Kentucky v. Graham* for the proposition that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." 473 U.S. 159, 166 (1985). (ECF No. 19 at 253, n. 7.) While this may be true in § 1983 cases, it bears no application in the Title IX context.[6]

While Ms. Huang may bring Title IX claims against Ohio State as an institutional recipient of federal funding, she cannot bring a cause of action under Title IX against an individual school official, such as Dr. Rizzoni. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) ("[Title IX] has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals."); *Stiles v. Grainger Cnty.,* 819 F.3d 834, 849 (6th Cir. 2016) ("Title IX authorizes suit only against a school itself and not individual administrators."); *Klemencic v. Ohio State Univ.,* 263 F.3d 504, 510 (6th Cir. 2001) ("Only recipients of federal funds may be liable for damages under Title IX.") (internal quotations and citations omitted). The Court therefore grants Defendants' motion to dismiss as to Ms. Huang's Title IX claims against Dr. Rizzoni.

### 2. Title IX Claims Against Ohio State

#### a) Deliberate Indifference

Ms. Huang's remaining deliberate indifference claim focuses on Ohio State's response to her complaint of sexual harassment. Ms. Huang contends that Ohio State failed to take appropriate action to address Dr. Rizzoni's misconduct, subjected her to a sexually hostile environment, and deprived her of educational and career opportunities. Ohio State challenges the sufficiency of Ms.

---

[6] Congress enacted Title IX under the Spending Clause. *Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613, 629 (6th Cir. 2019) (citing *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274 (1998)). In doing so, Congress used its spending power to attach specified conditions to the award of federal funds, and Title IX's contractual nature therefore defines the scope of available remedies. *Gebser,* 524 U.S. at 287. Furthermore, Ms. Huang's reliance on *Kentucky v. Graham* is misplaced, as that case, along with the Sixth Circuit's decision in *Alkire v. Irving,* 330 F.3d 802, 810 (6th Cir. 2003), which she also cites to, discusses the availability of Eleventh Amendment immunity in section 1983 cases, which is not at issue in a Title IX claim.

Huang's claim on the grounds that by alleging procedural defects, a failure to follow policy, or disagreeing with the outcome of procedures, Ms. Huang fails to state a plausible deliberate indifference claim. (ECF No. 12 at 133–34.)

Recipients of federal funding, such as Ohio State, may be held liable under Title IX when (1) they are deliberately indifferent to sexual harassment, (2) of which they have actual knowledge, (3) that is so severe, pervasive, and objectively offensive that it deprives the victims of access to the educational opportunities or benefits provided by the school. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999); *see Stiles,* 819 F.3d at 848 (6th Cir. 2016). In *Davis,* the Supreme Court plainly stated that a school "may not be held liable for damages unless its deliberate indifference 'subjects' its students to harassment." 526 U.S. at 644. The same standard applies, whether a case of student-on-student harassment case or teacher-on-student harassment. *Williams*, 400 F.3d at 367.

In *Kollaritsch v. Mich. State Univ. Bd. of Trs.*, the Sixth Circuit elaborated on *Davis's* causation requirement and held that "a student-victim plaintiff must plead . . . that the school's deliberate indifference to [sexual harassment] resulted in further actionable sexual harassment against the student-victim, which caused the Title IX injuries." 944 F.3d 613, 618 (6th Cir. 2019). The Sixth Circuit further declared that, "[a] student-victim's subjective dissatisfaction with the school's response is immaterial to whether the school's response caused the claimed Title IX violation." *Id.* Our superior court determined that, "Because none of the plaintiffs . . . suffered any actionable sexual harassment *after* the school's response, they did not suffer 'pervasive' sexual harassment as set out in *Davis* and they cannot meet the causation element." *Id.* The same holds true here.

