IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MENG HUANG,

                Plaintiff,

    v.

THE OHIO STATE UNIVERSITY, *et al.,*

                Defendants.

**Case No. 2:19-cv-1976**

**Judge James L. Graham**

**Magistrate Judge Chelsey M. Vascura**

## OPINION AND ORDER

This case involves Plaintiff's allegations of sexual harassment by her Ph.D. advisor at The Ohio State University ("OSU" or "Ohio State"). Plaintiff alleges that after she refused her advisor's unwanted advances, he sabotaged her Ph.D. candidacy exam causing her to fail the exam, her removal from a graduate research project sponsored by the Ford Motor Company ("Ford"), the termination of her employment as a Graduate Research Associate and removal from the Ph.D. program. She alleges that her advisor's unwelcome advances constituted quid pro quo harassment, created a hostile work environment, violated her due process rights; and that Ohio State retaliated against her for filing a complaint against him.

This matter is before the Court for consideration of Defendants' Motion for Summary Judgment filed by Defendants The Ohio State University and Dr. Giorgio Rizzoni. (ECF No. 105.) For the reasons that follow, Defendants' motion is **GRANTED IN PART AND DENIED IN PART.**

## I.    FACTUAL BACKGROUND

Defendant Giorgio Rizzoni is a tenured professor of mechanical and aerospace engineering at Ohio State's College of Engineering. He is the Director of the College of Engineering's Center

1

for Automotive Research ("CAR"), and the Ford Motor Chair in Electromechanical Systems. He has advised over forty students to Ph.D. completion. (Defs.' Ex. C, Rizzoni Dep. 9, 27, ECF No. 105-3 at 5688, 5691.) Plaintiff is a citizen of the People's Republic of China. In December 2013, she emailed Rizzoni her curriculum vitae and expressed interest in pursuing her Ph.D. in the United States and joining Rizzoni's research team. (Pl.'s Ex. 1, ECF No. 114-3 at 6299–6300.) Rizzoni encouraged Plaintiff to apply to OSU's Mechanical Engineering Ph.D. program. (*Id.* at 6299.) After Plaintiff was tentatively admitted to the program in March 2014, she forwarded the status of her application to Rizzoni. (Pl.'s Ex. 3, ECF No. 114-5 at 6304–07.)

On April 4, 2014, Rizzoni sent Plaintiff a letter offering her the position of Graduate Research Associate at CAR for the Fall 2014 semester. (Pl.'s Ex. 2, ECF No. 114-4 at 6302.) The position provided a monthly stipend, full tuition and fees, and a supplemental stipend based on Plaintiff's academic credentials. (*Id.*) Plaintiff accepted Rizzoni's offer on May 3, 2014. (ECF No. 102-3 at 4996.)

The position offered was changed to Graduate Fellow in a subsequent letter sent on July 29, 2014, in which Rizzoni told Plaintiff that he was pleased to inform her that she had been selected as a "Graduate Fellow for the first two years of [her] studies (with the same stipend and benefits outlined in [her] original offer letter)." (ECF No. 98-3 at 3784.) Rizzoni additionally committed to adding "a supplement to your monthly stipend in the amount of 10%." (*Id.*)

Plaintiff matriculated to Ohio State for the Fall 2014 semester. Plaintiff claims that Rizzoni inappropriately touched her during their first meeting in Rizzoni's office at CAR in September 2014. (Compl. ¶ 33–34, ECF No. 1 at 11.)

Rizzoni assigned Plaintiff to a Ford-sponsored University Research Project (the "URP") on battery aging for electric vehicles as her Ph.D. research project. (Anderson Dep. 11–13, ECF

No. 76-1 at 659–61; ECF No. 98-1 at 3620–21.) Plaintiff's participation in the URP, required her to travel with Rizzoni and other students for project meetings in Dearborn, Michigan, and participate in bi-weekly WebEx meetings with Rizzoni and Ford personnel. (*See* ECF No. 98-3 at 3778; ECF No. 100-1 at 4250.)

Plaintiff claims that Rizzoni continued and intensified his inappropriate touching for the next three years during meetings at his office and his home, during car rides to and from Ford or other meetings, and at a public restaurant. According to Plaintiff, she was required to submit to Rizzoni's inappropriate touching to complete her Ph.D. program. (Compl. at ¶ 189.)

Rizzoni denies ever touching Plaintiff inappropriately, threatening her, or conditioning her success on her submission to physical contact with him. (ECF No. 99-1 at 4039.) Plaintiff did not report Rizzoni's alleged sexual harassment to anyone at Ohio State until December 12, 2017, after she failed her Ph.D. exam.

Plaintiff regularly met with Rizzoni for the first year and a half of their relationship, but Rizzoni began criticizing her performance as a Ph.D. candidate in 2016 when she allegedly failed to attend regularly scheduled meetings with him and began enrolling in courses unrelated to her Ph.D. program against his advice. (ECF No. 114-6 at 6333; ECF No. 114-10 at 6360.) Rizzoni gave Plaintiff unsatisfactory and incomplete grades in her mechanical engineering dissertation research course (ME 8999) for the Spring and Summer 2017 terms. (ECF No. 114-15 at 6375.) On August 1, 2017, Rizzoni terminated Plaintiff's supplemental stipend for the Fall 2017 semester alleging poor performance and "inattention to making progress towards her dissertation." (ECF No. 105-3 at 5773, 5769; ECF No. 114-16 at 6378.)

Plaintiff took her oral Ph.D. candidacy exam on December 8, 2017. (ECF No. 114-28 at 6420.) Following the exam, the committee members submitted detailed feedback on Plaintiff's

performance and voted unanimously to fail her. (ECF No. 105-8.)  Plaintiff claims that Rizzoni used his authority and reputation to manipulate the exam which resulted in her failure.  When Rizzoni notified Plaintiff of her failure, he also informed her that she was removed from the Ph.D. program and would not receive a second chance to take the exam. (ECF No. 102 at 4746–47; ECF No. 105-3 at 5795–96; ECF No. 114-32 at 6431.)  After entering Plaintiff's candidacy exam results, Rizzoni notified Ford on December 11, 2017, that she had failed the exam and would no longer be in the Ph.D. program. (ECF No. 114-26 at 6410.)

On December 12, 2017, Plaintiff reported Rizzoni's alleged misconduct to Vishwanath Subramaniam, then chair of Ohio State's Mechanical and Aerospace Engineering ("MAE") Department. (ECF No. 105-12 at 5974.)  Later that day, Subramaniam and a human resources employee met with Plaintiff, and she reported Rizzoni's alleged long-term sexual harassment and his alleged role in the failure of her Ph.D. candidacy exam.  (Subramaniam Dep. 13, ECF No. 95-1 at 2512; ECF No. 105-12 at 5974.)

Subramaniam was concerned that Plaintiff's "status as a legal student of the United States would [] come to an end at the end of that semester [December 2017]," and she would likely be deported. (ECF No. 95-1 at 2521.) Subramaniam decided to "intervene and ask the graduate school for permission to hold a second candidacy exam," thus preserving her status as a student at OSU. (*Id.*)  That request was granted, and Plaintiff was informed of the graduate school's decision. (ECF No. 105-12 at 5978.)

On December 13, 2017, Plaintiff filed a complaint with the OSU Title IX office. (ECF No. 102 at 4750–51.)  The university promptly commenced an investigation of Plaintiff's complaint.

On December 15, 2017, three days after Plaintiff first reported Rizzoni's misconduct, the MAE Department gave Plaintiff a new Graduate Research Associate position for the Spring 2018

semester, along with funding for her tuition and stipend. (ECF No. 95-1 at 2567.) This preserved Plaintiff's student status, avoided her deportation, and preserved the status quo pending the results of the university's investigation.

On December 18, 2018, Ohio State informed Rizzoni of Plaintiff's complaint, removed him from campus, and assigned him to home duty until the university completed its investigation. Ohio State informed Plaintiff of Rizzoni's suspension. (ECF No. 105-12 at 5974.)

Subramaniam assisted Plaintiff with finding a new advisor and a new candidacy exam committee. (ECF No. 95-1 at 2526.)

On January 5, 2018, Plaintiff submitted a forty-three-page complaint to OSU investigator, Jonathan Parry, entitled, "An Influential Professor? A Powerful Director? The Ford Chair at OSU? Another Harvey Weinstein!!!" (ECF No. 105-12.) Plaintiff's complaint contained multiple allegations of inappropriate touching in Rizzoni's office, in his car, at his home, and at other locations. (*Id.*)

On March 29, 2018, Ohio State released the report of its investigation of Plaintiff's complaint concluding that ". . . the greater weight of the evidence supports a finding of insufficient evidence that Respondent violated the university's Sexual Misconduct policy 1.15." (ECF No. 105-15 at 6138.) Rizzoni was permitted to return to campus and continued his work.

On March 23, 2018, while the investigation was pending, Plaintiff passed her Ph.D. candidacy exam. (ECF No. 114-1 at 6293.) Her graduation was delayed because she had not authored any peer reviewed journal publications. (ECF No. 105-16 at 6136.) That requirement was later waived, and she was permitted to graduate. (*Id.*) Plaintiff received her Ph.D. from Ohio State in December 2019. (*Id.* at 6137.) The termination of Plaintiff's academic relationship with Rizzoni ended her participation in the Ford URP, but Ford offered her employment as a battery

management and modeling research engineer, which she declined. (ECF No. 105-1 at 5540.) Ford also permitted Plaintiff to complete her Ph.D. dissertation research using its proprietary information. (ECF No. 87-3 at 2163.)

