IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MENG HUANG,<br><br>    Plaintiff,<br><br> vs.<br><br>THE OHIO STATE UNIVERSITY and GIORGIO RIZZONI,<br><br>    Defendants. | Case No. 2:19-cv-01976<br><br>Hon. Judge James L. Graham<br>Mag. Judge Chelsey M. Vascura<br><br>**Plaintiff's Response in Opposition to Defendant's Motion in Limine to Exclude I) "Testimony Unrelated to the Sole Remaining Claim"; II) "Hearsay Evidence" Relating to other Female Chinese Students; and III) Testimony Regarding Medical Records for Treatment Received in China** |

I.  Introduction

Defendant's Motion in Limine filed on 03/22/2023 (Doc # 160)(hereafter, "Motion") misses the mark in every direction that it aims in that it seeks to exclude evidence that is either (A) highly relevant to and probative of the sexual harassment claim at issue; or (B) theoretical testimony that Plaintiff has no intention of introducing.

The primary purpose of Defendant's Motion is apparently to entreat upon this Court to deprive Plaintiff of basic procedural due process, and have this case decided on something other than the merits, by keeping the jury from hearing a substantial body of evidence that is highly relevant to and probative of Plaintiff's claim. Most pertinently, Defendant asks the Court to exclude i) all evidence of Defendant's retaliatory interference with Plaintiff's PhD candidacy exam, which effectively expelled her from the PhD program at OSU's Center for Automotive Research and ended her relationship on the Ford team; ii) all evidence of OSU's investigation of Plaintiff's sexual harassment complaint filed against Defendant; and iii) Defendant's retaliatory revocation of Plaintiff's stipend. PAGEID #: 6895–96; 6899. Defendant baldly asserts that "none of these topics

or testimony are relevant," and that "none of this [evidence] ha[s] any bearing" on whether Defendant sexually harassed the Plaintiff as alleged. PAGEID #: 6896, 6900. This contention is simply preposterous, meriting rejection by this Honorable Court as set forth fully below. The rest of the Motion need not be resolved because it does not relate to any evidence that Plaintiff intends to introduce.

II.  Law and argument

**A.    Evidence is relevant if it has the tendency to make a fact of consequence to the action more or less probable than it would be without the evidence, and relevant evidence should be heard by the trier of fact except in limited circumstances not applicable here.**

Fed. R. Evid. 401 defines evidence as relevant if "(a) it has the tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FRE 402 makes all "[r]elevant evidence. . .admissible unless. . .provide[d] otherwise" by the United States Constitution, a federal statute, or the rules of evidence. Relevant evidence enjoys a presumption of admissibility, which may be challenged, per FRE 403, by claims of the evidence causing "unfair prejudice, confusion of the issues, [or] misleading the jury." Relevant evidence may only be so excluded when there is a "substantial" risk of these negative effects, however (*Id.*), and Defendant barely argues for exclusion based on any such "substantial" risk— presumably knowing that he cannot show a "substantial" risk. Rather, he simply asserts that such evidence is not relevant, and that "[n]one of these topics have [sic] any bearing on whether Dr. Rizzoni sexually harassed Plaintiff." PAGEID #: 6896. Because the evidence in question is not only relevant but highly probative of Plaintiff's claims, it should be heard by the jury.

**B.    Defendant seeks to exclude evidence showing (A) that Plaintiff was an exceptionally excellent PhD student and research engineer whose work and abilities were recognized as such by Defendant and his partners at Ford, the latter of whom were eager to hire Plaintiff even after Defendant disparaged her and tried to fail her out of his program; and (B) that Defendant abused his power to pretend otherwise, taking escalating steps to destroy Plaintiff's budding career, as a pretext to cover up for his longstanding pattern of sexual predation and abuse against her as he came to reasonably suspect that this misconduct had been or would imminently be exposed.**