In the present case, Ms. Huang claims that she was "subjected to physical sexual harassment that was so severe, pervasive, and objectively offensive that she was denied access to educational opportunities and benefits at OSU and through OSU's relationship with Ford." (Compl. ¶ 180, ECF No. 1 at 48–49.)  Noticeably lacking in Ms. Huang's complaint are any allegations that Ohio State's response to her complaint failed to protect her from any further sexual harassment perpetrated by Dr. Rizzoni.  Ms. Huang admits that her complaint triggered an investigation, that Ohio State suspended Dr. Rizzoni during its investigation, and that the university assigned her a new PhD advisor and candidacy exam committee.  Furthermore, nowhere in her complaint does Ms. Huang state that she and Dr. Rizzoni had any further contact after Ohio State responded to her allegations.

Ms. Huang has failed to adequately plead a deliberate indifference claim under Title IX, as she does not allege that she was subjected to further sexual harassment after notifying Ohio State of her complaint.  Any alleged "severe, pervasive, and objectively offensive" sexual harassment she experienced all occurred before she filed her complaint.  The Sixth Circuit requires that at least one additional incident "of [sexual] harassment after the school has actual knowledge and implements a response, is necessary to state a claim." *Kollaritsch*, 944 F.3d at 621.  Without this essential piece, Ms. Huang's claim falls short and is subject to dismissal.  As Ms. Huang does not plead the causation necessary to state a viable deliberate indifference claim under Title IX and as set forth in *Davis,* Defendants' motion is granted as to Ms. Huang's deliberate indifference claim against Ohio State.

### b) Retaliation

Title IX prohibits retaliation against a person who complains of sexual harassment. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74 (2005).  Here, Ms. Huang claims that

Ohio State retaliated against her for engaging in protected activity through adverse actions that deprived her of certain educational and career opportunities. Most notably, Ms. Huang was never reassigned to the Ford project. At this motion to dismiss stage, Defendants don't challenge the sufficiency of Ms. Huang's Title IX retaliation claim against Ohio State. It therefore survives Defendants' motion, which is consequently denied as to Ms. Huang's Title IX retaliation claim against Ohio State.

### D. Due Process Claim

Ms. Huang further claims that Dr. Rizzoni, in his personal capacity, deprived her "of her liberty and property without due process in violation of law under the Fourteenth Amendment to the United States Constitution and contrary to her rights protected by 42 U.S.C. § 1983." (Compl. ¶ 217, ECF No. 1 at 57.) Defendants argue that Ms. Huang's due process claim should be dismissed, because she fails to specify any deprivation of either a liberty or property interest. (ECF No. 12 at 137.) Defendants further submit that even if Ms. Huang's allegations are taken as true, Dr. Rizzoni is entitled to qualified immunity, because his alleged misconduct does not violate a clearly established, constitutionally protected interest. (*Id.* at 140.)

#### 1. Deprivation of a Right

To evade dismissal under Rule 12(b)(6) for a § 1983 claim, a plaintiff must plead facts supporting two elements: (1) a deprivation of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was caused by a person acting under color of state law. *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003). In her complaint, Ms. Huang pleads that Dr. Rizzoni, "used his OSU position, status, and authority to subject [her] to sexual harassment." (Compl. ¶ 216, ECF No. 1 at 57.) Ms. Huang further clarifies in her response

in opposition to Defendants' motion by stating that Dr. Rizzoni violated her substantive due process right to bodily integrity. (ECF No. 19 at 256.)

"[T]he existence of a constitutional right must be the threshold determination in any section 1983 claim." *Doe v. Claiborne Cnty.*, 103 F.3d 495, 509 (6th Cir. 1996). The Sixth Circuit has determined that a student has a right to bodily integrity, which is a deprivation of liberty "of the most fundamental sort." *Id.* at 507. Our superior court has emphasized that the "right to bodily integrity . . . encompasses the right not to be sexually assaulted under color of law." *Id.* Therefore, contrary to Defendants' arguments, Ms. Huang has identified a protected liberty interest. Her complaint alleges at length that her liberty interest in bodily integrity was deprived by Dr. Rizzoni's repeated instances of unwelcome advances, touching, and harassment.