Plaintiff presently works in the United States as a senior battery system engineer. (ECF No. 102-1 at 4709–10.)

## II.     PROCEDURAL BACKGROUND

### A.     Motion to Transfer

This case was originally filed in the United States District Court for the Eastern District of Michigan on August 31, 2018.[1] (ECF No. 1.)  On November 11, 2018, Defendants filed their Motion to Dismiss, or in the Alternative, Motion to Transfer Case to United States District Court for the Southern District of Ohio. (ECF No. 12.)  On April 4, 2019, Plaintiff voluntarily dismissed several of her claims with prejudice. (ECF No. 25.)  On May 14, 2019, the Eastern District of Michigan granted Defendants' alternate motion and transferred the action to this Court. (ECF No. 26.)  In granting Defendants' alternate motion, the Eastern District of Michigan reserved judgment on the substantive bases for the motion, leaving Defendants' Motion to Dismiss under Fed. R. Civ. P. 12(b)(1) and (6) for this Court's consideration. (*Id.* at 431.)

### B.     Motion to Dismiss

On February 3, 2020, the Court granted Defendants' Motion to Dismiss in part and denied their motion in part. (ECF No. 38.)  Defendants' motion was granted in part as to Plaintiff's Title IX deliberate indifference claim against both Defendants, her Title VII quid pro quo, hostile work environment, and retaliation claims against Rizzoni, her Title IX retaliation claim against Rizzoni,

---

[1] On February 2, 2018, Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission. (ECF No. 1 at 39.)  On October 26, 2018, Plaintiff received her right to sue letter. (ECF No. 61-1 at 598.)

and her Michigan state law claims for sexual harassment, retaliation, tortious interference with a prospective contractual relationship, and defamation against Rizzoni.

### C.  Surviving Claims

Plaintiff's surviving claims are her Title VII quid pro quo, hostile work environment, and retaliation claims against Ohio State, her Title IX retaliation claim against Ohio State, and her due process claim against Rizzoni in his individual capacity.

### D.  Motion for Summary Judgment

On May 17, 2021, Defendants filed their motion for summary judgment.  It is fully briefed and ripe for adjudication.

## III.    STANDARD OF REVIEW

Defendants have moved for summary judgment on each of Plaintiff's claims under Federal Rule of Civil Procedure 56.  Under Rule 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt,* 586 F.3d 459, 465 (6th Cir. 2009).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record, "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

A district court considering a motion for summary judgment "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Revis v. Meldrum,* 489 F.3d 273, 279 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for

the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986); *see Dominguez v. Corr. Med. Servs.,* 555 F.3d 543, 549 (6th Cir. 2009). "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Revis,* 489 F.3d at 279–80 (quoting *Anderson,* 477 U.S. at 251–52).

"The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Rule 56(c) requires "[a] party asserting that a fact cannot be or is genuinely disputed [to] support [that] assertion by citing to particular parts of materials in the record." Thus, "the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Poss v. Morris (In re Morris)*, 260 F.3d 654, 665 (6th Cir. 2001) (cleaned up).

## IV.  DISCUSSION

### A. Plaintiff's Title VII Claims

Plaintiff claims that she was subjected to sexual harassment by her supervisor, Rizzoni, and that Ohio State retaliated against her, in violation of Title VII of the Civil Rights Act of 1964. (ECF No. 1 at 50.) Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Plaintiff claims sex discrimination based on quid pro quo harassment by Rizzoni, and his creation of a hostile work environment and that Ohio State retaliated against her after reporting his alleged harassment to university officials.

Plaintiff's Title VII claims are based on an alleged employment relationship with Ohio State.  Her Title VII claims based on her relationship as a student have been dismissed.  Courts have considered the dual role of graduate students as both students and university employees hired as teaching and research assistants, "carefully delineated between graduate students' academic activities and employment activities, and deemed them to be employees only with respect to what they do in employment." *Seaton v. Univ. of Pa.*, 2001 U.S. Dist. LEXIS 19780, at *24 (E.D. Pa. Nov. 30, 2001) (collecting cases); *see also Bucklen v. Rensselaer Polytechnic Inst.,* 166 F. Supp. 2d 721, 725 (N.D.N.Y. 2001) (refusing to "extend the parameters of Title VII to encompass purely academic decisions, such as the testing and qualification of doctoral students, that have only a tangential effect on one's status as an employee"); *Stilley v. Univ. of Pittsburgh of the Commonwealth Sys. of Higher Educ.,* 968 F. Supp. 252, 261 (W.D. Pa. 1996) (determining all issues pertaining to completion of plaintiff's dissertation related to plaintiff's role as a student and not as an employee); *Al-Maqablh v. Univ. of Cincinnati Coll. of Med.*, No. 1:11-cv-531, 2013 U.S. Dist. LEXIS 158365, at *26 (S.D. Ohio Nov. 5, 2013) (concluding that the dominant purpose of plaintiff's relationship with the university was educational and that "the undisputed evidence establishes that the University's decision to dismiss Plaintiff from the Graduate Program was an academic decision unrelated to Plaintiff's alleged employment with the University").

### i.    Plaintiff's Employment Status

The Sixth Circuit recognizes that "[t]he issue of an employment relationship can arise in numerous different scenarios [including those involving] a graduate student," *Bryson v. Middlefield Volunteer Fire Dep't, Inc.*, 656 F.3d 348, 355 (6th Cir. 2011) (citing *Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230 (11th Cir. 2004) and *Ivan v. Kent State Univ.*, 863 F. Supp. 581, 585 (N.D. Ohio 1994)), but "'has not addressed whether a graduate assistant is an 'employee' for

purposes of Title VII.'" *Al-Maqablh*, 2013 U.S. Dist. LEXIS 158365, at *22–23 (quoting *Ivan*, 863 F. Supp. at 585). Here, Ohio State concedes that Plaintiff was an employee in her status as a Graduate Research Associate, which began in late August 2017. (Bons Aff. ¶ 6, ECF No. 105-19 at 6189.) Prior to that, her status was a Graduate Fellow earning college credit and doing graduate research on the Ford-sponsored URP. (*Id.* at ¶ 5; ECF No. 98-3 at 3784.) Plaintiff has presented no evidence to the contrary.

Rizzoni first offered Plaintiff a position as a Graduate Research Associate for the Fall 2014 semester. (ECF No. 114-4 at 6302.) That changed in his letter of July 29, 2014, when he informed her that she had instead been:

> selected to be funded as a United States Department of Energy (US-DOE) Graduate Automotive Technology (GATE) Graduate Fellow for the first two years of your studies (with the same stipend and benefits outlined in your original offer letter) . . . Once your Fellow appointment ends, the remainder of your studies will be funded by research programs . . . During the first year, and thanks to the Fellowship, you will have the opportunity to take courses and to prepare for the Ph.D. Qualifying Exam. You will not have any specific research assignments, but you will participate in the meeting of my electrochemical energy storage systems research to become familiar with our research . . . Alex Bartlett, a senior Ph.D. student . . . will be your student mentor upon arrival. In time, I expect you to become a leader in your research field, and to take on the responsibility to serve as a mentor to younger students.

(ECF No. 98-3 at 3784.)

Plaintiff accepted these terms when she matriculated to Ohio State in the fall of 2014.

Rizzoni's letter outlines a purely academic relationship, not an employment relationship. It consists of an academic Fellowship devoted solely to learning experiences to be received by Plaintiff such as taking courses, studying, preparation for her Ph.D. qualifying exam, participating in meetings where the subject of her studies is discussed by graduate students and faculty members engaged in research projects, and mentoring by a senior Ph.D. student. It anticipates that she might later become a mentor for other students, but there is no evidence in the record that Plaintiff ever

did so. The study program included a stipend of $1,900 per month plus a 10% supplemental stipend. These payments are in the same category as an academic scholarship. There is no mention of living expenses. It is clear that education, not money, was at the core of this relationship.

In *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 323 (1992), the Supreme Court determined that, when Congress used the term "employee" in Title VII, it "intended to describe the conventional master-servant relationship as understood by common-law agency doctrine." *Id.* at 322-23.

The fundamental elements of a master-servant relationship under common-law agency doctrine are the rendering of service (work) for the employer, under the control of the employer, in exchange for compensation. *See* Restatement of Employment Law § 1.01 (2015). An employee is "[s]omeone who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance." Black's Law Dictionary (11th ed. 2019).

Here, Plaintiff was not obligated to perform any work or service for OSU. Any work she did was in pursuit of her own educational goals. The university set academic standards for the ultimate success of her studies, but that is not the kind of control contemplated by agency principles. She was in complete control of how to conduct her academic studies, the amount of time she devoted to them, and whether she read an assignment or attended a lecture or meeting.

The Court finds as a matter of law that Plaintiff was not employed by the university until she was appointed as a Graduate Research Associate in late August 2017.