A fundamental hurdle that Rizzoni will struggle to clear at trial is to convince the jury that there is a legitimate explanation for why Meng Huang—a star student who was a top recruit from China to OSU's world-class PhD program, whom Rizzoni touted as comparable to his most accomplished former students, and whom Rizzoni's partners at Ford showered high praise upon and were eager to hire—was cast by Rizzoni as his "worst student," who was so "self centered" and "stubborn" that she "had no business applying for jobs," and not only became the first student in Rizzoni's decades-long academic career to fail a PhD candidacy exam under his supervision, but also received the "most unusual" punishment from Rizzoni of being denied an otherwise routinely given second chance to take the candidacy exam. Because the evidence will show that no such legitimate explanation exists, there is a substantial probability that the jury will conclude that the *only* explanation for this extraordinary paradox is that Rizzoni's words and actions against Ms. Huang were taken as he became increasingly desperate for a pretext to cover up for his longstanding pattern of sexual predation and abuse against her; a pattern that began from their first meeting after Huang had taken a 3.5 hour train-ride to meet Rizzoni, at his request, for "some quiet time" in his hotel room in Shanghai.

Naturally, Rizzoni would prefer to exclude this evidence, which includes, not least, the following:

- In 2014, at the suggestion of an acquaintance, Plaintiff emailed Defendant about matriculation at The Ohio State University as a PhD student at OSU's College of Mechanical and Aerospace Engineering. HUANG 01409–01410. Plaintiff is a Chinese national who, prior to matriculation, was an accomplished and gainfully employed engineer who had not lived or worked in the United States. Doc. #: 102-1, Huang Dep., 15:14–16:8. Defendant acknowledged that Huang came from a top tier mechanical

Page 3 of 12

engineering program" in China. Doc. #: 98-1, Rizzoni Vol. 1, 90. Plaintiff ultimately applied to the University and was accepted in 2014 into the PhD Program at the Center for Automotive Research "CAR" in OSU's College of Mechanical and Aerospace Engineering with Defendant as her PhD advisor. HUANG 01409–01410. Plaintiff had no prior relationship with Defendant, who was the Director of CAR and the Ford Motor Chair in Electromechanical Systems at OSU. Doc. #: 98-1, Rizzoni Vol. 1, p. 47, Exs. 37, 39; Doc. #: 100-1, Rizzoni Vol. III, 9:13–18:13.

- Defendant Rizzoni—who had brought in more than $50M in research funds to the University during his tenure, and who was honored by a plaque of his image featured in the CAR building's lobby—admitted that he held substantial power over his students' careers. Doc. #: 98-1, Rizzoni Vol. 1, 12:23–16:19; 119–122.

- After Ms. Huang's first three semesters in his program, Rizzoni touted her performance, stating that she had "very successfully completed all of her requirements, and then some ... as a graduate student at Ohio State." Doc. #99-1, Rizzoni Vol. 2, p. 42, Ex. 63; Doc. #: 76-1, Anderson Dep., p. 16:3–25. According to Rizzoni, per an email he wrote to a Ford representative in October of 2015 in Huang's third semester recommending her for an internship, she was "continuing in [the] footsteps" of two of his previous students whose work was recognized by Ford as meeting "extraordinarily high standards," was "rapidly becoming engaged in all aspects of battery research," and "extending" the work of these two "fantastic" students. Doc. #: 98-1, Rizzoni Vol. 1, 189:22–190:16; Doc. #: 99-1, Rizzoni Vol. 2, 27:4–13; Doc. #: 76-1, Anderson Dep., p. 21:19–23:13, Ex. 125.

- Yet by January of 2016, in her fourth semester, Rizzoni began to openly berate Huang, including in emails to her where he called her "the most stubborn student I have ever come across," and stated that "the stupidest thing a PhD student can do is to ignore the advice of their advisor," and "if you cannot see that, then you do not belong in our PhD program." OSU_002113.