Under § 1983, Ms. Huang must also allege that Dr. Rizzoni was acting under color of state law at the time of the events giving rise to her complaint. *Neuens v. City of Columbus*, 275 F. Supp. 2d 894, 900 (S.D. Ohio 2003). A state official "acts under color of law when he acts in performance of his official duties, whether he strictly adheres to those duties or oversteps the bounds of his authority." *Id.* (citing *Stengel v. Belcher,* 522 F.2d 438, 441 (6th Cir. 1975)). By alleging that Dr. Rizzoni used his position as a tenured professor at OSU to violate her right to bodily integrity, Ms. Huang has pled sufficient facts to support a plausible § 1983 claim.

### 2. Qualified Immunity

Next, the Court must determine whether Dr. Rizzoni is entitled to qualified immunity for his alleged misconduct. The doctrine of qualified immunity affords government officials protection "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982) (internal quotations omitted)).  Under the two-part qualified immunity test, courts must determine: 1) "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right," and 2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  *Id.* at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *see also Adams v. Ohio Univ.*, 300 F. Supp. 3d 983, 1001 (S.D. Ohio 2018).  These prongs may be addressed in either order.  *Doe v. Miami Univ.*, 882 F.3d 579, 604 (6th Cir. 2018).  If both prongs are not met, the government official is entitled to qualified immunity.  *Id.*

At the motion to dismiss stage, courts "review an assertion of qualified immunity to determine only whether the complaint 'adequately alleges the commission of acts that violated clearly established law.'" *Back v. Hall*, 537 F.3d 552, 555 (6th Cir. 2008) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  "A constitutional right is clearly established where its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right—in other words, where it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 900 (6th Cir. 2014) (internal quotation marks and citations omitted).  "To be clearly established, a right must have been decided by the United States Supreme Court, the Court of Appeals, or the highest court of the state in which the alleged violation occurred." *Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001).  As the Sixth Circuit Court of Appeals decided in *Doe v. Claiborne Cnty.*, 103 F.3d at 507, that there is "a clearly established right under the substantive component of the Due Process Clause to personal security and to bodily integrity," the Court finds that the right to bodily integrity is a clearly established constitutional right in this case.

The remaining inquiry is whether Ms. Huang has alleged facts which, taken as true, "describe a violation of a clearly established statutory or constitutional right of which a reasonable

public official, under an objective standard, would have known." *Adams*, 300 F. Supp. at 1002 (quoting *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 664 (S.D. Ohio 2016)). The Sixth Circuit has already supplied the answer to this inquiry, as it has firmly declared that "no rational individual could believe that sexual abuse by a state actor is constitutionally permissible under the Due Process Clause." *Doe v. Claiborne Cnty.*, 103 F.3d at 507. Taking Ms. Huang's allegations as true, no reasonable school official would have believed that subjecting her to sexual harassment was permissible. Because the law was clearly established at the time, and a reasonable official would have known as much, Dr. Rizzoni's request for qualified immunity for Ms. Huang's due process claim is denied.

### E. CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss under Fed. R. Civ. P. 12(b)(1) and (6) (ECF No. 12) is **GRANTED IN PART and DENIED IN PART.** The Motion to Dismiss is **GRANTED as to Count B (against both Defendants), Count C (against Dr. Rizzoni only), Count D (against Dr. Rizzoni only), Count E (against Dr. Rizzoni only), Count F (against both Defendants), Count G (against both Defendants), Count M (against Dr. Rizzoni), and Count N (against Dr. Rizzoni for alleged defamatory statements made to Ford) of Ms. Huang's complaint AND DENIED as to Count C (against Ohio State only), Count D (against Ohio State only), and Count H (against Dr. Rizzoni) of Ms. Huang's complaint.**

What survives Defendants' Motion to Dismiss are Ms. Huang's Title VII claims against Ohio State, her Title IX retaliation claim against Ohio State, and her due process claim against Dr. Rizzoni in his personal capacity. Ms. Huang's Title IX deliberate indifference claim against both Defendants, her Title IX retaliation claim against Dr. Rizzoni, her Title VII claims against Dr.

Rizzoni, and her state law claims against either or both Defendants are **DISMISSED WITH PREJUDICE**.

      **IT IS SO ORDERED.**

/s/ James L. Graham  
JAMES L. GRAHAM  
United States District Judge

DATE: February 3, 2020