### ii.    Quid Pro Quo Sexual Harassment Claim

To succeed on her quid pro quo sexual harassment claim, Plaintiff must show:

(1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) her refusal to submit to

11

the unwelcome demands resulted in an adverse employment action; and (5) liability may be imputed to the employer.

*Sanford v. Main St. Baptist Church Manor, Inc.*, 327 F. App'x 587, 596–97 (6th Cir. 2009).

To satisfy the fourth element, Plaintiff must establish (i) a tangible employment outcome, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," and (ii) that this outcome occurred because of her refusal to submit to Rizzoni's alleged unwelcome advances. *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998); *Sanford,* 327 Fed. App'x at 597 (6th Cir. 2009). "The terms 'tangible employment action' and 'adverse employment action' are interchangeable." *Keeton v. Flying J, Inc.*, 429 F.3d 259, 263 n.1 (6th Cir. 2005) (quoting *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461 n.5 (6th Cir. 2000)).

Defendants argue that Plaintiff cannot establish an adverse employment action, because any action taken against Plaintiff was with respect to her student status and not her employment with the university. Plaintiff counters that her refusal to submit to Rizzoni's unwelcome demands resulted in the loss of her supplemental stipend, removal from the Ford URP, and termination of her position as a Graduate Research Associate, which she claims were all employment-related decisions. The question is therefore whether these matters were components of her employment relationship or her student relationship. If any of these were components of her student relationship, they are not cognizable under Title VII.

### a. Plaintiff's Supplemental Stipend

In her capacity as a student, Plaintiff received stipends to help offset her educational costs. Her 10% supplemental stipend was cancelled on August 1, 2017, prior to her employment as a Graduate Research Associate. Stipends, like scholarships, are awarded to assist in academic

endeavors. (*See* ECF No. 105-19 at 6188–89.) This portion of Plaintiff's claim therefore fails as a matter of law because it is not employment related.

**b. The Ford-Sponsored University Research Project**

During the Fall 2014 semester, Rizzoni assigned Plaintiff the Ford URP as her dissertation research project. (Anderson Dep. 11–13, ECF No. 76-1 at 660–61.) Plaintiff received this assignment in her capacity as Graduate Fellow.[2] Plaintiff worked on this assignment on campus beginning in Spring 2015, at Ford as a visiting scholar during the summer of 2016, and as a paid Ford intern during the summer of 2017. (*Id.* at 660, 665, 672–75; ECF No. 98-5 at 3942.)

After Plaintiff completed her internship at Ford, she was appointed as a Graduate Research Associate in late August 2017. (ECF No. 105-19 at 6189.) The Ford URP was part of her dissertation research and not a part of her employment relationship with Ohio State. It predated her university employment as a Graduate Research Associate. Furthermore, Plaintiff's academic relationship with Rizzoni ended when she failed her initial Ph.D. candidacy exam, and it was the termination of that academic relationship that ended her participation in the Ford URP. *See Al-Maqablh v. Univ. of Cincinnati Coll. of Med.,* 2013 U.S. Dist. LEXIS 158365, at \*26 (finding that "the undisputed evidence establishes that the University's decision to dismiss Plaintiff from the Graduate Program was an academic decision unrelated to Plaintiff's alleged employment with the University.") Therefore, this portion of Plaintiff's claim also fails as a matter of law because it is not employment related. Finally, it should be noted that even though Plaintiff was no longer

---

[2] According to Ohio State's Graduate Handbook, "A graduate fellowship is a financial award made by the university or an external agency directly to a graduate student to provide support during a portion of the graduate degree program." https://gradsch.osu.edu/handbook/10-0-graduate-fellowships-graduate-fellowships-introduction (last visited Oct. 21, 2022).

permitted to participate in the Ford URP, she was permitted to continue and complete the dissertation research project which had been assigned to her in the Ford URP.

### c.  Plaintiff's Graduate Research Associate Position

Plaintiff was never actually terminated as a Graduate Research Associate.  *Keeton v. Flying J, Inc.*, 429 F.3d 259, 263 (6th Cir. 2005) ("We have decided that when an employer imposes an employment action that would be an adverse employment action but then quickly reverses the action, the employee has not suffered an adverse employment action."); *Bowman*, 220 F.3d at 462 ("Even if we assume that the loss of the [] position constitutes a significant change in employment status, there is no tangible employment action in this case because the very temporary nature of the employment action in question makes it a non-materially adverse employment action.")

According to Rizzoni's December 12, 2017, email to CAR staff members, Plaintiff's "appointment with CAR will end at the end of this semester," which indicated the end of the Fall 2017 semester. (ECF No. 84-5 at 1729.)  On December 15, 2017, the MAE Department gave Plaintiff a new Graduate Research Associate position for the Spring 2018 semester, along with MAE funding. (ECF No. 105-12 at 5974.)  According to Ohio State's 2017-2018 academic calendar, which the Court takes judicial notice of,[3] December 14, 2017, was the last day of Fall 2017 final exams, and the Spring 2018 semester began on January 8, 2018.  Thus, Plaintiff obtained funding for a Spring 2018 Graduate Research Associate position before the beginning of the Spring 2018 semester.

The undisputed record evidence shows that Plaintiff continued working as a Graduate Research Associate until she graduated from Ohio State in December 2019.  The Court therefore

---

[3] https://contactbuckeyelink.osu.edu/important-dates-calendar.pdf Courts may judicially notice facts which are "not subject to reasonable dispute" because they are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

finds as a matter of law that Plaintiff's Graduate Research Associate position was never actually terminated, and she did not suffer an adverse employment action as a result of Rizzoni's actions. *Bowman*, 220 F.3d at 462 (finding that "cases where the employment action, while perhaps being materially adverse if permanent, is very temporary [] do not constitute materially adverse employment actions.")

Because Plaintiff has failed to provide sufficient evidence to establish the fourth element of her claim that she suffered an adverse employment action, the Court grants summary judgment to Ohio State on Plaintiff's Title VII quid pro quo claim.

### iii.    Hostile Work Environment Claim—*Faragher/Ellerth* Defense

To establish a prima facie hostile-work-environment claim under Title VII, Plaintiff must show: "'(1) she was a member of a protected class; (2) she was subjected to unwelcomed harassment; (3) the harassment was based on sex[]; (4) the harassment created a hostile work environment; and (5) employer liability.'" *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 411 (6th Cir. 2021) (quoting *Ladd v. Grand Trunk Western R.R.*, 552 F.3d 495, 500 (6th Cir. 2009)).

The parties do not dispute that Plaintiff is a member of a protected class. But there are genuine disputes of material fact concerning whether the alleged harassment occurred and whether the harassment created a hostile work environment.

Ohio State has asserted an affirmative defense to Plaintiff's hostile work environment claim under the *Faragher/Ellerth* framework. *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004) ("[A]bsent [] a 'tangible employment action,' . . . the defense is available to the employer whose supervisors are charged with harassment."); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998). Here, the alleged sexual harassment did not culminate in an adverse employment action, hence the defense is available.

15

In *Faragher* and *Ellerth*, the Supreme Court was called upon to define the circumstances under which an employer should be held vicariously liable for the sexual harassment of a supervisory employee, which created a hostile work environment, but did not culminate in an adverse employment action.  The Court struck a balance by imposing strict liability subject to an affirmative defense.  It created this defense to fashion a rule which would further Title VII's "primary objective . . . not to provide redress but to avoid harm." *Faragher,* 524 U.S. at 806 (cleaned up).   To do this, the Supreme Court combined the EEOC's Title VII enforcement regulations requiring employers "to take all steps necessary to prevent sexual harassment from occurring . . . and give credit [] to employers who make reasonable efforts to discharge their duty" with "[t]he requirement to show that the employee has failed in a coordinate duty to avoid or mitigate harm." *Id.*

Summarizing the rule, the Supreme Court said:

> An employer may, for example, have provided a proven, effective mechanism for reporting and resolving complaints of sexual harassment, available to the employee without undue risk or expense. If the plaintiff unreasonably failed to avail herself of the employer's preventive or remedial apparatus, she should not recover damages that could have been avoided if she had done so. If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care, and if damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided.

*Id.* at 806–07.

The *Faragher/Ellerth* affirmative defense requires an employer to establish two elements by a preponderance of the evidence:1) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and 2) that plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer.  *Quinn v. Griffith*, 515 F. App'x 543, 547 (6th Cir. 2013) (cleaned up).  For the *Faragher/Ellerth* defense to apply, Ohio State must establish both prongs.  *Wyatt,* 999 F.3d at 414.

16

Plaintiff claims that genuine disputes of material fact exist concerning whether Ohio State failed to exercise reasonable care to prevent Rizzoni's sexually harassing behavior, whether Ohio State promptly investigated her complaint and corrected the harassing behavior, and whether Plaintiff reasonably delayed reporting Rizzoni's harassment.

### a. Reasonable Care to Prevent and Correct Promptly Sexually Harassing Behavior

The first element of the *Faragher/Ellerth* defense considers whether Ohio State had a "reasonable sexual harassment policy" and whether that policy "was effective in practice." *Id.* (cleaned up).