- By September of 2016, Rizzoni substantially escalated his hostility toward Huang, including by lodging a series of bizarre personal attacks on her in a series of emails to Lori Herman, a Ford employee who served as a liaison to Ford's top contacts at Universities, like Rizzoni at Ohio State. Deposition of Dyche Anderson, p. 55:18–24. After Huang had written to Herman, copying Rizzoni, in response to an email about "Visa sponsored jobs" at Ford, Rizzoni responded privately to Herman stating, in part: "Confidential. Please stop paying attention to Meng. It is not clear to me what she is doing with her life, but she is the worst PhD student I have ever had. ... She has no business applying for jobs. ... She is a self-centered and stubborn person who does not know how to listen to advice. ... Sorry to have to write such an unpleasant message." Doc. #99-1, Rizzoni Vol. 2, p. 43–44; OSU_003777. In a separate email he sent on the same day, Rizzoni further lamented to Herman that "my other 11 [PhD students] think I am next to God, and act accordingly," but that Plaintiff "does not even begin to understand what a special opportunity it is to be my PhD student." Doc. #: 99-1, Rizzoni Vol. 2, p. 45, Exs. 64-65; OSU_003131;

- Unfortunately for Rizzoni, Herman did not have as much sway over Ford's employment decisions as he seems to have assumed. Thus, despite Rizzoni's interference and efforts to assassinate her character, Huang secured one of the "limited" internships available in

Ford's Research and Advanced Engineering department for the summer of 2017. *Id.*, p. 35; Doc. #: 76-1, Anderson Dep., p. 16:3–25.

- Dyche Anderson is a research and advanced engineer at Ford, who co-supervised Plaintiff on the CAR team and who was her direct supervisor during her internship. Anderson was consistently and effusively complementary of Plaintiff's work for the team. On August 16, 2017, Anderson informed Defendant that Plaintiff's final internship presentation was so good that his manager at Ford wanted Plaintiff to give a presentation of a Ford sponsored research project on battery aging for electric vehicles. Anderson later informed Ohio State investigators that Plaintiff "was an outstanding employee," and that "her final presentation was so good that my manager asked me in our review: 'when do we hire her?'" Doc. #: 76-1, Anderson Dep., p. 92. And at his deposition in this case Anderson continued to rain praise on Huang's work and capabilities. He testified that his evaluation of her work at Ford was "very, very, very, very positive." *Id.*, p. 27. He stated that her "contributions" were "outstanding," that she demonstrated "a high amount of technical ability," "she caught on to things that ... only someone with deep understanding would be able to understand," he was "impressed with her work ethic, ... focus, commitment, seriousness of purpose, earnestness, and honesty," that "she had enthusiasm for what she did," and "we had to push her out [of the building] at the end of the day." *Id.*, 27–30, 38, et seq. 90.

- Anderson, who worked directly with Herman, had never seen Rizzoni's September 2016 email to Herman until his deposition. "I was really surprised at . . . this email," he said, as it "does not seem consistent" with Anderson's experiences working with Plaintiff. Doc. #: 76-1, 57:9-10, 58:3. Anderson was unequivocal that "based on her performance [at Ford] I saw no reason why technically she would not be able to pass the candidacy exam." Doc. #: 76-1, 84:15-16

- When she returned to campus, and back in Rizzoni's orbit, after her extraordinarily successful summer 2017 internship with Ford, Rizzoni's mistreatment of Huang escalated. Having thrived at Ford despite his efforts to derail her prospects there, Rizzoni realized that he was losing control over Plaintiff and her silence was no longer guaranteed. Thus, he set out to destroy her academic career. In summer 2017 he canceled her supplemental stipend, claiming that "the progress in the previous semester and her inattention to making progress towards her dissertation and her continued ... effort to enroll in ... coursework that had nothing to do with her graduate studies, things like German, statistics, law classes, all of that is behavior that is literally unconscionable for a Ph.D student in the latter half of a Ph.D program." Doc. #: 99-1, Rizzoni Dep. Vol. 2, 83:8-19. Rizzoni admitted that he removed the stipend as punishment, to "express[ ] my unhappiness" at Plaintiff's lack of responsiveness to his demands and requirements, as well as giving Plaintiff an "unsatisfactory mark" for her work. *Id.,* 21-23. Rizzoni had not communicated this stipend termination to Plaintiff by the time it became necessary to register for the coming semester, in August of 2017, forcing Plaintiff to email him in concern for her lack of registration materials. Doc. #: 99-1, Rizzoni Dep. Vol. 2, 97, Doc. #: 99-2, Ex. 76.