At the time of Plaintiff's allegations, Ohio State had a sixteen-page sexual misconduct policy, which defined and prohibited quid pro quo and hostile environment sexual harassment, and applied to all faculty, staff, students, student employees, graduate associates, appointees, volunteers, supplier/contractor, and visitors. (Defs.' Ex. M, ECF No. 105-13.)  This policy was widely available and required supervisors to report incidents of sexual harassment, permitted both informal and formal complaints, provided a mechanism for bypassing a harassing supervisor when making a complaint, and provided for training regarding the policy. (*Id.*)

The Sixth Circuit has held that an employer takes "measures to prevent sexual harassment by maintaining a reasonable sexual harassment policy, making this policy widely available, and having regular training on the policy." *Clark v. United Parcel Service, Inc.,* 400 F.3d 341, 348 (6th Cir. 2005).  The Sixth Circuit further commented that:

> While there is no exact formula for what constitutes a 'reasonable' sexual harassment policy, an effective policy should at least: (1) require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) and provide for training regarding the policy.
>
> *Id.* at 349–50.

It is apparent that during Plaintiff's matriculation and employment at Ohio State, the university had a sexual harassment policy in place which satisfies all of the above requirements. (ECF No. 105-13.)  The Sixth Circuit has emphasized that, "[t]he employer cannot merely have an anti-harassment policy; it must also disseminate or publicize it." *Collette v. Stein-Mart, Inc.*, 126 F. App'x 678, 685 (6th Cir. 2005).  Kristi Hoge, then team lead for OSU's employee relations team, testified that OSU's sexual misconduct policy was disseminated university wide via various communication mechanisms such as electronic newsletters. (ECF No. 97-1 at 3244.)

Plaintiff arrived at Ohio State during a time of intense concern and publicity about sexual harassment on college campuses in the aftermath of the July 2014 firing of the director of OSU's nationally famous marching band.[4]  Following the U.S. Department of Education's Office of Civil Rights' four-year review of Ohio State's handling of sexual harassment complaints, Ohio State entered into an agreement with the Office of Civil Rights ("OCR") to ensure proper Title IX compliance.[5]  (ECF No. 82-1 at 1005–06.)  The September 2014 OCR agreement required mandatory sexual harassment training for different categories and groups across the university. (*Id.* at 1033–34.)  Sexual harassment and the university's efforts to combat it remained the subject of constant publicity culminating in a forty-five-minute address by then Vice President Biden in September 2015 on the occasion of the "It's On US"[6] initiative's one-year anniversary and the university's announcement of its new Buckeye ACT program to combat sexual violence by raising

---

[4] https://www.thelantern.com/2014/07/ohio-state-fires-band-director-jonathan-waters/ (last visited Nov. 3, 2022); https://www.thelantern.com/2014/09/jonathan-waters-to-sue-ohio-state/ (last visited Nov. 3, 2022). "Pursuant to Rule 201(b), Courts have the power to take judicial notice of the coverage and existence of newspaper and magazine articles." *U.S. ex rel. Lam v. Tenet Healthcare Corp.,* 481 F. Supp. 2d 673, 680 (W.D. Tex. 2006) (citing *Washington Post v. Robinson,* 935 F.2d 282, 291 (D.C.Cir.1991) (allowing judicial notice of the existence of newspaper articles) and *Jackson v. Godwin,* 400 F.2d 529, 536 (5th Cir.1968) (finding that newspapers and magazines allowed in a prison carried extensive coverage of riots to the point where the district court could take judicial notice of such coverage)).

[5] *See also Waters v. Drake,* 222 F. Supp. 3d 582, 594–95 (S.D. Ohio 2016) (discussing OCR's compliance review of Ohio State's Title IX program and the resulting September 2014 agreement).

[6] *See* https://www.itsonus.org/ (last visited Nov. 3, 2022).

awareness and providing training and resources to students and the university community. (*Id.* at 1045.) The university made training available to each member of the university community during the fall of 2015 and each fall thereafter. (ECF No. 97-1 at 3274, 3282.) University-wide training notifications were electronically sent to all faculty, staff, and students, along with links to the applicable policies and training. (*Id.* at 3282.)

Plaintiff argues that Ohio State failed to exercise reasonable care to prevent the alleged sexually harassing behavior in this case, because the university did not implement mandatory training for its faculty and staff until 2017. Plaintiff offers no evidence to support this assertion. Instead, she claims that OSU investigator Jonathan Parry's deposition testimony shows that "Parry did not receive training on sexual harassment investigations prior to being assigned to investigate Huang's complaint." (ECF No. 114-1 at 6290.) The record evidence contradicts this assertion. When questioned about the training he received prior to the investigation, Parry responded that "some of the content was about sexual harassment investigations." (ECF No. 94-1 at 2210.)

Parry's testimony is consistent with Ohio State's then-applicable Sexual Misconduct policy mandate that "Investigators will be trained to resolve cases of alleged sexual misconduct and will be familiar with applicable policies and procedures." (ECF No. 105-13 at 6085.) Then OSU Title IX Coordinator, Kellie Brennan, also testified that Ohio State provided multiple Office of Civil Rights-approved training sessions to its investigation teams on topics such as sexual harassment and sexual violence and skill-building around investigatory practices. (Brennan Dep. 30, 34, 44, ECF No. 82-1 at 998, 1002, 1012.) Finally, there is nothing in Parry's thorough and articulate report which exhibits any defects which might be related to inadequate training.

Plaintiff cites Rizzoni's deposition testimony where he said he did not "believe that the University required us to go through formal [documented] training" before 2017. (ECF No. 98-1

19

at 3542.)  Defendants point out that Rizzoni also said that well before 2017, he was aware of OSU's sexual harassment policy, and he participated in informal training sessions "in administrative meetings [where] [i]t was clear that the University had a policy on sexual harassment and generally speaking we, the faculty and the staff at the University, understood the basic significance of sexual harassment." (*Id.* at 3543.)

Rizzoni says that he understood during these meetings "that anything that could be . . . pursued or portrayed as being a form of harassment towards an individual related to things such as unwanted sexual advances and the like, [and it] was not an appropriate behavior, not an accepted and tolerated behavior." (*Id.*)  Brennan also testified that she "engage[d] in training broadly across the University" [,] "train[ed] faculty and staff departments, [and] student organizations" [and] "offer[ed] a general sexual harassment training that was open to any member of the University that was regularly scheduled." (ECF No. 82-1 at 1036.)

Hoge further testified that "the university set forth [annual] training that was made available to every single member of the community." (ECF No. 97-1 at 3274.)  Hoge also stated that all students, faculty, and staff received notice of their responsibilities regarding the sexual misconduct policy and links to available training.  (*Id.* at 3282.)  The sexual misconduct policy additionally listed sexual misconduct training resources for faculty, staff, and student employees. (ECF No. 105-13 at 6091.)

In light of all of the above, the Court finds as a matter of law that Ohio State had a reasonable and effective policy in place when Plaintiff reported Rizzoni's sexually harassing behavior.

Plaintiff claims that OSU's policy was ineffective in practice.  The first prong of the *Faragher/Ellerth* defense "ensures that an employer will not escape vicarious liability if it was

aware of the harassment but did nothing to correct it or prevent it from occurring in the future." *Clark v. UPS*, 400 F.3d at 349 (cleaned up). Plaintiff has produced no evidence that Ohio State received any information about Rizzoni's alleged sexual harassment of Plaintiff prior to her December 12, 2017, complaint or that it had ever received any information that he might engage in or had ever engaged in such conduct. Only a few days after receiving Plaintiff's complaint, OSU removed Rizzoni from campus. Plaintiff offers no evidence that she was subjected to further sexual harassment by Rizzoni during that brief interval or any time thereafter. (*See* ECF No. 114 at 6265.) Rizzoni was not permitted to return until after the university completed its investigation three months later.

Plaintiff argues that Ohio State failed to promptly investigate her complaint, because it did not issue its investigative report until March 29, 2018, more than three months after Plaintiff's initial complaint. Plaintiff offers nothing to support her assertion that this time period was unreasonable under the circumstances.

The record reflects that Ohio State issued a thirty-seven-page investigative report concerning the allegations Plaintiff submitted in a forty-three-page complaint. The university interviewed thirty-nine witnesses and reviewed "extensive email documentation, text messages, and written statements submitted by Complainant and Respondent" before issuing its March 29, 2018, report. (ECF No. 114-6 at 6309–10.) The Court finds that Plaintiff has failed to establish a genuine dispute of material fact as to whether OSU took reasonable care to promptly investigate her allegations.

The Court finds that Plaintiff has failed to produce evidence upon which a jury could reasonably find that Ohio State did not have a proven, effective mechanism in place for adequately addressing Plaintiff's complaint of Rizzoni's sexually harassing behavior. *See Wathen v. Gen.*

*Elec. Co.*, 115 F.3d 400, 407 (6th Cir. 1997) (finding the employer's response adequate where the "response put an end to the behavior of which plaintiff complained" because the plaintiff "admit[ted] that there were no incidents of sexual harassment after she made her complaint"); *Kauffman v. Allied Signal*, Inc., 970 F.2d 178, 184 (6th Cir. 1992) ("[A]gency liability is not strict and can be negated if the employer responds adequately and effectively once it has notice of the actions."). Though Plaintiff may disagree with the outcome of Ohio State's investigation, a "plaintiff's dissatisfaction with the investigation does not justify her rejection of the corrective action taken." *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 457 (6th Cir. 2008).