- During the Fall semester of 2017, the relationship between Plaintiff and Rizzoni grew ever more hostile, with Rizzoni complaining to others about Plaintiff "demonstrating lack of performance and interest in research" by not meeting with him, alone in his

office. Doc. #: 99-1, Rizzoni Dep. Vol. 2, 100:11-12) He complained, for instance, that Plaintiff was "not meeting with me at a time when as you're preparing for a candidacy exam this is what you do." Doc. #99-1, Rizzoni Dep. 123:2-5. He emailed Anderson regarding the candidacy exam that "Meng finally showed up for a meeting this afternoon. We reviewed her dissertation proposal, which is in pretty good shape." Doc. #: 99-2, Rizzoni Dep. Ex. 85.

- On October 24, 2017, Anderson commented on Plaintiff's dissertation proposal and confirmed that it was in good shape. On Sunday November 15, 2017, Defendant criticized Plaintiff stridently on a call with the Ford team. Plaintiff lost her temper at Defendant in response: "[T]here was an outburst in the meeting very severe by Ms. Huang to the point where ... we muted our ... voice and just sat back for a while until things settled down." Doc. #76-1, Anderson Dep., 66:4-9. Anderson noted that "I believe she said she did not want to be alone with Professor Rizzoni in his office on – especially on Sunday." Doc. #76-1, Anderson Dep., 68:13-15. The next day, November 16, 2017, Anderson emailed Rizzoni, stating, in part, as follows: "About the Sunday meetings [with Plaintiff] ... It might not be about wanting to work on Sunday, but rather to be alone in a man's office with no one else in the building." Doc. #: 114-21, PAGEID #: 6392. Anderson, at least, had begun to connect some dots regarding the disparity between his experience of Plaintiff's work, and Rizzoni's behavior and comments about her. On November 17, 2017, Plaintiff emailed Rizzoni to ask why the composition of her candidacy committee had been suddenly changed: "Why are my exam committee members changed?. . .When was this decided?" Rizzoni responded by writing "This is what happens when you never meet with me and never reply to my emails. Things change." Doc. #: 100-2, Ex. 103.

- On December 12, 2017, Less than one month after Rizzoni received the email from Anderson about Huang not wanting "to be alone in a man's office with no one else in the building, Plaintiff presented her PhD candidacy examination to a panel selected by Rizzoni. This committee was initially given general information by Defendant, as in an email of September 14, 2017, when Defendant explained to the three committee members why each had expertise relevant to the examination, and noted that "My requirements ... .are that Meng will satisfy the written part of the GE by writing a 15 page dissertation proposal ... You are welcome to prepare other written questions if you wish." Doc. #: 114-18, PAGEID # 6386. After the November 15 meeting, and the exchange of emails with Anderson about why Plaintiff might be struggling, Rizzoni became more determined to bury Plaintiff, writing on December 7, 2017 to one of the members that "This student has been a challenge ... I would like this exam to be a real exam. The outcome will be whatever it needs to be." Doc #114-23, DOCID 6398). Rizzoni also grew agitated that Plaintiff was not meeting with him in regard to the candidacy examination as often as he believed she must: "She wasn't taking things seriously," Rizzoni said of Plaintiff's reluctance to schedule one-on-one meetings with him. Doc. #100-1, Rizzoni Dep. Vol. 3, 36:6-7.