An employer satisfies the first element of the *Faragher/Ellerth* defense "when it has promulgated and enforced a . . . harassment policy." *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 275 (6th Cir. 2009).  Ohio State has therefore satisfied the first prong of the *Faragher/Ellerth* defense as a matter of law.

### b. Whether Plaintiff Unreasonably Delayed Reporting Rizzoni's Harassment to OSU

The second element of the *Faragher/Ellerth* defense considers whether an employee "unreasonably failed to take advantage of any preventative or corrective measures" the employer provided. *Wyatt,* 999 F.3d at 415.  The Sixth Circuit considers "how and when a plaintiff uses the company's existing corrective and protective measures." *Id.* at 416 (citing *Thornton*, 530 F.3d at 457) (concluding that a plaintiff acted unreasonably in part because after years of escalating harassment, she did not report the harassment until two months after taking a leave of absence); *EEOC v. AutoZone, Inc.*, 692 F. App'x 280, 216 (6th Cir. 2017) (concluding that a plaintiff unreasonably failed to take advantage of corrective opportunities when she waited two months to report harassment and her allegations were vague and nonspecific).

In the instant case, Plaintiff waited over three years to report the alleged sexual harassment that began when she first visited Rizzoni's office in 2014.

In her response in opposition to Defendants' Motion for Summary Judgment on the grounds that she unreasonably failed to avail herself of the university's protective and corrective measures, Plaintiff claims that "issues of material fact exist as to the reasonableness in [her] delay in reporting the sexual harassment," because "Rizzoni repeatedly told [her] that if she did not succumb to his demands to meet in person, her employment with OSU would end." (ECF No. 114 at 6266) (citing ¶ 38, ECF No. 114-1 at 6279.)  Plaintiff's citation states that:

> On September 21, 2016, Rizzoni emailed Huang to accuse her of 'never being around CAR', talking to Ford about employment without consulting with him, being the worst student he had ever had because she wouldn't listen to him, threatened to terminate her funding, and called her 'a negative burden' on him. (OSU 15401 – 15403, attached as Exhibit 8). Rizzoni then forwarded this unprofessional and unsubstantiated email to John Kabat, Maryn Weimer, and Lori Herman. *Id.* Rizzoni also stated his students usually treat him like a god. *Id.*
>
> (ECF No. 114-1 at 6279.)

The only evidence Plaintiff offers in support of her allegation is an email Rizzoni sent on September 21, 2016. (ECF No. 114-10 at 6360.)

As the Sixth Circuit and other courts have repeatedly recognized, "[a] district court is not required to 'search the entire record to establish that it is bereft of a genuine issue of material fact.'" *Emerson v. Novartis Pharm. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) (quoting *Street*, 886 at 1479–80). "'[J]udges are not like pigs, hunting for truffles' that might be buried in the record." *Emerson*, 446 F. App'x at 736 (quoting *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991)); *see also Dibrell v. City of Knoxville, Tenn.*, 984 F.3d 1156, 1163 (6th Cir. 2021).  Thus, the Court will limit its analysis to Rizzoni's September 21, 2016, email, which reads:

**From:** Giorgio Rizzoni <​███████​>
**Date:** Wednesday, September 21, 2016 at 6:51 AM
**To:** "Huang, Meng" <​███████​>
**Cc:** Giorgio Rizzoni <​███████​>
**Subject:** update

Meng:

You have disappeared. After you returned I asked you to prepare a summary so we can start writing a paper, and you have not done it yet, a month later.

You are never around CAR, and yesterday afternoon you missed a spectacular seminar by Prof. Kim.

You have enrolled in 4 classes in spite of my advice to you against taking any more classes (repeatedly in the past year). I can understand the electrochemistry class, which I suggested you take when you first arrived, and which you did not complete, against my advice, at the time. At this rate, you will never be ready for the candidacy exam. You have really not understood what it means to be a PhD student, and how fortunate you are to have funding for your studies. Since you are never at CAR we never have a chance to talk, and you never ask for advice anyway – you just go on doing whatever you want.

I am not sure why you are talking to Ford about employment without consulting with your advisor. But I suppose it does not matter because you do not understand what advice means anyway.

I thought that you had started showing signs of maturing and of understand what it means to be a PhD student, but you clearly have not.

Of all the PhD students I have advised in my career (~40), you are positively the worst PhD student I have ever advised. Primarily, because you do not listen to advice.

I am not sure what is going through your head, but if you continue living your life as if graduate student support falls from the sky and you can do whatever you want, we will quickly terminate this relationship.

I have already explained of all these things to you multiple times, but you seem to not have the ability to listen to me. My other (11) PhD students are all great partners who help me as I help them. You are a net negative burden on me, because you cost me money and give back nothing.

Do not reply to this email. The next time we speak in person.

GR

(ECF No. 114-10 at 6360.)

Obviously, a single email does not demonstrate repetition, as repetition "is the act of repeating, or doing, saying, or writing something again."

https://www.dictionary.com/browse/repetition (last visited Oct. 21, 2022). Accordingly, the Court will limit its analysis to Plaintiff's one alleged threat of retaliation.

This email contemplates that the subject matter will be discussed "in person" but it makes no demands for any private meetings with Plaintiff. It has no sexual innuendo, it is not personal, it is strictly confined to academic concerns and the probable consequences of Plaintiff's failure to fulfill the requirements of a Ph.D. program. It does not express any feelings of affection or desires for a personal or intimate relationship or anger or resentment for the absence or rejection of such contact. It is not by any stretch of the imagination a credible threat of retaliation for the refusal of

unwanted sexual advances or for reporting sexual harassment. "[A]n employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment." *Gallagher*, 567 F.3d at 276 (cleaned up); *Minarsky v. Susquehanna Cty.*, 895 F.3d 303, 315 (3d Cir. 2018) (citing *Pinkerton v. Colo. Dep't of Transp.,* 563 F.3d 1052, 1063 (10th Cir. 2009) (collecting cases finding that a generalized fear did not excuse a two-to-four-month delay in reporting harassment).  Among these courts is the Sixth Circuit, where the *Thornton* panel found that a two-month delay in reporting sexual harassment was unreasonable when there were "available and preventive measures to avoid harm." 530 F.3d at 457.

It is noteworthy that Ohio State's sexual misconduct policy has an anti-retaliation provision, an anonymous hotline for reporting any sexual misconduct, and offers confidentiality to the extent possible[7] for information received in connection with the filing, investigation, and resolution of sexual misconduct allegations. (ECF No. 105-13 at 6084.)  The confidentiality provision also references a resources list of confidential support, non-confidential support, and medical resources. (*Id.*)  Plaintiff knew or should have known that she had valuable resources to protect herself from the kind of abuse she alleges, but she failed to avail herself of those resources.

Ohio State provided international students sexual harassment awareness training on their rights and the resources available to protect them against sexual harassment. (ECF No. 82-1 at 1128–29.)  *See Ellerth*, 524 U.S. at 765 ("any unreasonable failure to use any complaint procedure provided by the employer … will normally suffice to satisfy the employer's burden").  Plaintiff's forty-three-page document entitled "An Influential Professor?  A Powerful Director?  The Ford

---

[7] The policy notes certain exceptions such as "except when necessary to conduct an appropriate investigation, to provide assistance and resources to complainants, to perform other appropriate university functions, or when the university is required to provide information under law." (ECF No. 105-13 at 6084.)

Chair at OSU? Another Harvey Weinstein!!!" demonstrates her ability to forcefully advocate her objections to sexual harassment and her awareness that American society will not tolerate it, even when committed by persons who occupy positions of great power or influence. (ECF No. 105-12.)

Plaintiff was present on campus in the fall of 2014 during a firestorm of publicity in the aftermath of the university's firing of its nationally famous marching band director for tolerating a culture of sexual harassment in the band and in the fall of 2015 when the Vice President of the United States spoke on campus on the occasion of the university's initiative to combat sexual harassment.[8] Yet she chose to remain silent about her alleged abuse, choosing instead to tolerate it to get her Ph.D., and move on, thereby exposing the female students behind her to the risk of abuse by an individual she compared to the disgraced entertainment mogul Harvey Weinstein. *See Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 268 (4th Cir. 2001) ("Little can be done to correct this objectionable behavior unless the victim first blows the whistle on it.") "Allowing subjective fears to vitiate an employee's reporting requirement would completely undermine Title VII's basic policy 'of encouraging forethought by employers *and* saving action by objecting employees.'" *Id.* (quoting *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 764 (emphasis added)).

Some courts have expressed serious reservations about whether a fear of retaliation should be an excuse for failing to report sexual harassment. *See, e.g., Adams v. O'Reilly Auto., Inc.,* 538 F.3d 926 (8th Cir. 2008); *Matvia v. Bald Head Island Mgmt.,* 259 F.3d 261 (4th Cir. 2001).

In *Thornton,* the Sixth Circuit said, subjective fear is not enough. 530 F.3d at 457. In *Gallagher*, the Sixth Circuit said that unsubstantiated hearsay that others who use a hotline to

---

[8] *See, e.g.,* https://www.thelantern.com/2015/09/vice-president-joe-biden-addresses-sexual-assault-prevention-during-ohio-state-visit/ (last visited Nov. 3, 2022), which the Court takes judicial notice of pursuant to Fed. R. Evid. 201(b).

report sexual harassment were fired was not sufficient to raise a genuine dispute of material fact. 567 F.3d at 276.