- Plaintiff was then unsurprisingly deemed by the committee selected and directed by Rizzoni to have failed her PhD candidacy examination, which was the first time in Rizzoni's lengthy career that a student under his supervision had failed such a candidacy exam. Doc. # 98-1, Rizzoni Dep. Vol. 1, p. 106. Additionally, Rizzoni refused to allow Plaintiff to re-take the candidacy exam, which was also a highly unusual measure. Rizzoni

initially tried to frame this as a group decision, stating in an email to his committee that once "we decide she's not allowed [to retake the candidacy exam], she'll be barred from being a graduate student in any program at OSU." Doc. #: 100-1, Rizzoni Dep. Vol. 3, 49:18-23; 100-2, Ex. 196. But at his deposition, Rizzoni admitted that he had to take individual "responsibility for that." "The one person who has the button allow or not to conduct the second exam is the adviser. ...  Sure. I pushed that button - that box. I'm responsible for it. I have no arguments with that." *Id.*, p. 54:19-20, 73. Thus, with Rizzoni's "death sentence" carried out, Huang was also removed from the Ford team. Doc. #: 100-1, Rizzoni Dep. Vol. 3, 54:23-25, 55:1-2) In taking this action, Rizzoni surely understood that as a foreign national, her visa would thus be endangered such that she would most likely have to return to China. This fortuitous (to Rizzoni) circumstance is certainly relevant to whether he was attempting to conceal his abuse by functionally deporting Plaintiff.

- Indeed, the step of barring Plaintiff from a second chance at the candidacy exam was so severe that Rizzoni was immediately questioned about it by Jeffrey Bons, Chair of the Graduate Studies Program in Mechanical and Aerospace Engineering, who noted in a December 13, 2017 email to Rizzoni (the day after Huang's doomed candidacy exam) that "[m]y inquiry at this point is due to the outcome of the recent exam, which is most unusual (fail and no second attempt). . . The question I have is to understand why the committee felt not to allow a second attempt." Doc # 100-2, Rizzoni Dep. Vol. 3, Ex. 204.

- After learning of the results of the candidacy exam, and that Rizzoni had effectively expelled her from OSU thereby jeopardizing her visa, Plaintiff no longer had anything to lose. She complained to multiple members of the College and the University, including the Graduate School, Public Safety and the Title IX office about having been sexually assaulted by Rizzoni for the previous 4 years. Plaintiff detailed a pattern and practice of unwanted and inappropriate touching dating from her first meeting with Rizzoni in China, in 2014. She provided extensive, detailed information to OSU and its investigators, much of which was ignored, minimized, or distorted. This behavior included:

    o Defendant leaning over and touching Plaintiff around the shoulder unprompted, in their first meeting in Shanghai, and holding her hand. Doc. #: 102-1, Huang Dep., 34:18-25; 39:10.
-
    o Defendant rubbing her thigh while they sat at a restaurant bar in Columbus (where Rizzoni paid cash), despite her repeatedly pushing his hand away. Doc. #: 102-1, Huang Dep., 101:19-21.

    o Defendant rubbing Plaintiff on the thigh, or touching her chest, while in car rides together and, at times while on audio-only phone calls with Ford. Doc #: 114-6, OSU Report, PAGEID #: 6315.

    o Defendant grabbing and rubbing Plaintiff's buttocks as she leaned over to hang a souvenir decoration from China on his office window. Doc. # 114-6, OSU Report, PAGEID #: 6316.

- o Defendant requesting that Huang meet him at his home on a Sunday while his family was gone, claiming (falsely) that he was unable to drive due to a recent knee surgery, where he repeatedly groped her and escalated to masturbating through his pants; *Compare* Doc. #: 114-6, OSU Report, PAGEID # 6317, with

- o Defendant reaching from behind Plaintiff to grab her breasts during a meeting in his office on her return from the Ford internship. Doc. #: 114-6, OSU Report, PAGEID # 6320.

- Subsequent to her complaint to OSU, Plaintiff was assigned a new advisor, and without any further interference from Rizzoni was able to successfully complete her dissertation and graduate with her PhD from OSU in December, 2019, eighteen months later than she would have graduated had Rizzoni not rigged her initial candidacy exam.