The only cases in which the Sixth Circuit has considered threats of retaliation sufficient to raise genuine disputes of material fact regarding the second element of the *Faragher/Ellerth* affirmative defense are *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400 (6th Cir. 2021) and *Shields v. Fed. Express Customer Info. Servs.*, 499 F. App'x 473 (6th Cir. 2012).

In *Wyatt,* the plaintiff's supervisor made threats of adverse employment actions immediately after she rebuffed his sexual advances in a hotel room reminding her that "to move up at Nissan, . . . it's not about what you know, it's who you know" and that Wyatt "need[ed] somebody like [Mullen] on [her] corner." 999 F.3d at 416.  This coupled with the fact that this supervisor had previously swiftly removed her from a desirable job project after she complained about his advances was held sufficient to raise genuine disputes of material fact regarding the reasonableness of Wyatt's failure to make a formal complaint to her employer. *Id.*

In *Shields,* one of the plaintiffs told her harasser that she intended to report his harassment to the employer, and he responded, "It wouldn't be in your best interest; you wouldn't have a job." 499 F. App'x at 483.  The Sixth Circuit found that this harasser had made credible threats of physical violence and that "a jury reasonably could find that the plaintiffs' safety concerns justified their failure to initiate complaints against [their harasser]." *Id.*  The instant case is clearly distinguishable from *Wyatt* and *Shields*.

Here, there is no evidence that Plaintiff ever threatened to report Rizzoni's alleged misconduct, nor is there any evidence that she ever resisted or complained to him, so it is not surprising that there is no evidence that he ever threatened her with retaliation for resisting or reporting his actions.  Construing the evidence in the light most favorable to Plaintiff, it might

support a finding that she had a subjective fear of retaliation, which under controlling law of this circuit is not sufficient to justify her failure to report the alleged misconduct to OSU.

Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, the Court finds as a matter of law that Plaintiff's failure to report Rizzoni's alleged harassment before December 2017 was unreasonable.

Though Plaintiff claims she endured Rizzoni's unwanted advances for the purpose of obtaining her Ph.D. degree, "the calculus changes when the reasonableness of [Plaintiff's] silence is scrutinized with an eye toward whether the law should hold [Ohio State] liable for" Rizzoni's alleged offensive conduct "[w]here, as here," Ohio State "had no knowledge of [the alleged] misconduct" until years after the first alleged incident. *Deters v. Rock-Tenn Co.*, 245 F. App'x 516, 526 (6th Cir. 2007).

Because Ohio State took prompt and effective action in investigating Plaintiff's complaint and putting Rizzoni on administrative leave, "[t]hese facts create a 'strong inference' that [Plaintiff was] unreasonable in not invoking [Ohio State's] complaint procedure sooner." *Crawford v. BNSF Ry. Co.*, 665 F.3d 978, 985 (8th Cir. 2012) (quoting *Adams v. O'Reilly Auto., Inc.*, 538 F.3d 926, 932 (8th Cir. 2008)). Furthermore, Plaintiff has pointed to no record evidence of prior retaliation or threats of retaliation at Ohio State for reporting harassment, which also supports an inference of unreasonable delay. *See Crawford,* 665 F.3d at 985.

The Court therefore concludes that Plaintiff has failed to produce evidence which would support a jury finding that Ohio State has failed to show by a preponderance of the evidence that Plaintiff's failure to take advantage of its protective and corrective measures was unreasonable. Ohio State has therefore satisfied both prongs of the *Faragher/Ellerth* affirmative defense to employer liability on Plaintiff's hostile work environment claim as a matter of law. Accordingly,

the Court grants summary judgment to Ohio State on Plaintiff's Title VII hostile work environment claim.

### iv. Title VII Retaliation Claim

Plaintiff brings retaliation claims against Ohio State under Title VII of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972. The same legal framework applies to both claims. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 (6th Cir. 2013), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. 338 (2013). The Court focuses first on Plaintiff's Title VII retaliation claim.

To establish a prima facie case of retaliation under Title VII, a plaintiff must show: "(1) she engaged in a protected activity; (2) her exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 568 (6th Cir. 2019) (cleaned up). If a plaintiff establishes a prima facie case, the burden of production shifts to the defendant "to proffer some legitimate, nonretaliatory reasons for its actions." *EEOC v. New Breed Logistics,* 783 F.3d 1057, 1066 (6th Cir. 2015) (cleaned up). If the defendant proffers such reasons, the burden of persuasion shifts back to the plaintiff "to show that the proffered reasons were not the true reasons for the employment decision, *i.e.*, that the reasons were a pretext for retaliation." *Id.* (cleaned up).

The parties do not dispute the first and second elements. Therefore, Plaintiff's retaliation claim rests on whether she can establish that she was subjected to a materially adverse action, and if so, whether a causal link exists between her protected activity and the adverse action.

A materially adverse action involves any conduct "that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Hawkins v. Anheuser-Busch,* Inc., 517 F.3d 321, 345 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

Plaintiff argues that a reasonable jury could infer that Defendants' conduct would likely deter someone from engaging in protected activity.  Here, Plaintiff's first statutorily protected activity[9] was reporting Rizzoni's alleged sexual harassment to Subramaniam and an OSU human resources employee on December 12, 2017.  The Sixth Circuit has "interpreted protected activity broadly to include complain[ts] to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices.'" *Simpson*, 359 F. App'x at 571 (quoting *Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 579 (2000)).  "[C]omplaints to human resources personnel regarding potential violations of Title VII constitute protected activity . . . ." *Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc.*, 495 F. App'x 651, 655 (6th Cir. 2012).

Plaintiff claims that the adverse actions she experienced under her Title VII retaliation claim were loss of her stipend compensation until additional funding and support were secured and removal from the Ford URP.  In support of this claim, Plaintiff cites Rizzoni's deposition testimony describing Plaintiff's exam failure and his December 11, 2017, decision to not allow her a second chance, which resulted in Plaintiff no longer being in the graduate program. (ECF No. 100-1 at 4251.)  As a further result of that decision, Plaintiff was no longer a Graduate Research Associate working on the Ford URP. (*Id.*)  Plaintiff also cites to Rizzoni's email to Lori Herman at Ford informing Herman that he "fired" Plaintiff. (ECF No. 114-25 at 6403.)

---

[9] "Title VII prohibits retaliation against an employee because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing in connection with an allegedly unlawful employment practice."  *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 570 (6th Cir. 2009) (cleaned up).

The undisputed record evidence shows that Plaintiff did not engage in protected activity until December 12, 2017, the day after Rizzoni made the December 11, 2017, decision to not allow her to retake the Ph.D. candidacy exam, which resulted in Plaintiff's removal from the graduate program and the Ford URP. Plaintiff admits that "Professor Rizzoni made the decision to remove me from the URP prior to the date I officially filed the complaint." (ECF No. 105-1 at 5615.) To meet her prima facie burden, Plaintiff must establish that an adverse action was taken against her "subsequent to engaging in protected activity," and she has failed to do so here, as the alleged adverse action was taken before she complained about Rizzoni's conduct and not afterwards. *Fuhr*, 710 F.3d at 676. Moreover, Plaintiff fails to point to any record evidence establishing that her stipend compensation was delayed in any manner following her complaint about Rizzoni. Plaintiff's Title VII retaliation claim therefore fails as a matter of law, and the Court grants summary judgment to Ohio State on this claim.

### B. Title IX Retaliation Claim

Similarly, a plaintiff alleging a Title IX retaliation claim must show "that (1) she engaged in protected activity, (2) the funding recipient knew of the protected activity, (3) she suffered an adverse school-related action, and (4) a causal connection exists between the protected activity and the adverse action." *Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020) (cleaned up).

Plaintiff claims several adverse school-related actions concerning her Title IX retaliation claim against Ohio State, some allegedly committed by Rizzoni and others by Ohio State. But as the Supreme Court noted in *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 283 (1998), while "agency principles guide the liability inquiry under Title VII," by contrast, "Title IX contains no comparable reference to an educational institution's 'agents,' and so does not expressly call for application of agency principles." Moreover, "it would frustrate the purposes of Title IX to permit

a damages recovery against a school . . . based on principles of respondeat superior or constructive notice." *Id.* at 285.  The Sixth Circuit has therefore declined to "impute[] the discriminatory animus of another to the funding recipient," because it "is inconsistent with Title IX principles requiring that a funding recipient be held liable 'only for its own misconduct.'" *Bose,* 947 F.3d at 994 (quoting *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999)).[10]  Therefore, any alleged retaliation by Rizzoni is not a cognizable Title IX claim against Ohio State.

"To qualify as 'adverse,' an educational action must be sufficiently severe to dissuade a 'reasonable person' from engaging in the protected activity."  *Gordon v. Traverse City Area Pub. Sch.*, 686 F. App'x 315, 320 (6th Cir. 2017).  Ohio State maintains that Plaintiff fails to show that it took any adverse school-related actions after Plaintiff first complained about Rizzoni on December 12, 2017.