"[A] jury is permitted to make reasonable inferences from facts proven in evidence having a reasonable tendency to sustain them." *Jackson v. City of Cleveland*, 925 F.3d 793, 814, 2019 (6th Cir. 2019) (quoting *Galloway v. United States*, 319 U.S. 372, 396, 63 S. Ct. 1077, 87 L. Ed. 1458 (1943)). A "reasonable inference" is one "that a rational jury could make from the facts." *Oros v. McCullick,* No. 1:19-cv-535, 2019 U.S. Dist. LEXIS 138838, *22 (West. Dist. Mich. 2019). Where evidence can assist the jury in establishing facts necessary to the claim *at issue* then that evidence is admissible.

Here, all of the so-called "unrelated" evidence that Rizzoni seeks to exclude is evidence of his desperation for a pretext to justify and cover for his abuse of Plaintiff, as it demonstrates consciousness of guilt and efforts to delegitimize Plaintiff and protect himself against the likelihood that she would expose his abuse. Defendant offers case law which is inapposite, as it declares "[e]vidence relating *only* to those previously dismissed claims has minimal probative value." *Alexander v. Hoffman*, 2019 WL 4640281, *2 (E.D. Mich. 2019)(emphasis added).  In another cited case, the court granted a motion in limine to exclude evidence from dismissed claims because the "Plaintiff did not file a response to Defendant's motion to exclude such testimony." *Wilkerson v. Warner*, 2014 U.S. Dist. LEXIS 96276, * 6 (E.D. Mich. 2014).

Excluding the evidence of Rizzoni's conduct against Plaintiff, as he requests, would indeed constitute reversible error, as it would arbitrarily bar from presenting evidence of her claim despite

its relevance and probative value. The Sixth Circuit has acknowledged that due process prohibits "egregious or arbitrary government conduct" and prohibition of the very basis of the claim at issue in a lawsuit would surely meet that bar. *Beck v. Haik*, 377 F.2d 624, 637 (6th Cir. 2004), quoting *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.,* 538 U.S. 188, 198, 123 S.Ct. 1389 (2003). District courts have accordingly followed, finding that evidence is relevant based upon its probative value, not whether it arose as to one specific claim, now dismissed. *Bates v. Dura Auto. Sys.,* No. 1:08-cv-0029, 2011 U.S. Dist. LEXIS 71653, *17 (M.D. Tenn. 2011); *Official Comm. of Unsecured Creditors v. Hendricks (In re Dwight's Piano Co.)*, 2009 U.S. Dist. LEXIS 1724, *12-13 (S.D. Ohio, 2009)("Conceivably, the same evidence could support both a dismissed cause of action and a cause of action that is to be presented to the trier of fact."). In *Beck*, the court reviewed the exclusion of evidence by witnesses whose proposed testimony was relevant to determining if the defendant had attempted to rescue plaintiff's decedent, or merely searched for the decedent's body without urgency. *Id.* at 636. The court determined that testimony must be determined to be relevant before a decision to exclude can be made. *Id.* A court abuses its discretion if it rules against evidence based upon a clearly erroneous assessment of it. *Id.,* quoting *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447 (1990)). And, finally, the court determined that evidence which, "if believed by the jury. . .would clearly support one of the plaintiffs' main theories of the case" actually "compelled [the Sixth Circuit] to conclude the letters should have been admitted. They were relevant." *Beck* at 638, 639.

      Here, the evidence summarized above would amply support the jury finding that Rizzoni engaged in precisely the longstanding pattern of cultivation, assault, and intimidation alleged, demonstrating the manner in which he could manipulate the OSU PhD program to keep his victim pliant and silent, and stemming from his knowledge of what he had done, need to avoid repercussions by crushing Plaintiff's remaining resistance. For this reason, such evidence cannot be excluded, and the jury must be permitted to consider the full range and effect of Rizzoni's "most unusual" behavior toward her, in the highly charged context of her PhD exam, to determine the

truth of whether he abused her as she has alleged.

**C.   The remainder of Defendant's Motion asks this Court to exclude evidence that Plaintiff does not intend to introduce.**

Plaintiff respectfully submits that the remainder of Defendant's Motion does not require substantive attention from the Court, as it is addressed to theoretical evidence or testimony that Plaintiff does not intend to introduce.