### i.  Actions Relating to Ph.D. Exam and Ford URP

Plaintiff first alleges that she suffered materially adverse actions, because she had to wait an additional semester to graduate, a permanent mark remains on her academic record for failing her first Ph.D. candidacy exam, and she lost the prestige of working on the Ford URP and publishing in conjunction with the project.  But these claimed adverse actions are all consequences of Plaintiff's December 11, 2017, Ph.D. candidacy exam failure and not the result of any actions taken by Ohio State after Plaintiff first complained about Rizzoni on December 12.

Though Plaintiff admitted that Rizzoni removed her from the Ford URP prior to filing her complaint, she claims that the adverse impact of that decision continued even after filing her complaint.  (ECF No. 102-2 at 4868.)  When questioned about it during her deposition, she stated

---

[10] In her response in opposition to Defendants' motion, Plaintiff also recognizes "While an educational institution is not liable under Title IX for its teacher's retaliatory actions, it is liable for the institution's retaliatory actions." (ECF No. 114 at 6267) (citing *Bose,* 947 F.3d at 990.)

"as a consequence, I was deprived of the chances and access to continue working on the project and the access to keep the connection with Ford engineers for discussions on research. That caused [] a loss for my progress in this research field and jeopardize[d] my prospective of employment with Ford Motor Company." (*Id.* at 4867.)

Not only was Plaintiff removed from the Ford URP prior to filing her complaint, which does not satisfy the requirement that an action be taken subsequent to the protected activity, but Plaintiff has also failed to demonstrate an "injury or harm, which is a fundamental requirement for demonstrating retaliation." *Garner v. Cuyahoga Cty. Juvenile Court*, 554 F.3d 624, 640 (6th Cir. 2009) (citing *Burlington*, 548 U.S. at 67).  Plaintiff claims that she lost progress in her research field, but she fails to articulate how she was damaged.  Plaintiff also claims that her removal from the Ford URP jeopardized her prospective employment with Ford, but the undisputed record evidence shows that Plaintiff was offered an engineering position with Ford, and that she turned it down for another engineering position in the United States.  Any alleged harm is therefore speculative in nature and contradicted by the evidentiary record before the Court, and "[u]nder Rule 56, this type of speculation cannot survive summary judgment." *Cline v. Dart Transit Co.*, No. 5:18CV0258, 2021 U.S. Dist. LEXIS 81902, at *23 (N.D. Ohio Apr. 29, 2021) (citing *Arendale v. City of Memphis,* 519 F.3d 587, 605 (6th Cir. 2008) (a plaintiff cannot survive summary judgment based on conjecture or conclusory allegations).

### ii.    Reduced Student Access to the CAR Building

Plaintiff also takes issue with her reduced student access to the CAR building.  Plaintiff claims that when she went to retrieve her belongings from the CAR building after business hours on the evening of December 21, 2017, she swiped her student ID card and was denied entry. (ECF No. 105-12 at 5974.)  Plaintiff contacted campus police to enter the building and gather her

personal belongings. (*Id.*)  Ohio State contends that not only was Plaintiff's access restricted by Rizzoni and any alleged discriminatory animus cannot be imputed to OSU, but that Plaintiff's building access was removed immediately after she failed her Ph.D. exam and before she filed her complaint and therefore cannot constitute a Title IX retaliatory act as it was not taken subsequent to Plaintiff's protected activity.

According to Rizzoni, Plaintiff's building access was removed on December 11, 2017, after she failed her Ph.D. candidacy exam and was no longer a CAR student. (ECF No. 114-32 at 6431.)  When asked whether her CAR access was limited immediately upon no longer being a CAR student, Plaintiff responded:

> I have no idea on which exactly date Professor Rizzoni instructed the CAR facility staff who was in charge of the access to make the change to limit my access, the full access I used to have prior to candidacy exam. I found my full access to CAR office building was changed. I found this out in late December 2017.

(ECF No. 102-2 at 4871.)

Plaintiff acknowledges that her building access changed after she failed her Ph.D. exam and was no longer a CAR student, but she also admits that she does not know when the action took place.  Plaintiff's testimony also reflects that she did not attempt to access CAR after hours until December 21, 2017.  Plaintiff therefore cannot to point to any record evidence creating more than a metaphysical doubt as to whether her building access was restricted before or after she complained on December 12, 2017.  As such, Plaintiff has not met her burden at summary judgment to put forth evidence creating a genuine dispute of material fact that this action was taken after she engaged in protected activity.  Moreover, Plaintiff agrees that this action was initiated by Rizzoni after Plaintiff failed her Ph.D. candidacy exam and not by Ohio State.  The Court therefore finds as a matter of law that Plaintiff has not met her prima facie burden of establishing that an adverse educational action was taken against her by Ohio State.

Alternatively, even if Plaintiff had met her prima facie burden of establishing that Ohio State took an adverse educational action against her after she filed her complaint, the burden then shifts to Ohio State to articulate a legitimate, non-discriminatory reason for limiting her building access. *See Gordon*, 686 F. App'x at 320.

Ohio State points out that even after Plaintiff was reinstated as a mechanical engineering graduate student, that did not alter the fact that she was no longer a CAR student and was therefore not entitled to after-hours access to CAR. As Maryn Weimer, who was the interim CAR director during Rizzoni's suspension, testified, "Meng was told that she could enter CAR during business hours," which was "accessible to any student. She was restricted access [] after hours, as all non-CAR students would be." (ECF No. 105-11 at 5927.) While Plaintiff may have desired "the normal access that [a] CAR student could have," (ECF No. 102-2 at 4869), she was no longer a CAR student. Plaintiff was instead an MAE-funded student who was not entitled to the same after-hours access as CAR students. But as Weimer testified, Plaintiff had the same business hours access as other non-CAR students and was therefore not denied any educational benefits or privileges as an MAE student following her complaint. The Court therefore finds as a matter of law that Ohio State has articulated legitimate, non-discriminatory reasons for the removal of Plaintiff's after-hours access to the CAR building.

The burden then shifts to Plaintiff to "identify sufficient evidence that would permit a jury to disbelieve Ohio State's proffered explanations." *Gordon*, 686 F. App'x at 322. She "may do so by showing that those explanations '(1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action.'" *Id.* (citing *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012)).

Plaintiff's only evidence in support of her claim here is that nine days after she complained about Rizzoni's alleged sexually harassing behavior, she discovered that she could not access the CAR building after hours. She fails to point to any evidence showing that Ohio State's explanations have no basis in fact, did not actually motivate the action, or were insufficient to warrant the action. She simply relies on the fact that she discovered that she no longer had access a little over a week after complaining about Rizzoni, which she believes sufficiently establishes evidence of an adverse action.

But even if temporal proximity is sufficient to create a prima facie case on the facts presented, it does not resolve the ultimate issue of whether a plaintiff's retaliation claim survives summary judgment. *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 402 (6th Cir. 2010) (citing *DiCarlo v. Potter*, 358 F.3d 408 (6th Cir. 2004)). "'[T]he plaintiff [still] retains the ultimate burden of producing sufficient evidence from which the jury could reasonably reject the defendants' explanation and infer that the defendants intentionally [retaliated] against [her].'" *Herrera v. Churchill McGee, LLC*, 545 F. App'x 499, 503 (6th Cir. 2013) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003)); *see Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) ("[T]he plaintiff was required to offer evidence from which a jury could reasonably reject the defendants' stated reason [], and that it used those reasons to mask its retaliation against her."). Plaintiff simply does not put forward sufficient proof on this point and cannot carry her burden to prove pretext. The Court therefore finds as a matter of law that Ohio State did not retaliate against Plaintiff by reducing her access to the CAR building. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (stating that "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason").

iii. **Plaintiff's Access to her CAR Computer and Ford Research**

Plaintiff also claims that shortly after she submitted her complaint, Ohio State retaliated against her by taking custody of her CAR research resources and refusing to give her access despite repeated requests.  Plaintiff claims she did not have access to her research from the date she filed her complaint on December 12, 2017, until February 7, 2018.  The record reflects that Plaintiff was not given access to her Ford research until February 7, 2018. (ECF No. 114-1 at 6290.)

As a reasonable jury could find the lack of access to research necessary for a Ph.D. candidate's dissertation proposal to be sufficiently severe to qualify as an adverse educational action, the burden shifts to Ohio State to articulate a legitimate, non-discriminatory reason for withholding Plaintiff's research access and materials until February 7, 2018.

The parties agree that Rizzoni removed Plaintiff from the Ford URP on December 11, 2017, the day before Plaintiff filed her complaint.  As Rizzoni explained, "the student was no longer a GRA working on the Ford URP project and at CAR." (ECF No. 114-32 at 6431.)  Rizzoni further stated that he "removed [Plaintiff's] access to various Buckeye Box files that contained information that belonged in part to Ford, to protect Ford confidentiality and OSU's rights to the project information." (*Id*.)  The record evidence demonstrates that Rizzoni initiated the process to remove Plaintiff's electronic access to the Ford research files on December 12, 2017, at 7:26 a.m. by contacting then CAR IT Manager, Jim Riedel, concerning Plaintiff's virtual machine CAR account and Ford models and simulations, which was hours before Plaintiff approached Subramaniam to first complain about Rizzoni. (ECF No. 84-5 at 1729–30.)  The record further reflects that these actions were taken by Rizzoni and not Ohio State and therefore do not constitute actionable adverse educational actions taken by Ohio State.