**1.   Plaintiff does not intend to introduce hearsay evidence of Rizzoni's harassment of other female Chinese students.**

Defendant has also objected to "speculative and hearsay evidence" which, he says, must be excluded. This evidence is, supposedly, Plaintiff's testimony "regarding the alleged sexual misconduct that she contends other Chinese female students," including Ruochen Yang, "suffered at the hands of Dr. Rizzoni, despite having no direct, first-hand knowledge of such alleged misconduct." (Doc. # 160, PAGEID 6896). Hearsay, under FRE 801, is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." In support of his contention that Plaintiff will offer hearsay, and speculative evidence, Rizzoni cites to Plaintiff's deposition to claim that Plaintiff will testify about statements for which she has no basis, and argues that "Plaintiff cannot testify regarding the experiences of others of which she has no direct knowledge." Doc #: 160, PAGEID 6897.

Defendant also ignores the availability of direct evidence of Rizzoni's abuse of Ruochen Yang, including Yang's own testimony of her own experience, and the official records of OSU's investigation in which Yang informed investigators that she had physically moved Rizzoni's hand off of her hip" as "she felt uncomfortable with this type of physical interaction." Doc #114-39, Decl. of Ruochen Yang; Doc. # 94-1, Dep. of Jonathan Parry, 231:19-232:15; Doc. #114-6, 27, fn 6.

Rizzoni indeed admitted that he had put his hands on Yang's waist, causing her to "lift his arm and move it away" from her. "I remember that one time there was an occurrence where I

touched her, I put my arm around her, yes. . . I remember that she lifted my arm and moved it away from her waist, yeah." Doc. #: 98-2, Rizzoni Dep. Vol. 2, 10:23-25; 11:3-5. Rizzoni also confirmed his awareness that the OSU sexual harassment policy included a prohibition on "intentional sexual touching however slight by an individual upon another that is without consent and/or by force or coercion" *Id.*, Ex. 2). He testified clearly to his knowledge, stating that "sexual harassment has to do with something that has sort of a motive and intent of imposing ... behavior ... on someone who doesn't wish it, who does not want it." Doc. #: 98-1, Rizzoni Dep. Vol. 1, 115:24-25, 116:1-4.

In short, no hearsay testimony will be necessary to establish Rizzoni's misconduct toward Ms. Yang, which is directly relevant to the jury's consideration of his conduct towards Ms. Huang. Because Plaintiff does not intend to introduce any such hearsay evidence, this aspect of Defendant's Motion is moot.

    **2.    Plaintiff does not intend to introduce medical records from China that are inaccessible and have not been produced.**

Likewise as to Defendant's claim that unproduced Chinese medical records may not be admitted, Plaintiff concedes that such records were not produced, and that Plaintiff does not intend to make use of them during trial. Thus, this portion of the Motion too is moot.

### III. Conclusion

For the reasons set forth above, this Honorable Court should reject Rizzoni's request to exclude evidence of the "most unusual" punitive measures to which he subjected Plaintiff as she maintained her refusal to submit to his self-described "godlike" authority. Because it is the jury's sacred duty to assess this evidence, the Motion should be denied.

                                                                                    Respectfully submitted,

                                                                                    */s/Peter Pattakos*
                                                                                    Peter Pattakos (0082884)
                                                                                    Gregory Gipson (0089340)
                                                                                    The Pattakos Law Firm LLC
                                                                                    101 Ghent Rd., Fairlawn, OH 44333
                                                                                   P: 330.836.8533/F: 330.836.8536
                                                                                    peter@pattakoslaw.com

                                                                                   *Attorneys for Plaintiff Meng Huang*

## Certificate of Service

The foregoing document was filed on April 6, 2023, using the Court's e-filing system, which will serve copies on all necessary parties.

                                                                                   */s/ Peter Pattakos*
                                                                                   *Attorney for Plaintiff*