37

The Court's analysis therefore shifts to the period after Plaintiff was reinstated as a funded graduate student and given a second chance to take the Ph.D. exam on December 19, 2017, which was the day after Rizzoni was suspended from campus.

The record evidence shows that Plaintiff first requested access to her CAR desktop from her MAE workstation on December 28, 2017. (ECF No. 87-2 at 2134–35.)  The Spring 2018 semester did not begin until January 8, 2018.  On January 8, 2018, Weimer emailed Parry to let him know that CAR was holding Plaintiff's computer for his investigation and would hold it until Parry no longer needed it. (ECF No. 87-2 at 2133.)  Weimer assured Parry that CAR would provide Plaintiff access to her research files. (*Id.*)

On January 26, 2018, Plaintiff, her student advocate, Weimer, and Subramaniam discussed transferring Plaintiff's research data to an external hard drive on January 30, 2018. (*Id.* at 2141.)

Early on the morning of January 30, 2018, Weimer asked for a temporary pause on giving Plaintiff access to the research files, because Ohio State needed Ford's approval of the release of its intellectual property to Plaintiff. (ECF No. 87-3 at 2150.)  Dyche Anderson, the Ford principal investigator assigned to the Ford URP, confirmed that Ford owned the intellectual property, and because Plaintiff was no longer working on the Ford URP that Ohio State "was making sure it was okay before that information was passed on" to Plaintiff for her continued research. (ECF No. 76-1 at 748.)

Plaintiff nonetheless went to CAR on January 30, 2018 and connected an external hard drive to her CAR computer and spent several hours downloading files. (ECF No. 87-3 at 2153.)

On February 2, 2018, Plaintiff acknowledged that CAR would not return her access to the Ford data and model until Ford gave permission for her to use its intellectual property. (ECF No. 76-2 at 841.)

On the evening of Friday, February 2, 2018, Ford granted its permission for Plaintiff to continue using its model in her research. (ECF No. 87-3 at 2163.)

On February 7, 2018, Plaintiff received access to her former CAR computer and Ford research. (ECF No. 114-1 at 6290.)  That same day, Mrinal Kumar, Associate Professor of MAE, informally agreed to act as Plaintiff's Ph.D. advisor. (ECF No. 87-3 at 2161; Kumar Aff. ¶¶ 1–2, ECF No. 105-16 at 6136.)

The Court finds that Ohio State has articulated non-discriminatory reasons for its delay in allowing Plaintiff access to her former computer and research due to the pending investigation against Rizzoni and most importantly, the intellectual property issues associated with the Ford model.

The burden shifts back to Plaintiff to establish that Ohio State's proffered reasons were pretextual, and she cannot do so.  Plaintiff simply states that OSU's actions were in direct response to her protected activities and would dissuade any reasonable person from reporting sexual harassment.  Once again, Plaintiff does not offer the required evidence "from which a jury could reasonably reject the defendants' stated reason [], and that it used those reasons to mask its retaliation against her."  *Tingle*, 692 F.3d at 530.  As Plaintiff's statement, without more, is insufficient to establish that Ohio State's explanations have no basis in fact, did not actually motivate the action, or were insufficient to warrant the action, the Court finds as a matter of law that Plaintiff has not presented sufficient evidence to establish that Ohio State retaliated against her by withholding her computer and research during the pendency of its investigation and Ford's review of the intellectual property associated with Plaintiff's research.[11]

---

[11] The Court also notes that Plaintiff did not have a new Ph.D. advisor until February 7, 2018, and that the record reflects that Plaintiff passed her Ph.D. candidacy exam the following month on March 23, 2018.  Plaintiff later graduated from Ohio State in December 2019.

iv.    **Ohio State's Investigation**

Plaintiff further claims that Ohio State retaliated against her "by conducting an investigation designed to discredit her, exonerate Rizzoni, intimidate her into leaving OSU voluntarily, and traumatize her further." (ECF No. 114 at 6268.)

Plaintiff claims that Ohio State retaliated against her throughout its investigation "by explicitly telling her it would be easier to transfer to a different school, drafting a report that failed to credit any of her supporting evidence, releasing her written complaint to Rizzoni over her objection, [], and assuring Rizzoni to 'trust the process' during the investigation." (ECF No. 114 at 6268.)  The only evidence that Plaintiff provides in support of this assertion is a one-page excerpt from OSU's investigatory notes referencing that "Jonathan [Parry] emailed Rizzoni to set up a call for he and his attorney to get an update" followed by a bullet point stating "We will update him that we are [doing] some fact finding – 'trust the process: manage his expectations and give a more firm timeline of completion." (ECF No. 114-36.)  Even construing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, Plaintiff's statement and the excerpt offered in support thereof are insufficient to satisfy her burden at summary judgment. Plaintiff simply makes conclusory allegations and fails to provide sufficient evidence to establish that Ohio State was motivated by any retaliatory animus when conducting its Title IX investigation, and that she suffered an adverse school-related action as a result.

Moreover:

Like every other offense, sexual misconduct and the penalty for sexual misconduct range in severity from trivial to life-altering. Where in this range an incident and the remedy lie is a determination that requires neutral assessment and sober evaluation, which the law firmly commits to the university's discretion and in which the law requires, at least, the rudiments of due process. Neither the accuser nor the accused commands unilaterally either the validity of the accusation or the fashioning of the remedy. The accuser has a right to a remedy for a valid accusation

and the accused has a right to vindication from an invalid accusation; the law and the university must ensure that the rights remain in equipoise.

*Garrett v. Univ. of S. Fla. Bd. of Trs.*, 448 F. Supp. 3d 1286, 1298 (M.D. Fla. 2020).

Ohio State's thirty-seven-page investigation report is on its face a professional and well-reasoned account of the results of a thorough investigation of all of Plaintiff's allegations of sexual harassment and academic retaliation.  It recounts the results of interviews of thirty-nine individuals including all five of Rizzoni's then-current female advisees and five of his six former female advisees (the sixth could not be located) and several then-current and former male advisees.  Most current and former advisees, male and female, reported that Rizzoni often expressed encouragement and affirmation with physical touching such as hugs, pats on the hand or shoulders, or (when sitting) on thighs or lap.  None of them considered this sexual in nature and none reported anything more serious or intrusive.  All reported that Rizzoni would often meet with them on weekends in his office and sometimes at his home, and that he would often offer rides in his car to campus or meeting locations.

The university also interviewed all of the faculty members who had any role in Plaintiff's Ph.D. candidacy examination and found no evidence which would support Plaintiff's claim that Rizzoni manipulated that proceeding.

The investigation produced evidence which corroborated Rizzoni's criticism of Plaintiff's performance as a Ph.D. candidate and other evidence which raised serious issues about Plaintiff's credibility. (ECF No 105-15 at 6122.)

The university's report is hearsay, and in this proceeding, the Court considers Plaintiff's sworn version of the facts as true, but Plaintiff bears the burden of proof on her claim that "OSU retaliated against Huang by conducting an investigation designed to discredit her and exonerate Rizzoni." (ECF No. 114-1 at 6289.)

The report supports its conclusions with specific statements attributed to individuals who would appear to be in a position to have knowledge of the facts contained in the statements attributed to them and who would not seem to have any reason to provide false information. Plaintiff has provided no evidence that their statements were false or that the university knew or should have known they were false.  Nor has she produced any evidence that the university negligently or intentionally failed to interview or consider the statements of any other persons who might reasonably be expected to have information favorable to or supportive of her claims.

The Court thus finds as a matter of law that Plaintiff has failed to show that genuine disputes of material fact exist with respect to her claim that Ohio State took any school-related adverse actions against her, and she therefore has not shown that genuine disputes of material fact exist concerning the third element of her Title IX retaliation claim against Ohio State. Accordingly, the Court grants Ohio State summary judgment on Plaintiff's Title IX claim.

### C.  Plaintiff's Due Process Claim Against Rizzoni

Plaintiff's allegations of Rizzoni's inappropriate touching turn on issues of credibility. Defendants claim that Rizzoni is entitled to qualified immunity on Plaintiff's due process claim. "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  Defendants acknowledge that under Sixth Circuit precedent,[12] sexual harassment does violate a clearly established constitutional right but argue that Plaintiff's implausible allegations do not rise to the level of creating a genuine dispute of material fact regarding this issue.  Though Rizzoni adamantly denies ever touching Plaintiff inappropriately during any of the alleged incidents, the Court is bound at summary judgment to credit Plaintiff's testimony that he did.  Defendants' motion for summary

---

[12] *Doe v. Claiborne Cty.*, 103 F.3d 495 (6th Cir. 1996).

judgment is therefore denied as to Plaintiff's due process claim against Rizzoni in his individual capacity.

## V.      CONCLUSION

For the reasons stated above, Defendants' motion (ECF No. 105) is **GRANTED IN PART AND DENIED IN PART.**  Summary judgment is granted to Ohio State on Plaintiff's Title VII quid pro quo, hostile work environment, and retaliation claims and on Plaintiff's Title IX retaliation claim.  Summary judgment is denied as to Plaintiff's due process claim against Rizzoni in his individual capacity.

**IT IS SO ORDERED.**

/s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: November 4, 2022