**Exhibit A**



Rikleen Institute for **Strategic Leadership**
*Developing Inclusive Leadership*

## REPORT OF LAUREN STILLER RIKLEEN

**Introduction**

This expert witness report is prepared at the request of legal counsel for Meng Huang ("Ms. Huang"). All opinions expressed herein are my professional opinions, to a reasonable degree of professional certainty.

I was asked to analyze the response of The Ohio State University ("OSU") to Ms. Huang's allegations of sexual harassment, Ms. Huang's silence over the years of the sexual harassment, the impact of the power differential that resulted in retaliation, and the treatment she received once she reported the behavior. My opinion is that Ms. Huang remained silent because she was aware of the significant power differential that existed between her and OSU Professor Giorgio Rizzoni ("Prof. Rizzoni"), that her fear of retaliation was confirmed to be accurate by Prof. Rizzoni's response to her increased resistance, and that her fears were further confirmed by the reaction of both Prof. Rizzoni and OSU to her allegations where Ms. Huang's credibility was discounted and her experiences were diminished throughout the investigative process.

This report more specifically addresses the sexual harassment, retaliation, and abuse of power described in the allegations of Ms. Huang against Prof. Rizzoni and OSU, and the failure to conduct a fair, reasonable and thorough investigation of Ms. Huang's allegations. This report details my credentials and then sets forth the basis for my analysis: my own independent research and writing; my training, education and experience, including interviews and conversations with thousands of women; my knowledge and review of social science research that has been reported over the past decades; my review of other investigations, including in higher education, in the course of my research and writing, and documents provided by counsel for Ms. Huang. In writing *The Shield of Silence* (more fully described below), as well as in other articles that I have written, presentations I have made, and the analysis provided in this report, I rely heavily on academic peer-reviewed studies in a variety of social science journals, as well as law review articles written by scholars and practitioners representing victims of sexual harassment. Sexual harassment, the silence of victims, and retaliation have been topics of study for several decades, providing a detailed body of data and research. Key components of that research are addressed below.

The case documents that I have reviewed are listed in Appendix A, studies cited herein are listed in Appendix B, and CV is attached as Appendix C. The factual underpinnings of this lawsuit are set forth throughout the documents identified in Appendix A and, therefore, are not separately summarized here.

**RIKLEEN INSTITUTE, LLC**
**87 Sears Road, Wayland, MA 01778**

01042673.1

**Qualifications**

Since January, 2011, I have been the President of the Rikleen Institute for Strategic Leadership, providing consulting, training, and speaking services on a variety of workplace culture issues, including: workplace misconduct and sexual harassment; women's leadership and advancement; the impacts of unconscious bias in all aspects of workplace behaviors; and strengthening multi-generational relationships.

Prior to January, 2011, I practiced law and served as a mediator. I am a licensed attorney in the Commonwealth of Massachusetts. As a former equity partner in the law firm of Bowditch & Dewey LLP, I became deeply involved in gender bias issues, both within my firm and externally. As the only mother and one of two women in my firm's equity partnership, I was instrumental in the establishment of a Leadership Committee which consisted of several equity partners, the Managing Partner, and the firm Administrator to address the retention and advancement of women in the firm. I worked closely with a consultant in setting the agenda, developing training, and addressing sensitive issues that needed leadership attention.

From September 1, 1998, to August 31, 1999, I was President of the Boston Bar Association, the 5th woman in its more than 300-year history, and the first woman elected to that position from a practice outside the Boston area. One of my signature initiatives was the establishment of a *Task Force on Professional Challenges and Family Needs*, which produced a report that received national attention. This report, entitled *Facing the Grail: Confronting the Costs of Work-Family Imbalance,* analyzed the costs of attrition and examined a variety of factors that impact the retention and advancement of women, including the importance of culture within an organization.

In the early 2000s, I began researching a book about women's experiences in the legal profession. That book, *Ending the Gauntlet: Removing Barriers to Women's Success in the Law ("Ending the Gauntlet")*, was published by Thomson/West in 2006. As part of my research, I conducted confidential interviews with hundreds of women around the country, as well as firm leaders, to learn more about institutional barriers to women's success.

One key finding from these interviews was the extent to which power imbalances result in women remaining silent in the face of bias, negative behaviors, and harassment, fearing retaliation from those in positions of power over their employment security, their compensation, and their career advancement. Women shared stories of being bullied, sexually harassed, denied reasonable requests, for example, to address family challenges during the workday, and other negative experiences. In most instances, the interviewees chose to remain silent about the incidents because they feared retribution. They also did not trust that the institution would conduct a fair inquiry or would appropriately support them in the process. Their responses were consistent with the findings of the 2016 Equal Employment Opportunity Commission Select Task Force on the Study of Harassment in the Workplace ("EEOC Task Force"), more fully discussed below. Women who experience harassment remain silent because they fear: they will be disbelieved; no one will act on their claim; they will be blamed for the harasser's behaviors; and they will be victims of professional retaliation and social ostracism.

In my research, many of the women interviewed had observed instances where people who previously reported harassment or negative behaviors became targets of retribution, for example, through loss of important work, being passed over for promotion, or social isolation. They described a cultural tolerance for inappropriate conduct in the workplace, leading them to conclude that they had to endure the negative behaviors to maintain their job and future opportunities.

In numerous instances, I interviewed firm leaders at the same firm as women I had interviewed. All interviews were confidential so no one knew if I interviewed others in their workplace. In such instances, the male leaders invariably described a workplace that was markedly different from the one described by female interviewees from their own firm. The leaders saw themselves as managing a culture where people succeeded solely on merit and, although they acknowledged that challenges impacting women's success existed in other environments, most felt that such challenges were well-managed in their own workplaces. In the years since I wrote *Ending the Gauntlet*, I have continued to observe that disconnect between the lived experiences of people without power in an organization in contrast to statements by senior leadership denying that their workplace poses barriers or shields misconduct.

In 2005, I was appointed by the president of the American Bar Association ("ABA") to serve a three-year term as one of twelve commissioners on the ABA Commission on Women in the Profession. In that role, I had the opportunity to speak with scores of women around the country, including law students, about their experiences with misconduct and harassment. Many of the experiences that were described to me were similar to the stories I heard while researching *Ending the Gauntlet*. These conversations again demonstrated that, even in organizations that purported to have policies and procedures addressing sexual harassment, the employers' actual practices were far different.

In 2012, I was appointed by the president of the ABA to the Task Force on Gender Equity. In that capacity, I researched and authored the publication, *Closing the Gap: A Road Map for Achieving Gender Pay Equity in Law Firm Partner Compensation*. In that publication, I analyzed the roots of pay inequality in law firms, including unconscious biases, structural inequities, and power imbalances that disadvantage women in discretionary systems, such as compensation and bonuses.

I have additional experience and insight into student experiences at the collegiate level. Between approximately early 2011 and 2014, I was an Executive-in-Residence at the Boston College Center for Work & Family. Being on campus, I had numerous opportunities to participate in programs – as both a presenter and attendee – where I could engage directly with students about their experiences in the higher education environment. As a founding and continuing member of the Council for Women of Boston College (established in 2003), I have further opportunity to interact with students and participate in programs on campus. I had a similar opportunity to engage frequently with the higher education community in my decade of service as a trustee at Clark University, between 1998 and 2008. In all of these years of frequent engagement on campus communities, I learned about and directly observed the hierarchies that exist in higher education, and the critical role that professors play in the lives of their students, particularly with respect to academic and career guidance, support, and recommendations.

I had additional opportunities to meet and speak with students and young workers around the country while conducting research for my next book, *You Raised Us, Now Work With Us: Millennials, Career Success, and Building Strong Workplace Teams*, which was published in 2014 in hard copy, and as an updated paperback in 2016. Although not the focus of this book, interviewees often described negative experiences where they were bullied or sexually harassed by individuals in positions of power over them. The stories tended to follow a similar pattern in which the misconduct was not reported for fear of retaliation.

In January 2018, I was retained by the Women's Bar Association of Massachusetts ("WBA") to conduct a survey focusing on sexual harassment and negative behaviors in the law firm workplace setting. My role included drafting the survey, analyzing the results, and writing a report detailing the findings and offering recommendations for providing a safe, respectful and inclusive workplace for all employees. The survey results revealed the wide range of sexual harassment, bullying, and other negative behaviors that occur in the law firm workplace; provided a more nuanced analysis of victims' fears of reporting misconduct; and shed light on institutional failures to respond even when a report was made.

The survey demonstrated that unchecked power imbalances serve as the foundation for and perpetuation of sexual harassment and other negative and inappropriate behaviors. Many of the experiences described by the respondents were perpetrated by prominent and well-respected partners or senior leaders. In such circumstances, the victims felt they had no place to turn for support or remedial measures. Moreover, fear of retaliation loomed large.

Following the positive response to the release of the WBA report, *Survey of Workplace Conduct and Behaviors in Law Firms*, I continued researching and writing on the topic of sexual harassment and negative behaviors. This led to the publication of my fourth book, *The Shield of Silence: How Power Perpetuates a Culture of Harassment and Bullying in the Workplace ("The Shield of Silence")*. The book examines the cultural, workplace, and societal norms that allow misconduct to flourish, identifying the structures, power dynamics, and behaviors that need to change to protect victims.

The central themes of *The Shield of Silence* are that: (1) deeply entrenched power dynamics prevent victims from accessing the very systems that are supposed to protect them; and (2) sexual harassment and misconduct will not be stopped unless the condition(s) that drives victims and bystanders into silence – the overriding fear that reporting misconduct will result in retaliation – is eliminated.

Throughout much of my professional career, I have also authored numerous articles and have given local, regional and national presentations on the topic of gender bias. In all of my research, interviews, and countless discussions with women and students over the past three decades, I have been continually struck by the extent to which individuals who have been sexually harassed did not report the misconduct because they feared retribution and they have not seen the system work on behalf of victims. Looming large in their motivation to stay silent is their terror of retaliation.

HR organizations and other professional associations, as well, recognize that sound preventative measures, such as effective policies and ongoing training, are necessary to encourage victims to report sexual harassment. As I wrote in *The Shield of Silence*, such policies and training programs, at minimum, should emphasize that retaliation is prohibited, clearly state that a full and fair investigation will take place by a competent and unbiased investigator, provide support mechanisms for those making the complaint throughout the process, assure that action will be taken following the investigation, as appropriate, and monitor for retaliation over time.

As much of Ms. Huang's experiences with Prof. Rizzoni and OSU demonstrate, and as described below, silence and power are the protective barriers that shield perpetrators of misconduct.

**Summary of Findings: OSU's Investigation Appears to Have Been Designed to Corroborate Prof. Rizzoni's Version of Events and Discredit Ms. Huang's**

My review of the documents identified in Appendix A reveals what I described above in my research: the power dynamics between Ms. Huang and Prof. Rizzoni were ever-present and appeared to silence Ms. Huang for several years until she finally spoke up about how he had treated her, by his words, emails, and actions, much of which she described as sexual and threatening in nature.

In its investigation, OSU ignored or discounted significant information provided by Ms. Huang; the impact of Ms. Huang's fear of retribution; the significance of the power imbalance between Ms. Huang and Prof. Rizzoni; and the fact that Ms. Huang was in a high-risk, vulnerable category as an international PhD student dependent on Prof. Rizzoni for the completion of her degree, career development, financial support, and her very ability to remain in the United States.

As more fully described below, the investigators failed to consider facts and issues, including findings from the 2016 Equal Employment Opportunity Commission Select Task Force on the Study of Harassment in the Workplace ("EEOC Task Force"), resulting in a flawed investigation. First-hand witness accounts or other corroboration do not generally exist in instances of alleged sexual harassment. The absence of corroboration, however, should not lead to the conclusion that the victim is not to be believed. Here, the investigators failed to analyze or consider the substantial body of research that would have warranted a different analysis than dismissing Ms. Huang's claims as unsubstantiated. It is clear that the OSU investigators drew all inferences in Prof. Rizzoni's favor, notwithstanding a detailed set of allegations from Ms. Huang that should have been carefully considered throughout the investigation, but were not.

The OSU investigators should have considered whether Prof. Rizzoni's behavior was an exercise of power over a vulnerable student who was too fearful of retribution to report the misconduct. If this had been considered, the OSU investigators would have seen that Prof. Rizzoni's behavior was a power tool through which he could and apparently did subordinate Ms. Huang. Just as sexual harassment is about power, so, too, is this case about power.

**Detailed Discussion**

On January 5th, 2018, Ms. Huang submitted to the investigators a 43-page document setting forth specific allegations against Prof. Rizzoni ("Initial Statement"). In this document, Ms. Huang described Prof. Rizzoni's acts of sexual harassment and retaliation. Subsequently, on March 14, 2018, Ms. Huang submitted to the investigators a rebuttal statement and 111-page supplement, providing additional detail ("Supplemental Response") in reply to Prof. Rizzoni's response to Ms. Huang's Initial Statement.

OSU conducted an internal investigation to determine whether Prof. Rizzoni violated the University's Sexual Misconduct Policy and, on March 29, 2018, OSU issued a Case Report summarizing the results of its investigation ("the OSU Report").

Contrary to the OSU Report's statement that Ms. Huang's complaint was "thoroughly investigated" (OSU Report p. 2), my opinion is that the University's investigation, and resulting conclusion that no policy was violated, ignored specific detail provided by Ms. Huang and failed to adequately address incidents that she reported in her Initial Statement. Specifically, the OSU Report identified the incidents it investigated: "Complainant specifically alleged that Respondent touched her inappropriately on the following occasions and in the following ways [list of incidents]." (OSU Report, p. 1) Yet a side-by-side comparison of Ms. Huang's Initial Statement with OSU's list of incidents demonstrates that specific allegations and events were either ignored or not adequately addressed, for example, an event of unwanted touching on December 29, 2914.

In addition, the analysis provided in the OSU Report was biased because the investigators resolved all disputed facts in favor of Prof. Rizzoni, even when other conclusions were plausible and reasonable. The OSU investigators failed to address or even demonstrate awareness of sexual harassment as a power dynamic and tool by which perpetrators exert control over their victims. This biased framework can be identified throughout the OSU Report, several examples of which are described herein.

The OSU Report discounted Ms. Huang's allegations and considered witness statements, including Prof. Rizzoni's, in a light most favorable to him. For a victim of abusive behavior, such institutional protection of the perpetrator presents an impenetrable barrier.

At the outset, as if to undermine Ms. Huang's recollection of the events alleged, the OSU Report calls into question the "extensive detail" that she provided to the investigators by stating: "The investigators asked Complainant if she had kept contemporaneous notes to the alleged incidents that she relied upon for purposes of creating her document. Complainant initially responded by asking, 'Why is that important?' Complainant then stated that she created her document without the aid of contemporaneous notes." (OSU Report p. 3)

It is curious that the OSU Report found it important to include Ms. Huang's question, as it showed that the investigators formed an early impression, doubting her credibility. This jaundiced view of Ms. Huang's credibility continued throughout the investigation.

6

Relationships and fear of retaliation permeate all aspects of an investigation, including with the complaining party and witnesses, and certainly played a significant, but unexamined, role here. For example, the OSU Report stated that there were, among the witnesses interviewed, ten current graduate students at the Center for Automotive Research ("CAR") and nine former CAR graduate students. The OSU Report did not, however, provide any further analysis of the relationship between these witnesses and Prof. Rizzoni, including whether their statements and recollections could be influenced by their reliance on Prof. Rizzoni and the need to maintain a positive relationship with him. This was important in evaluating credibility, as motive and bias are among the credibility factors that should have been examined in considering statements by those close to and dependent on Prof. Rizzoni. These students and former students had every interest in wanting to maintain a positive, non-adversarial relationship with Prof. Rizzoni; saying something potentially harmful about him could jeopardize that relationship.

Moreover, the ability of Professor Rizzoni to impact the careers of students engaged in automotive research at CAR should have been a paramount factor in determining the credibility of the witnesses who were questioned by OSU investigators. Prof. Rizzoni holds several distinguished titles. He has been the Director of CAR for the past two decades; he is also the Ford Motor Company Chair in ElectroMechanical Systems, and a Professor of Mechanical and Aerospace Engineering and of Electrical and Computer Engineering at OSU. In addition, his economic value to OSU is substantial: his work as Principal or Co-Principal Investigator has brought more than 54 million dollars of grant funds into the University over three decades. (Giorgio Rizzoni dep. pp. 31-32) As such, he holds positions of authority, prestige, and power within OSU and has extensive influence in and contacts with the automotive industry. The witnesses' fear of retaliation should have been considered by the investigators.

It is Prof. Rizzoni's power, prestige, and influence that are central to Ms. Huang's allegations. Each of the student witnesses interviewed for the OSU Report are highly likely to have a substantial interest in maintaining a positive relationship with Prof. Rizzoni. His towering influence would loom large over their success as students, including grades in his classes; support for their research at CAR; successful completion of their graduate studies; and assistance with job recommendations and key career placements in the automotive industry. The failure of the investigators to consider this in evaluating the responses of his students as well as all of the other witnesses significantly weakens the findings in the OSU Report.

The OSU Report also failed to consider similar potential concerns in describing the investigators' interview with Phoebe You, the Director of the OSU China Gateway program ("OSU China Gateway Director"). The OSU China Gateway Director had dinner with Professor Rizzoni and Ms. Huang the day of their initial meeting in China. In describing that dinner, Ms. Huang stated that she experienced unwelcome touching from Professor Rizzoni.

The OSU Report summarized the OSU China Gateway Director's interview by noting her experience with Prof. Rizzoni: "Respondent does touch people on the hand and shoulder in a friendly way, and … Respondent always gives her a hug when they meet. The witness stated that Respondent would 'tap her on the lap' while driving together if he was telling a story." She told the OSU investigators that "at first these interactions seemed very intimate" but she did not view them as "romantic or sexual." Further, in describing her observations that he interacts similarly

with students, the OSU Report adds: "The witness stated that no students have seemed uncomfortable or complained to her about their interactions with Respondent." (OSU Report pp. 3-4)

There is no indication whether the OSU Gateway Director had specifically asked any of the Chinese students who studied with Prof. Rizzoni whether they had concerns about his behavior, or whether she would even have been comfortable making such an inquiry. In fact, the OSU Report failed to provide any exploration of whether the China Gateway Director's credibility as a witness was impacted by her own professional motivations to maintain a positive relationship with Prof. Rizzoni, who serves as a member of the China Gateway Faculty Advisory Committee. The OSU website describes the importance of the China Gateway program as building upon OSU's "long-standing partnerships and strategic engagement with China. The Gateway serves as a mini embassy for Ohio State to foster connections and facilitate opportunities for students, researchers, alumni and partners." The website touts data showing the program's success in bringing students to OSU, its growing alumni group in mainland China and Taiwan, and the ongoing faculty and staff travel in China. Yet the OSU Report does not question whether her position as Director of this program could have affected her responses.

What is clear is that the OSU Gateway Director stated that Prof. Rizzoni touches people on the hand, he touches people on the shoulder, and he tapped her on the lap. She described the touching as "very intimate." This is similar to what Ms. Huang has said. The investigators then pivoted to focus on the fact that no one complained to her or seemed uncomfortable by this "very intimate" conduct. This shows the investigators' bias in favor of Prof. Rizzoni.

The above is one example of where the OSU Report repeatedly offered a supportive view of Prof. Rizzoni's and his witnesses' responses to Ms. Huang's allegations. This is in contrast to its treatment of Ms. Huang, as the OSU Report failed to provide a full and accurate summary of Ms. Huang's claims nor a supportive view of her allegations. The investigators should have presented the information in an unbiased and independent way, but did neither.

For example, in her Initial Statement of allegations against Prof. Rizzoni, Ms. Huang reported that on January 21, 2015, Prof. Rizzoni insisted that she sit in the front seat as they drove to pick up another passenger for a drive to Dearborn. During that portion of the drive, Ms. Huang stated that Prof. Rizzoni grabbed her hand, which made her feel uncomfortable. She then reported that, while in Dearborn, Prof. Rizzoni asked her to sit next to him during a presentation and then he leaned close to her, put his arm around the back of her seat, and touched her shoulder. On the way home, and after dropping off the other passenger, she states that Prof. Rizzoni again directed her to sit in the front seat. At one point, she says he pinched her cheek and, when she got out of his car, he also exited the vehicle, put both hands around her waist, and kissed her cheek. Ms. Huang stated that this experience made her feel ashamed. (Initial Statement pp.7)

The OSU Report's analysis of these allegations presented incomplete information. Significantly, the investigators never mentioned the incident of unwanted touching while in Dearborn. This omission is problematic and demonstrates a lack of thoroughness and bias. In presenting Prof. Rizzoni's response to the allegations about the car ride, the OSU Report stated that Prof. Rizzoni

admitted it "was possible he touched" Ms. Huang's hand but he denied any other improper touching.

The OSU Report then noted that Prof. Rizzoni described the Cadillac he was driving as having "a manual transmission and 'very tight and separate bucket seats' that would have made it impossible for him to sit 'inappropriately close to Complainant.'" (OSU Report p. 4) But the proximity of the seats was not relevant to Ms. Huang's allegations about Prof. Rizzoni's behavior in the car. Rather, her complaint focused on his hands continually reaching out to touch her. Bucket seats do not prevent a hand from touching the passenger in the other seat, even though the OSU Report seemed to find their presence sufficiently exonerating.

The OSU Report also presented witness testimony from the other passenger who drove with them to Dearborn, noting that the other passenger said he sat in the front seat, and that Ms. Huang's demeanor was cheerful and she was talkative (OSU Report p. 5) That summary of the passenger's statement does not contradict Ms. Huang's allegations about the drive; it simply does not address them. Moreover, as emails provided by Ms. Huang of her communications with Prof. Rizzoni over several years demonstrated, her outward demeanor generally belied the emotional response she was enduring. The passenger's observations do not, therefore, corroborate Prof. Rizzoni's denials; he is simply describing a different aspect of the drive once he entered the vehicle and Prof. Rizzoni was no longer alone with Ms. Huang.

This pattern of drawing conclusions that favored Prof. Rizzoni when a plausible alternate explanation would allow a positive inference in Ms. Huang's favor continued throughout the OSU Report. For example, Ms. Huang claimed that over a several month period in 2015, Prof. Rizzoni would repeatedly touch her while in his car and in his office, and frequently offered to pick her up to take her to CAR. The OSU Report then cited student witnesses who said it was common for Prof. Rizzoni to offer rides to his students. The fact that students attested to his driving them bears no relation to the specific allegations of Ms. Huang with respect to what would occur on *her* rides with him.

In April 2015, during another drive to Dearborn, Ms. Huang alleged that Prof. Rizzoni grabbed her left hand to place under his hip, purportedly to show her the massage function on his car. Here, the OSU Report relies on the statement of a student of Prof. Rizzoni who was also in the car. According to the OSU Report, the student supported Professor Rizzoni's denial. The investigators do not appear to have considered whether the student could be biased in his response, in light of the student's own relationship with Prof. Rizzoni. Nor is there any indication of whether the investigators asked the student about his vantage point from the back seat, what else he may have been doing, or whether he was paying attention or was distracted from what was happening in the front seat. (OSU Report, p. 6) Yet in his deposition, the student stated that, in general, when he is a passenger on trips to Dearborn, he would do work, read, and check social media on his phone. (Jayakumar dep. pp. 62-63) Accordingly, the investigators had no reason to rely upon the student's statement as corroboration of Prof. Rizzoni's denials of inappropriate behavior; nevertheless, the investigators found his presence and inability to support the alleged touching sufficient to disbelieve Ms. Huang.

Of significant interest, the investigators also conducted online research to see if this vehicle model had a driver's seat massage function and found that it did not, in accordance with Prof. Rizzoni's statement have a massage feature. (OSU Report, p. 15) That should not, however, have ended the inquiry. Equally plausible, but not apparently investigated, was whether the non-existent massage function was a subterfuge used by Prof. Rizzoni to have Ms. Huang touch him. Further, this effort by the investigators to independently corroborate Prof. Rizzoni is significant because, as will be described later, they took no such measures when online research could have corroborated Ms. Huang.

In another incident that Ms. Huang reported, on Aug. 22, 2017, Ms. Huang described a conversation in Prof. Rizzoni's office, during which he stood up, walked behind her, and then put both his hands under her arms and grabbed both her breasts. (Initial Complaint P.22) The OSU Report accepted Prof. Rizzoni's response at face value, without questioning whether, even if it was during the day at CAR and his door was open as Prof Rizzoni stated, a brief incident could go unseen.

The OSU investigators minimized Ms. Huang's own language in their recitation of her allegations. One example occurred with respect to a dinner in a restaurant on September 18, 2015, where Ms. Huang alleged the following:

> He proudly explained me his history, during which he put his right hand on my left lap and rubbed my lap all the way down to my left knee (I was wearing a summer dress). I was so humiliated and tried to use my hand to push away his hand, but he came back and rubbed my lap again and again until he had enough. I felt very sick but was too scared to shout in a public restaurant. Then he said, "Meng, I pay for your monthly stipend, so you'd better listen to me; otherwise, we may have a problem." (Initial Statement p.9)

The OSU Report described Ms. Huang's allegation by quoting her as follows: "Complainant stated that while Respondent was talking, he put his hand on her left lap and 'rubbed her lap all the way down to her left knee.'" (OSU Report p. 6) Not only did the OSU Report discount Ms. Huang's detailed description of the unwanted touching and how it made her feel, the investigators ignored Ms. Huang's description of Prof. Rizzoni's statement about her dependance on the monthly stipend he provides. By failing to address this alleged threat to Ms. Huang's economic security during a reported incident of sexual harassment, the investigators ignored a critical example of the way that power can be wielded in this context.

In addressing Ms. Huang's allegations of escalating behaviors in 2016, the OSU Report noted her reported experiences, and then stated: "Complainant did not provide specific dates for the incidents that allegedly occurred over this period, including the alleged incidents of Respondent touching her chest…" (OSU Report p. 8) It is common to attempt to undermine the credibility of a victim's recollection of sexual harassment because she is unable to recall a specific detail unrelated to the incident, such as the date or time. Victims often do not create contemporaneous documentation or otherwise record when incidents occur. The failure to provide a specific date should not undermine a victim's credibility.

10

The OSU Report summarized Ms. Huang's allegation that Prof. Rizzoni insisted on meeting with her in his office on weekends and, according to Ms. Huang, grabbed her hands, rubbed her thighs, touched her chest, grabbed her butt, and on one of those occasions, lifted a corner of her shirt and tried to put his hand under it. (OSU Report p. 7) The OSU Report stated that Prof. Rizzoni specifically denied touching her chest, butt, or lifting her shirt and commented that Ms. Huang did not provide specific dates for these incidents, without acknowledging that Ms. Huang did state with specificity that, between January-May and September-December, 2016, Prof. Rizzoni had requested 26 one-on-one meetings, of which 24 were on the weekends (sometimes on both days of that weekend), and one was even during Thanksgiving break. (Initial Statement p.13)

The OSU Report offered a further explanation for why Ms. Huang's allegations were not plausible: "Respondent stated that when he is meeting with individual students on weekends, other students frequently drop by his office unannounced. Thus, Respondent indicated that Complainant's suggestion that he was attempting to get her alone to harass her was not plausible." (OSU Report p. 8)

This is yet another example of the OSU investigators' failure to include important information provided by Ms. Huang in her Supplemental Response. Ms. Huang described Prof. Rizzoni's practice of weekend meetings with students, noting that his appointments are scheduled one-on-one, and that students do not step in until the previous meeting is finished. (Supplemental Response p. 57) Moreover, there is no indication that the investigators asked Ms. Huang if, during any of the times that she met alone with Prof. Rizzoni on weekends, other students ever dropped by unannounced.

In yet another example of how the investigators discounted Ms. Huang's statements and ignored relevant parts of her allegations, the OSU Report summarized her description of an incident of sexual harassment that occurred in Prof. Rizzoni's office on February 5, 2017. including allegations that Prof. Rizzoni "grabbed and rubbed her butt." Ms. Huang stated that this incident occurred while she was pasting a souvenir paper cutout from China on his window. In reporting Prof. Rizzoni's denial and defense, the OSU Report included his statement that the space is visible at all times to people internally and to people driving by on the road outside and driving into the parking lot. (OSU Report p. 8)

The OSU Report did not, however, include detailed supporting information provided by Ms. Huang in her Supplemental Response, including a photograph that demonstrated why Prof. Rizzoni's statement that they would be easily observed through the window was inaccurate. (Supplemental Response p. 55-56)

The OSU Report also stated that Prof. Rizzoni told investigators that, due to a skiing injury, his knee was "immobilized" and that "he spent most of his time in his office with his leg propped up on a chair." (OSU Report p. 8) Here, too, the investigators did not include critical information provided by Ms. Huang in response to this claim, including a photograph of Prof. Rizzoni's written work on a white board that she provided from their meeting, which demonstrated that he could stand up and move around. They also ignored Prof. Rizzoni's calendar entries that

demonstrated his busy schedule outside the office on February 6 and 7. (Supplemental Response pp. 54-55)

By ignoring her Supplemental Response, the OSU Report again discounted Ms. Huang's credibility and believed Prof. Rizzoni. The investigators believed the professor, demonstrating the power imbalance at the heart of her allegations. Overall, the OSU Report often treated Ms. Huang's allegations as a simple "he said/she said" dispute where all that seemed to matter was what "he said."

In another example, Ms. Huang stated that she was sexually harassed at Prof. Rizzoni's home on February 19, 2017, which was eleven days after he had knee surgery. Ms. Huang described an escalated level of unwanted touching that day that terrified and humiliated her. She described in detail where they were in his home, his preparation of coffee, where he touched her breast and how he "kept touching" his penis. (Initial Statement p.16 - 17) In addressing these allegations, the OSU Report first focused on an incidental statement made by Ms. Huang in her interview, where she said she was surprised to see Prof. Rizzoni walking without difficulty in his home. The OSU Report identified her expression of surprise as an apparent contradiction, pointing to Ms. Huang's Supplemental Response where she recounted an interaction with Prof. Rizzoni at CAR three days earlier, and observed that he was "walking without difficulty." The OSU Report stated: "Therefore, February 19, 2017, would not have been the first day she had allegedly witnessed him walking without difficulty." (OSU Report p. 9)

OSU's disregard for Ms. Huang's detailed follow up regarding her interactions is highly relevant: despite the fact that Ms. Huang's Supplemental Response totaled 111 pages, the OSU Report only chose to use it to question her testimony.

The OSU Report then described Prof. Rizzoni's denial of Ms. Huang's detailed description of the alleged sexual harassment that occurred in his home. This included medical documentation Prof. Rizzoni provided as supposed confirmation of his physical limitations on that date resulting from his knee surgery. But this documentation summarized by the OSU Report simply stated that: "The medical documentation included instructions to 'use crutches as directed paying close attention to your prescribed weight bearing status.' Respondent was referred to physical therapy with the instruction 'No weightbearing in flexion beyond 75 degrees for 6 weeks post-op.'" (OSU Report p. 10)

This medical statement was not in any way determinative of whether Prof. Rizzoni could walk unassisted, and should not have been accepted as evidence undermining Ms. Huang's credibility. The medical instructions did not state that Prof. Rizzoni needed to fully rely on the use of crutches eleven days after the procedure.

Moreover, an online review of medical literature would have provided to the investigators illuminating information as to when crutches would be needed nearly two weeks after knee surgery. Making such a supplemental inquiry would be consistent with the one undertaken by the investigators regarding whether the Cadillac model driven by Prof. Rizzoni had a massage feature, but there is no indication that any such inquiry was made. At the very least, further questioning of Prof. Rizzoni about the condition of his knee would have been warranted in light

of the significant discrepancy between Ms. Huang's detailed description of Prof. Rizzoni's behavior that day, and his statement that he was too impaired to walk around his home unassisted.

In her Initial Statement, Ms. Huang reported that she left Prof. Rizzoni's home that day feeling overwhelmed and humiliated and, as soon as she got in her car, "called a friend, Valerie Hendrickson, who is a lawyer." Attorney Hendrickson was also the girlfriend of another PhD student on Prof. Rizzoni's team. Ms. Huang stated that she tried calling twice but the calls went to voicemail, so she then followed up by texting Attorney Hendrickson to ask if she was available to talk. Later that day, Attorney Hendrickson responded by claiming she was sick, and asked if their conversation could take place via text, which Ms. Huang declined to do. Ms. Huang then reported that she became hesitant about whether she should follow up with Attorney Hendrickson, stating, "on the one hand, I really need the legal advice from her on what can I do when I am sexually harassed by my advisor," but then added that she did not want to put Attorney Hendrickson in a difficult position in light of her boyfriend's status as a student of Prof. Rizzoni. (Initial Statement p.17-18)

The OSU Report trivialized Ms. Huang's effort to reach Attorney Hendrickson by stating only that she tried to contact "a friend," without ever referencing the clear explanation in Ms. Huang's Initial Statement that she was contacting Attorney Hendrickson in her legal capacity. The OSU Report further minimized the communication by describing the emoji that Ms. Huang included when she texted Attorney Hendrickson. (OSU Report p. 9)

The OSU Report's diminishment of Ms. Huang's effort to contact a lawyer was particularly unfair in that even a cursory look at Ms. Huang's pattern of emails over her years at OSU reveals her frequent use of emojis, particularly with those who were in a position of power or authority over her. This was the case in many of her exchanges with Prof. Rizzoni; it would also be consistent with her effort to reach out to a lawyer at a moment when she described herself as feeling humiliated.

Ms. Huang described another incident of unwanted touching that occurred on July 20, 2017, in which she reported that Prof. Rizzoni rubbed her shoulder and arm while speaking with her at an event in Detroit. The OSU Report stated that Prof. Rizzoni "did not deny that he may have touched Complainant's arm, but denied any further contact, and stated that 'it would have been impossible to sexually harass (Complainant) in such a public setting without being seen and noticed by many others,' and that he did not do so." (OSU Report, p. 11)

Yet the specific unwanted touching that Ms. Huang described in this incident was not something that others necessarily would have noticed. For Ms. Huang, having her arm rubbed was a continued manifestation of Prof. Rizzoni's ongoing and unwanted physical attention; to others at a public event, it might seem like an unremarkable display of affection. Not all instances of unwanted touching take place in private. According to Ms. Huang's allegations, Prof. Rizzoni's behavior became increasingly emboldened. His stated insistence that he has never "sexually harassed" Ms. Huang should not diminish the impact that his alleged ongoing unwanted touching could have on Ms. Huang, a critical point that the OSU Report repeatedly failed to recognize. Further, Prof. Rizzoni's characterization of his behavior as not being "sexual harassment" is

13

something that should not have been accepted at face value. Rather, the investigators should have determined whether touching occurred and if it made Ms. Huang feel uncomfortable. Touching on the arm could easily fall into that category, particularly repeated touching.

The OSU Report discounted Ms. Huang's description of Prof. Rizzoni's treatment of her during a November 15, 2017, WebEx meeting with the Ford team and a subsequent meeting between Ms. Huang and Prof. Rizzoni on the morning of November 17. Ms. Huang had participated in the November 15 WebEx from Scott Lab; Prof. Rizzoni was at CAR. Ms. Huang stated that she did not go to CAR because the computer software license allowing her laptop access had expired and that by participating from Scott Lab, she could also avoid being alone with Prof. Rizzoni.

During this WebEx meeting, Prof. Rizzoni reportedly berated Ms. Huang for her alleged inaccessibility and threatened to terminate her from the PhD program. Prof. Rizzoni also reportedly told Ms. Huang that the Ford PI who had previously been invited to be on her candidacy exam committee was no longer involved, and Prof. Rizzoni then asked that she meet with him over the weekend. Ms. Huang reported that, after she resisted another weekend meeting, they agreed to meet early Friday morning, November 17, at Prof. Rizzoni's office.

During that Friday meeting, and in the presence of the CAR IT staff member and another member of the CAR research staff, Ms. Huang stated that Prof. Rizzoni again threatened to remove her from the PhD program if she did not meet with him over the weekend. (Initial Statement p. 25) Several hours after this meeting, Ms. Huang stated that she learned that Prof. Rizzoni had made changes to her candidacy exam committee. When she inquired about the reason for the changes, Prof. Rizzoni stated that "This is what happens when you never meet with me and never reply to my emails…things change." (Initial Statement p.25)

The OSU Report only partially addressed Ms. Huang's descriptions of these two meetings. First, the OSU Report noted that the Ford employees on the WebEx corroborated that Prof. Rizzoni was upset. One of the witnesses "recalled that Complainant 'began ranting about (Respondent's) request to meet on Sunday'" and the other Ford employee "recalled that Respondent was frustrated with Complainant for not being in his office for the meeting, and recalled Respondent commenting on Complainant's failure to meet with him for several weeks." (OSU Report p. 13) The OSU Report is silent on whether the Ford employees corroborated that Prof. Rizzoni also threatened to terminate her participation in the PhD program during the WebEx, although that would have been an important inquiry for the investigators to have made in light of Ms. Huang's repeatedly expressed fears of retaliation and her own description of this meeting.

In addition, the OSU Report included an excerpt from an email from one of the Ford employees on the November 15 WebEx: "About the Sunday meetings, (my wife) said something that never crossed my mind, and probably never crossed yours. It might not be about not wanting to work on Sunday, but rather to be alone in a man's office with no one else in the building. She said it would have made her uncomfortable. (I do not know whether CAR is full or empty on a weekend, this presumes the building is empty)." (OSU Report p. 17)

Rather than recognizing the spouse's perceptions as a red flag to be considered, the OSU Report simply stated that Prof. Rizzoni called the Ford employee to reassure him that it was routine for students to meet with him on Sundays at CAR.

With respect to the meeting on Friday, November 17, the OSU Report noted that the IT staff member who was present "did not recall overhearing" Prof. Rizzoni's threat to terminate Ms. Huang if she did not meet on the weekend. Curiously, the OSU Report further noted that the IT staff member also sent an email about Ms. Huang's software license expiration, in which he stated that "it was unusual" that he had not heard sooner from Ms. Huang about the need to renew her software license. According to the IT staff member's email, students and researchers would have known of the expiration in September, so he "would have expected to hear sooner along with the other researchers who were similarly impacted by the expiration well before then." (OSU Report p. 13)

The OSU Report's inclusion of this email questioning Ms. Huang's delayed renewal of her expired software license was offered without any recognition that it might represent something other than an example of Ms. Huang neglecting an aspect of her student responsibilities. There was no apparent consideration of the experience from Ms. Huang's perspective: that the expired software license provided Ms. Huang with an excuse for not being alone with Prof. Rizzoni at CAR, instead providing her a reason to do her work from Scott Lab.

The OSU Report never acknowledged that the witness statements from these two meetings could be viewed as corroborating Ms. Huang's fear of being alone with Prof. Rizzoni. And even though, at both the November 15 and 17 meetings, Prof. Rizzoni reportedly told Ms. Huang that he would terminate her from his PhD program if she would not meet with him over the weekend, the OSU Report never identified these statements as examples of how she says he wielded his power over her when she tried to resist his demands for weekend meetings.

Prof. Rizzoni also sent various emails to the candidacy committee instructing that the exam be a real exam" and that it was "important to send the right message" and that "the message may be terminal this time" (OSU 9677) He sent other emails instructing members of the committee to "be tough" (OSU 9787) and that "the outcome will be whatever it needs to be." (OSU 011537)

In addressing Ms. Huang's allegations about the PhD candidacy exam, the OSU Report extensively detailed Prof. Rizzoni's denial that he retaliated against her by damaging her reputation within the University and at Ford, and by selecting committee members loyal *to him* for her candidacy exam to sabotage her results. The OSU Report failed to consider Ms. Huang's allegations in the larger context of what she had endured for several years, nor did it consider Prof. Rizzoni's behavior as consistent with his increased frustration with her alleged resistance. The investigators failed to consider whether the reason Prof. Rizzoni terminated his role as Ms. Huang's mentor and advisor, cutting off his interest in, support for, and commitment to Ms. Huang's successful completion of the PhD program, was to retaliate for her increased refusal to be alone with him.

To Ms. Huang, it was the result she most feared – by rebuffing Prof. Rizzoni's alleged unwanted physical touching and demands to meet with her alone on weekends, she was now paying the

ultimate price. She stated that she felt his threats to her doctorate program, career development, financial support, and even her ability to remain in the United States were coming to fruition.

The OSU Report concluded with a summary of witness statements that supported various aspects of Prof. Rizzoni's denials. Throughout this analysis, the OSU Report continued to present statements in a light most favorable to Prof. Rizzoni and most harmful to Ms. Huang. The OSU Report failed to draw any connection between Prof. Rizzoni's witnesses and the motivation they might have to be silent or not say anything negative about the professor in order to remain in Prof. Rizzoni's good graces.

Moreover, the OSU Report continually discounted Ms. Huang's statements and experiences. For example, in a section entitled "Witness statements regarding Respondent's efforts to assist Complainant," the OSU Report stated that "three CAR staff members, one student, and one Ford staff member - shared with the investigators that Respondent had expressed concern about Complainant's well-being and academic progress, and asked them to reach out to Complainant to offer assistance. The witnesses all stated that Complainant never expressed concerns to them about her interactions with Respondent." (OSU Report at pp. 25-26)

It is entirely consistent with the EEOC's Task Force findings, my research, and other well-established resources that victims often do not tell anybody about their abuse, at least not right away. Ms. Huang had repeatedly made clear that she did not share her concerns about Prof. Rizzoni's behavior with others for fear of retribution. Accordingly, witnesses who stated that she never expressed concern simply corroborate her statements. Moreover, the placement of these witness statements in a section that purports to represent Prof. Rizzoni's efforts to assist Ms. Huang is a failure to recognize that such expressions of alleged concern about Ms. Huang's well-being to others – some of whom could be future employers – is, as research supports, gaslighting.

The OSU Report also identified conversations with six witnesses, including two current students, two current staff members, one Ford employee, and one non-affiliate of OSU, who "shared observations about Complainant as a PhD student that supported Respondent's perspective that Complainant was not committed to her research and degree." (OSU Report p. 26) Here, again, the OSU Report ignored an alternative interpretation: these summarized statements did not corroborate Ms. Huang's disinterest in being a student but, rather, supported her fear of and desire to avoid contact with Prof. Rizzoni and his exercise of power over her, and could also have been a manifestation of the depression and other physical and emotional symptoms she has described.

Ms. Huang documented that she felt humiliated by Prof. Rizzoni's harassment and feared discussing her concerns with anyone, yet the OSU Report discounted such statements and presented them in a light most negative to her: "Of the 37 witnesses that the investigators interviewed other than Complainant and Respondent, no witness recalled Complainant ever expressing that she felt uncomfortable interacting with Respondent prior to Complainant making her allegations after her candidacy exam." (OSU Report p. 26) The number of witnesses here is completely irrelevant; Ms. Huang said that she told nobody -- so there was no one who could corroborate what she has reported.

The investigators focus on the timing of Ms. Huang's report. The witness statements are presented as though Ms. Huang's concerns were raised **because** she failed her exam, implying that she made up the allegations in response to Prof. Rizzoni's decision to terminate her involvement in the PhD program. Had the OSU investigators considered what is known about why victims often fail to make contemporaneous reports, these statements could have been viewed as **supporting** what Ms. Huang continually asserted: she did not speak about Prof. Rizzoni's alleged sexual harassment because she felt shame and humiliation, and was fearful that if she spoke up, he would retaliate against her. There was also no consideration of the fact that victims of sexual harassment – particularly where the perpetrator is powerful within the organization – exhibit patterns of silence rather than speaking out, as will be further discussed, below.

The lack of objective inquiry was particularly clear in the OSU Report's summary of its interviews with the thirty-seven witnesses questioned about their "observations on interactions with Respondent." (OSU Report p. 27) As noted previously, the vast majority, if not all, of these witnesses have a current or ongoing relationship with Prof. Rizzoni. Their reliance on him likely includes both academic and career advancement. Prof. Rizzoni maintains extensive and important relationships in the automotive industry that have long served as a source of assistance to his students with job placements at prestigious companies. Each of these witnesses may have a self-protective bias to be silent bystanders and to ignore any alleged improper touching by their mentor, advisor, and professor. That potential component of their witness testimony, however, was neither acknowledged nor developed by the investigators.

In recounting the statements of these interviewees, the OSU Report noted that twelve witnesses "described Respondent's manner of interacting with people as involving touches on the hand, hugs, and pats on the shoulder." It further stated: "No witness felt that Respondent's physical interaction with them was romantic or sexual in nature." (OSU Report p. 27)

This demonstrates the extent to which the OSU Report ignored the fundamental basis of Ms. Huang's complaint. Sexual harassment is an abuse of power that does not require a romantic or sexual undertone; rather, it is the exertion of unwanted physical contact that silences selected victims into submitting to the whims of the perpetrator through fear of retaliation.

It should not have been relevant to the investigators whether the students perceived an intent of sex or romance behind Prof. Rizzoni's physical contacts. Nor is it relevant that other witnesses, who had every reason to protect their ongoing relationship with Prof. Rizzoni, did not express concern about the nature of his physical interactions with **them**. Prof. Rizzoni's reported ongoing and unwelcome touching of Ms. Huang, coupled with his alleged repeated threats to terminate her funding and continued enrollment in the PhD program, demonstrated an abuse of power that should have been a key focus of the OSU investigation. Instead, the OSU Report repeatedly focused upon conversations with witnesses described as corroborating of Prof. Rizzoni, even as those very witnesses likely had their own reasons to be fearful of damaging their relationship with him.

Moreover, the investigators failed to recognize the impact of culture in the investigation of Ms. Huang's claims. The OSU Report stated that: "One witness, a Chinese female, stated that she had heard about others being uncomfortable with Respondent's physical interactions, but she never experienced discomfort herself, and believed others' discomfort may have been due to cultural differences." (OSU Report p. 27) As will be further described below: "The hierarchies of relationships are particularly emphasized in Chinese society." (Chien)

Rather than viewing this statement as another red flag worthy of exploration, the OSU Report simply added the comment of another Chinese student, seemingly to demonstrate that Ms. Huang's culture was irrelevant to this inquiry and to suggest that Prof. Rizzoni's unwanted physical contact could easily be stopped. The OSU Report noted: "One other witness, also a Chinese female, stated that Respondent would at times pat her shoulder, and on one occasion, she brushed Respondent's hand away because she felt uncomfortable with this type of physical interaction. The witness stated that Respondent 'got the point' and stopped touching her." (OSU Report p. 27)

According to the OSU Report, when investigators asked Prof. Rizzoni about this, he recalled the interaction and stated that when this witness removed his hand from her shoulder, he understood that it meant he should stop touching her. Nowhere does the OSU Report acknowledge that another reasonable interpretation of this interaction is that it revealed a pattern of unwanted touching exhibited by Prof. Rizzoni.

In summarizing its analysis, the OSU Report restated the applicable definitions from within OSU's Sexual Misconduct policy, which includes the definition of non-consensual sexual contact as "**any** intentional sexual touching, **however slight, with any body part** or object, by any individual upon another that is **without consent** and/or by force or coercion. Sexual contact includes: intentional contact with the breasts, buttock, groin, or genitals, or touching another with any of these body parts or object, or making another touch you or themselves with or on any of these body parts; any intentional bodily contact in a sexual manner, though not involving contact with/of/by breasts, buttocks, groin, genitals, mouth, or other orifice." The OSU Report stated that "such acts of non-consensual sexual contact are forms of sexual assault, and therefore sexual misconduct under university policy." (OSU Report p. 31, emphasis added)

Ms. Huang consistently stated that she experienced repeated unwanted touching that met the University's own definition of non-consensual sexual contact, as cited above. Nevertheless, in its section summarizing disputed facts, the OSU Report seemingly contradicted its own recitation of the above-described definition of the University's policy by stating: "To be clear, Respondent acknowledged that he may have touched Complainant at various times on the hands, shoulders, arms, or in other similar ways, and numerous witnesses confirmed that Respondent regularly engaged in this sort of touching with individuals of both genders, none of whom found it to be sexual in nature. The nature of the admitted conduct, though, does not on its face rise to the level of sexual misconduct…" (OSU Report p. 31) The unwanted touching acknowledged by Prof. Rizzoni violated the University's definition, yet the OSU investigators appear to be imposing a higher standard, concluding that because Prof. Rizzoni's **admitted** forms of touching were acceptable to other students who did not complain about it, his treatment of Ms. Huang was not in violation of OSU policy. The OSU investigators also appear to entirely discount Ms. Huang's

statement that he also touched her breasts, buttocks, and thighs, fully accepting Prof. Rizzoni's denials.

In another example, the OSU Report referenced Ms. Huang's description of walking into Prof. Rizzoni's office as he was "actively rubbing the neck of a fellow student." The OSU Report then noted: "The student in question stated that sometimes Respondent would pat her on the back, but that it was never inappropriate. Further, Complainant alleged that Respondent's pattern of behavior was to attempt to get her alone to engage in improper touching. ***If that were true, it does not make sense*** that Respondent would invite her into his office while engaging in harassing another student." (OSU Report p. 32, emphasis added)

To the contrary, the OSU Report failed to acknowledge a different interpretation of this behavior: Prof. Rizzoni was demonstrating his power to Ms. Huang by revealing another student's acquiescence to it. The other student did not contradict Ms. Huang's observation that she was touched, thereby corroborating that Prof. Rizzoni had a practice of touching other students. Moreover, the investigation should not have been about what other students experienced, particularly in light of OSU's failure to consider their motivations to remain silent about Prof. Rizzoni's behavior, as well as OSU's failure to recognize that sexual harassment is a tool to exert power over victims.

In its summary of the disputed facts leading to its conclusion, the OSU Report accepted each response of Prof. Rizzoni seemingly without question, failed to include information from Ms. Huang, including but not limited to, examples from her Supplemental Response, and ignored other basic tenets that should have been considered important to its analysis, such as fear of retaliation, bias, interest, and motive. For instance, in its presentation of witness testimony, no analysis was conducted as to whether the witnesses themselves had biases, motivations, or other issues that would impact their statements and recollections.

The flaws in this investigation demonstrate why: "Organizations that want to understand their own culture cannot investigate themselves and expect direct and honest answers. Employees need the safety and anonymity that only an independent investigation can provide." (Rikleen, Cognoscenti/WBUR, 2018)

In my opinion, the OSU Report ignored the power dynamics between Prof. Rizzoni and Ms. Huang and failed to properly address Ms. Huang's claims, repeatedly discounted or entirely ignored her allegations, selectively analyzed information most advantageous to Prof. Rizzoni, and relied on witnesses without any inquiry about their relationship with and professional dependance upon Prof. Rizzoni.

## Research Presented by the OSU Task Force on Sexual Abuse

The shortcomings of the OSU Report are even more striking in light of long-standing research on sexual harassment, important aspects of which were included in the report of the OSU Task Force on Sexual Abuse ("OSU Task Force") that was convened by OSU's president to analyze instances of sexual abuse on college campuses. As reported in *The Lantern*, the student newspaper of OSU: "The … task force itself was created following the May 2019 release of the

independent investigative report into sexual abuse committed by former Ohio State physician Richard Strauss … The investigation conducted … detailed acts of sexual abuse against at least 177 former students and concluded that university personnel at the time failed to adequately respond to or prevent Strauss' abuse."

The OSU Task Force was charged with, "focusing specifically on identifying and understanding the particular challenges and cultural barriers that may exist in college departments of athletics or in the clinical medical enterprise that could affect sexual abuse reporting." (OSU Task Force report p. 2) The work of the Task Force was far-reaching, as it provided a broad-based analysis of the topic of sexual harassment in higher education.

The OSU Task Force was convened, and its report was issued, after OSU completed its investigation of Ms. Huang's allegations against Prof. Rizzoni. Its November 2020 report, however, is relevant to this matter because it included research and recommended practices that have long been available to and known within the higher education community.

The OSU Task Force brought together nationally-recognized experts in a series of discussions to share research, information, and best practices. These experts participated in roundtable conversations focused on research and strategies for addressing sexual assault, sexual harassment, sexual misconduct, harassment, and related behaviors.

The report of the OSU Task Force reinforced that Ms. Huang's description of sexual harassment and assault, abuse of power, retaliation, and the University's failed response are supported by research, yet that appeared to be ignored by OSU investigators when Ms. Huang finally summoned the courage to step forward and share her story of alleged misconduct.

In reporting on sexual abuse in higher education over the past decade, the OSU Task Force stated that fear of retaliation "was a frequently recurring theme in public reports about the incidents" and included "interference with career or academic success" and "monetary loss" that included loss of scholarships. (OSU Task Force Report pp. 7-8)

Critically, the OSU Task Force also reported that "cases involving international students, both in the U.S. and abroad, revealed a particular set of vulnerabilities" including being "targeted by exploiting their need for support in navigating and adapting to a new culture." The report stated that: "International students' uncertainty with regard to whether their alleged abuser's conduct was acceptable under United States norms and their lack of familiarity with how to access support services was also exploited by their alleged abusers." (OSU Task Force Report p. 8) That Ms. Huang's status as an international student placed her at greater potential for exploitation and made her more vulnerable to misconduct was not recognized in the OSU Report.

In its summary of themes that emerged from the roundtable discussions with experts, the OSU Task Force highlighted the importance of "proactively addressing retaliation" in order to create a "survivor-centered culture." In addition, the OSU Task Force reported that the "frequent power imbalance between perpetrators and survivors highlights the importance of paying special attention to high-risk groups and niche vulnerabilities." (OSU Task Force Report p. 10)

For example, experts participating in the OSU Task Force roundtables recognized "the unique vulnerabilities of graduate students, who have special dependence on advisors and mentors for funding, letters of recommendation, and career development and advancement. The impact of harassment on graduate students is often both economic and psychological. Because of this dependent role, graduate students may not see a way out of the situation, so a common response is to 'keep your head down.'" (OSU Task Force Report p. 37)

In reporting on the discussions among roundtable experts as to where sexual harassment is most likely to occur, the OSU Task Force stated that sexual harassment targets "are plentiful and are available in any place where power imbalances exist." The OSU Task Force identified "places in an organization that lack capable guardians" as particularly vulnerable, for example, "STEM labs where power differentials seem to be extraordinarily high. STEM labs are isolated from the rest of the university. Everyone in those labs is dependent on head scientists for employment, publications, and other professional necessities." (OSU Task Force Report p. 45)

Further commenting on the dependent relationships that can exist in the STEM fields, the OSU Task Force experts noted that, according to studies from the Association of American Universities, "many female graduate students are being assaulted and harassed, and, whereas employees in a company can leave and find a new job if they are being harassed by a boss, students tend to have fewer options." (OSU Task Force Report p. 45) The OSU Report failed to include any recognition of Ms. Huang's additional vulnerabilities as a PhD student in the STEM field.

The OSU Task Force experts also discussed the importance of organizational support in creating buy-in for cultural change. The OSU Task Force Report stated that presenters: "firmly addressed the need for training and education programs that are ongoing and customized to individual settings. A one-size-fits-all approach is not sufficient to achieve effective and sustained change, and multiple modalities are ideal." (OSU Task Force Report p. 11)

Training is certainly a crucial preventative measure that OSU should have implemented to prevent sexual harassment and retaliation from occurring. Prof. Rizzoni stated he participated in an online sexual harassment training program at OSU from 2017-2019, that consisted of viewing a video module that lasted "between one and two hours." Only one of those years overlapped with his role as Ms. Huang's advisor. He had no training during her first few years in his program. (Rizzoni's Answers to First Discovery Requests, Interrogatory No. 8 and Rizzoni dep. p. 114) Consistent with the experts participating in the OSU Task Force who addressed the importance of ongoing and customized programs, prescriptive training modules are inconsistent with practices that organizations should be instituting and will not work to promote changes in organizational culture. (Rikleen)

The information discussed during the OSU Task Force roundtables was widely available in the social science literature prior to OSU's investigation of Ms. Huang's claims and should have been of critical importance to the University's response to her allegations of sexual harassment. Had this information been accessed by the OSU team investigating Ms. Huang's claims, the OSU Report could very likely have come to a different conclusion.

**The Privileges of Power and the Institutions that Support the Powerful**

It is important to note that studies addressing sexual harassment in the workplace are as relevant and applicable to Ms. Huang as research on sexual harassment in academia. Workplace dynamics relating to power, reporting, and retaliation are applicable to and may even be exacerbated within a higher education setting. In particular, PhD students like Ms. Huang have multiple roles: they are students, focusing on their studies, and they are also university employees, frequently applying their academic areas of expertise in a workplace setting. Moreover, faculty members, as both employers and professors, may be perpetrators of sexual harassment.

It is well-established that when ostensibly respectable people – particularly those in positions of power and privilege – are accused of wrongdoing, the instinct of their colleagues is often to protect and defend them. As a result, a decision not to report negative behaviors and misconduct, such as sexual harassment, has historically been shown to be a logical and common choice. Even if the institution has a policy and reporting process, it does not compensate for a flawed implementation.

Power and hierarchy are essential elements in many instances of sexual harassment. As one scholar wrote: "[W]hen it comes to accusations of sexual harassment, we need greater institutional accountability for the conduct of those at the top of the workplace hierarchy, alongside greater protection for the rank-and-file." (Arnow-Richman)

Policies and preventative strategies were discussed in one study examining university policies from an employee perspective. The study demonstrated that even a strongly written policy is insufficient in the face of a culture that impedes efforts to assert one's rights under that policy. Women self-censor. Knowing they would not receive support through the formal process, they simply did not report. The study found that: "…managers rarely exercised their broad mandate to protect employee rights, and instead often shielded the harassers – and the University – from women's complaints. …women anticipated these management practices in fashioning their responses to unwanted sexual attention. These interactions reshaped – and narrowed – the meaning of sexual harassment for working women." (Marshall p. 99)

Just as Ms. Huang reportedly experienced and the OSU Report revealed, the University was more protective of its prestigious faculty member than in demonstrating a commitment to fairly, fully and thoroughly investigate her complaints. In remaining silent for years, Ms. Huang's choice was a logical one.

Research has also identified a range of harms that can arise when a woman's experience is ignored or discounted. Victims develop a sense of powerlessness and futility, believing that nothing they say or do will ever make a difference. Victims also feel worthless; if nothing is done to address their painful experience(s), then the victim is left believing she simply does not matter. Moreover, victims who finally shared their stories are often filled with self-doubt when questioned about whether they are remembering correctly or when their claims are discredited. Met by skepticism and with no institutional support, victims are left questioning themselves.

This is the dynamic that played out in the OSU Report where, as discussed above, the investigators discounted the extensive details provided by Ms. Huang in her compilation of the allegations and minimized her experiences. Through this discounting and diminishment of her experiences, it was then easier for the OSU investigators to accept the statements of Prof. Rizzoni in formulating their conclusion.

A University of Pennsylvania law review article detailed how the discounting of women's credibility and dismissal of their experiences within institutional settings cause harm:

> Credibility discounts and experiential trivialization harm women in an abundance of ways – up to and including the supremely destabilizing process of prompting women to question the truth of their own experience. Women are devalued and gaslighted from every direction, discouraging them from continuing to seek systemic support. Ripple effects discourage the broader community of women from seeking the help they need. And our entire society suffers from the failure to fully understand, credit, and value a substantial portion of the human experience. Together, these harms operate to form a formidable obstacle to women's healing, safety, and ability to obtain justice. (Epstein p. 453)

This was the experience of Ms. Huang: the credibility of her allegations was undermined and the toll it took on her was ignored. She experienced the same "gaslight-style gauntlet of doubt, dismissal, and outright disbelief" that other victims so frequently face. (Epstein p. 399) Whether as victims of domestic abuse, as detailed in this law review article, or as victims of harassment in any institutional setting where allegations against powerful individuals are met with skepticism and disbelief, the resulting physical, psychological, and emotional response is not credited. It is relevant to note that scholars have compared the responses that victims of domestic violence experience with the responses of sexual harassment victims: "In fact, harassed women often report feelings similar to those of sexually assaulted or battered women: anger, degradation, violation, and betrayal." (Huerta p. 618)

As happened with OSU's investigation of Ms. Huang, there also can be a tendency to minimize the effects of harmful behaviors based on either the intensity or frequency of the experiences. This results in subjective judgments about how bad a particular behavior is and whether it would warrant a disciplinary response. One large-scale analysis of existing research compared how different harmful experiences and stressors affected women's health and attitudes in the workplace. The study tested for a wide range of behaviors, including sexual harassment, which included "*unwanted sexual attention*, comprising sexual behaviors that are not wanted, welcomed, or reciprocated…". In reporting their findings, the researchers stated:

> More frequent though less intense harmful workplace experiences can impair women's occupational well-being as much as less frequent yet more intense experiences. Distinctions among harmful workplace experiences based on severity should be avoided. Such distinctions may perpetuate the view that some harmful workplace experiences (e.g., sexist jokes and remarks, ignoring women during meetings) have a lesser impact; they are in fact as detrimental as other well-recognized forms of mistreatment at work. (Sojo pp. 4 and 25).

This research has particular relevance to Ms. Huang, who described her shame and embarrassment resulting from all aspects of Prof. Rizzoni's alleged unwanted touching, even when his physical contact was directed to rubbing her arms, back, or neck areas and not other more intimate areas that she described also occurred. She feared seeing him because of the frequency of his touching. The OSU Report, however, seemed focused on the intensity and, as a result, diminished both.

As noted previously, research also demonstrates that those who occupy positions of power and prestige, and who are given significant authority over others, have an unchallenged opportunity to harass their subordinates. A group of noted scholars wrote that:

> [H]arassment is more about withholding gendered status and identity than it is about expressing sexual desire or sexuality. … Research shows that managers who are given unfettered, discretionary authority over subordinates are more likely to abuse it. The problem is exacerbated when those who occupy such positions are "stars" with high value to the organization. Regardless of their perceived worth to an organization or industry, bosses should not be given unconstrained power to control or direct other people's careers. Excessive, unchecked discretion not only provides a ready mechanism for discrimination; it also provides a powerful platform for harassment and intimidation. (Schultz)

The EEOC Task Force similarly described the notion of the "superstar" harasser - someone renowned in or a leader in his field who is "privileged with higher income, better accommodations, and different expectations."  In describing superstar status as a "breeding ground for harassment," the EEOC Task Force noted that "…power can make an individual feel uninhibited and thus more likely to engage in inappropriate behaviors." (EEOC Task Force Report)

These conditions existed at OSU, as Prof. Rizzoni was a distinguished faculty member who had significant discretionary authority over his students, including Ms. Huang. Institutions like OSU can be complicit in facilitating misconduct through their tendency to believe powerful leaders within their organization over those in a subordinate role.

It can be difficult to understand how a noted professor could justify to himself the sexual harassment of a student, yet that is important when considering the strength of a perpetrator's denials. A relevant body of research analyzed the motivations of those who commit sexual harassment behaviors and their awareness of themselves as committing acts viewed as socially unacceptable and offensive. In a study of cognitive strategies used to justify one's actions, researchers looked at how moral disengagement operates to allow perpetrators to justify their own behaviors. One example of such moral disengagement can be found when a perpetrator disregards or distorts the consequences of his behavior:

> The enactment of harassing acts as motivated by the need to accomplish specific goals … may lead perpetrators to cognitively minimize, ignore, distort, or disbelieve the harmful consequences of their actions. As such, there is little reason for self-

> censure to be activated. …[P]erpetrators may reinterpret the effects of their conduct
> as being pleasurable and flattering for the target. The invisibility of any suffering
> evoked through their harassing behavior may facilitate repeated offending. This may
> be reinforced through the reluctance of targets to make formal or informal complaints
> about sexual harassment … and through the adoption of passive coping responses ….
> Sexual harassers may, therefore, distort the consequences of their actions through
> attending to a lack of protest from the target. This lack of protest may incorrectly
> signal to the perpetrator that the target actually welcomed and enjoyed the behavior
> directed at them." (Page p. 26)

In essence, perpetrators are oftentimes able to convince themselves that they are doing nothing wrong. Moreover, the perpetrator often sees the victim's failure to report not as rooted in fear of retaliation, but as reassurance that she enjoys the attention. This distorted sense of reality provides a moral framework in which Prof. Rizzoni could vigorously assert his denials of the allegations.

The problem for the victim is compounded when she is then betrayed by the institution, as Ms. Huang reportedly felt when the OSU Report issued. Studies examine how people in organizations are impacted when trust is violated:

> Institutional betrayal occurs when an institution causes harm to an individual who
> trusts or depends upon that institution. … Institutional betrayal may be left to occur
> via omission of protective, preventative, or responsive institutional actions – typically
> actions promised by or available solely through the institution. (Smith pp. 578-79)

The authors noted that institutions are at risk for betraying their members when there is an "organizational tolerance for harassment, a lack of standard or serious sanctions, and management that does not take reports of harassment seriously, as well as acts of commission such as taking retaliatory actions against those who report harassment." (Smith p. 580)

Ms. Huang came to OSU and stated that she was excited about becoming part of an institution that excelled in the area of expertise she wanted to pursue and that offered access to professors, peers, and businesses of importance in her field of interest. Maintaining her place in that institution was important, and she feared that if she spoke up, it could be lost to her. When she finally shared her experiences, she expressed feeling betrayed by a response which, to her, demonstrated that the institution valued the preservation of its reputation and protected a powerful professor over her well-being.

The challenges for women in the STEM fields, as noted previously, can be particularly daunting. The National Academies of Science, Engineering, and Medicine undertook a study of the impacts of sexual harassment and found that the fields of academic science, engineering, and medicine share characteristics that make sexual harassment more likely to occur. In particular, the study noted that career advancement in these fields is heavily dependent on advisors and mentors, and that women more generally cope by trying to ignore or appease the harasser. They less often report the behaviors for fear of retaliatory actions.

25

Because victims who finally do come forward are often re-traumatized by the system, the experience ultimately culminates in a reinforcement that silence may have been the better choice. Ms. Huang's experiences are best summarized by Epstein's research:

> All too frequently, system gatekeepers also discount the importance of women's actual experiences and of the ways in which the system itself exposes women to additional harms. Such experiential discounting occurs when, regardless of the plausibility of a survivor's story and regardless of her personal trustworthiness – in other words, even when system actors believe her – they nonetheless adopt and enforce laws and policies that, in practice, re-victimize her. These issues – credibility discounting and experiential discounting – cannot be considered in isolation. Such an approach would fail to capture the way that each relies on and reinforces the other, both in practical reality and through the personal lens of survivor experience. (Epstein p. 438)

**The Prevalence of Sexual Harassment in Higher Education**

This section highlights research relevant to my opinion that OSU failed to consider the significant body of research, and extensive media coverage demonstrating that sexual harassment in academia is a significant problem, that it is often not about sex but about power, and the fact that the greater the power differential, the more difficult it is for a victim to speak up. This all adds credibility to Ms. Huang's description of her experiences at OSU, including how vulnerable she felt, as a woman from another culture and a PhD student who was totally dependent on Prof. Rizzoni, both academically and financially.

The extensive problem of sexual harassment in the higher education setting has been known, examined, and reported for decades. (Huerta p. 616) The Association of American Universities released a large-scale scientific survey in 2015 "to provide participating institutions of higher education with information to inform their policies to prevent and respond to sexual assault and misconduct." (AAU Survey p. III) In this study, the AAU included references to other campus surveys dating back to at least 2000.

As the body of research, studies, anecdotes and reports addressing sexual harassment in higher education demonstrate, a university setting fosters significant power imbalances such as the one that existed between Prof. Rizzoni and Ms. Huang. In particular, professors who bring in substantial grant money to the university, who direct important research and programs, and who attract students that they can mentor and develop into successful graduates and future loyal alumni are at the top of the university hierarchy in prestige and power. Responses to a large-scale survey focusing on sexual harassment experiences in academia highlighted the significant power differential that exists between faculty and students:

> Students depend on faculty in their field in a way that few employees depend on their bosses, for teaching them the information they need to advance in their field, giving them grades that determine what kind of future career they will have, writing letters of recommendation, providing career development opportunities such as research experience, mentoring, networking, funding, professional opportunities, and

introducing them to important people in their field. This high level of dependence on an academic advisor is particularly pronounced for graduate students. Tenured professors, in turn, have a level of job security that is unmatched in virtually any other profession. For professors who choose to abuse their power, the power differential between them and those below them in the academic hierarchy can lead to a highly sexualized environment, characterized by unwanted sexual attention towards students in the research lab, classroom, professor's office, academic conferences, field sites, or study-abroad programs. (Karami p. 21)

Universities provide an ideal setting for power – in the form of sexual harassment - to be exerted over a student whose response is fueled by fear that she would not be believed and would be subject to retaliation that would severely impact her future. This study identified how professors can misuse their privilege: "The invulnerability of tenured professors can lead to what has been referred to as the sexual supermarket…. In this environment, some professors behave as if one of the privileges of their job is to hit on students. … Professors who sexually harassed students typically faced very few, if any, consequences. As survey respondents noted…the person who paid the heaviest price for the harassment was, almost always, the victim of the harassment." (Amir p. 22)

For Ms. Huang, the more she resisted Prof. Rizzoni's unwanted touches and sought to avoid him, the more he harassed her and sought to retaliate, leading to her increased anxiety and other physical symptoms.

As noted in the prior section addressing the research presented to the OSU Task Force, graduate students can be at particular risk. A law review article focusing on the power differential between faculty and students identified the particular vulnerabilities of students in graduate programs, noting that the "small disciplinary communities that graduate students inhabit, and the high-stakes ways in which one or a handful of key faculty mentors and advisors can influence future academic career prospects mean that graduate students are very likely to be seriously harmed when sexually harassed by faculty." These risks are accentuated in doctoral programs which tend be even more insular and include close relationships with faculty. (Cantalupo pp. 679, 680)

One study examined how third and fourth-year medical students experienced and reported sexual harassment. The study described and confirmed prior research demonstrating that victims fear retaliation, have no confidence that their complaints will be taken seriously, and, therefore, do not report. The authors recommended that institutions focus on their own environment to understand why students believe that perpetrators will be protected. Sexual harassment inquiries should "identify students' perceptions of the fairness of the actual policies surrounding sexual harassment (formal organizational justice) and the way the institution really responds to such reports (informal organization justice)." (Wear, p. 7)

A group of scientists in an academic setting described the burden of coping with harassment as including everything but reporting the perpetrator: "…reactions ranging from appeasing the harasser and minimizing the incidents, seeking social support from friends and family, professional therapy, strategizing on future responses, engaging in activities to improve mental and physical health, and simply trying to stay focused on the work. However, it does not

typically include actually reporting the harassment to authorities." (500 Women Scientists Leadership)

Ms. Huang experienced these severe power imbalances and a dependence on Prof. Rizzoni in her PhD program. As the research supports, her reluctance to report his negative conduct and harassing behaviors was logical and typical.

**The Impacts on Students from Harassment and Institutional Betrayal**

In her deposition, Ms. Huang described the physical and psychological impacts she has endured as a result of Prof. Rizzoni's alleged sexual harassment and retaliatory behaviors, as well as OSU's failure to protect her and provide a fair, thorough, or reasonable investigation. At her deposition, Ms. Huang stated that the physical manifestations of her emotional distress included pain in her abdomen, exhaustion, anxiety, and nightmares. (Huang dep., p. 225)

A substantial body of research corroborates Ms. Huang's experience and demonstrates that student victims of sexual harassment often suffer a significant psychological and physiological toll. An analysis of the impact of sexual harassment of college students throughout the world stated:

> [W]omen students have reported decreased morale, decreased satisfaction with their career goals, and lowered grades. Furthermore, women students have reported feelings of helplessness and powerlessness over their academic career, strong fear reactions, and decreased motivation. Women college students have also reported headaches, sleep disturbances, eating disorders, and gastrointestinal disorders as common physical responses to sexual harassment. … [R]esponses to sexual harassment are influenced by disappointment and self-blame in the way others react and the stress of sexual harassment induced life changes such as loss of teaching or research fellowships, loss of student loans, and disrupted educational career path. (Paludi pp. 110-111)

A study analyzing the stress impacts experienced by students who were victims of sexual harassment found that: "as women endured more harassing behaviors, they described more symptoms of anxiety and depression." When that harassment was from a faculty member or an administrator, women students reported: "lower academic satisfaction, regardless of how frequently the harassment had taken place." (Huerta p. 625) This lower academic satisfaction may have had an effect on what other student witnesses were, in actuality, observing when they expressed an opinion about Ms. Huang's attitude towards her program.

Studies also demonstrate that victims do not respond in a linear way. Rather, they explore multiple coping strategies over time in their response to harassment. And, critically, seeking help through official channels is often the last place they turn: "The few women who do respond officially usually do so after the harassment gets so bad that harm has already been caused." (Paludi p. 114)

This was precisely Ms. Huang's experience. As she described, as Prof. Rizzoni's sexual harassment was increasing, her resistance to being in his presence reportedly grew. She stated that Prof. Rizzoni became angry at her challenge to his authority and responded by exerting his power and privilege. The facts show that he changed the circumstances of her exam, harmed or tried to harm her reputation with her peers and potential employers, and essentially sought to end her opportunities as a PhD student at OSU.

Based on the above authorities, Ms. Huang responded in a completely predictable way when victimized by alleged sexual harassment and retaliation – one that the OSU investigators could have recognized, had they been properly trained, had they availed themselves of information that had long been available to them, and had they not been predisposed to believing Prof. Rizzoni and discounting the statements of Ms. Huang.

**Minority Women Are at Greater Risk**

Addressing sexual harassment in the higher education setting requires the ability to also meet the needs of a global and diverse student body. As previously recognized by the OSU Task Force, minority women can be particularly vulnerable to sexual harassment. Ms. Huang's vulnerability may have been exacerbated by her status as an Asian woman who was fully dependent on Prof. Rizzoni for her very ability to remain in the United States and to maintain financial support as she worked towards her doctoral degree.

This cultural influence was apparent from Ms. Huang's initial meeting with Prof. Rizzoni in his hotel room. In one example, he handed her a class of tap water. Even though tap water is not typically used for drinking in China, Ms. Huang stated that she felt she should take the glass because of her culture and its respect for authority. (Huang dep. p. 25) In another example, Ms. Huang described Prof. Rizzoni's unwanted physical touching in this hotel, but said nothing because, as she stated at her deposition, he was "potentially my future advisor…in our culture, you…don't say something to upset authority figure." (Huang dep. p. 29) Further, in describing why she did not report or otherwise speak up about Prof. Rizzoni's behavior sooner, Ms. Huang stated that, in Chinese culture, being "a victim of sexual harassment is something that is very shameful and humiliating." (Huang dep. pp. 125-26)

A journal article described the concept of racialized sexual harassment that "denotes a particular set of injuries resulting from the unique complex of power relations that APA [Asian Pacific American] women experience in the workplace." APA women are described as being at particular risk of harassment due to "assumptions about their passivity" that results in victims being disadvantaged and disempowered. (Cho pp. 181 and 211)

In an analysis of sexual harassment of students in other countries, the authors reported that: "Ethnic women and women of color are especially vulnerable to sexual harassment from their professors…" (Paludi p. 108) The authors described research noting that "Chinese students reported a lower rate of sexual harassment incidents than students in the United States," a finding that may be reflective of "the secretive nature of the issue of sexual harassment in China." (Paludi p. 109) In another example of differences in Asian culture, the authors reported that

female sexual harassment victims studied in Hong Kong "may not report their experiences out of shame and embarrassment." (Paludi p. 110)

The application of this research to Ms. Huang's circumstances can be seen in her own deposition testimony, where she described seeking medical treatment when she visited China in the early summer of 2017. When asked whether she told her doctors about the sexual harassment, Ms. Huang stated that she did not, because her parents had accompanied her to these medical appointments, and she did not want them to know what she had been through. (Huang dep. p. 226)

This research also provides important context to the work of the EEOC Task Force, which found a large variance in the data regarding the percentage of women reporting sexual harassment. The EEOC Task Force found that the response rate was significantly lower when women were asked whether they had ever experienced sexual harassment than when they were asked whether they had experienced specific behaviors, such as unwanted sexual attention.

The EEOC Task Force reported that: "Based on this consistent result, researchers have concluded that many individuals do not label certain forms of unwelcome sexually-based behaviors – even if they view them as problematic or offensive – as 'sexual harassment.'" (EEOC Task Force p. 8)

This reluctance to "name" the offending behavior as sexual harassment, as described by the EEOC, has been identified in the higher education context: "research with college students (and employees) across the globe indicates that despite the fact they report experiencing behaviors that fit the legal definition of sexual harassment, they do not label their experiences as such..." (Paludi p. 108)

Ms. Huang repeatedly expressed feelings of shame and humiliation that were reinforced by her strong ties to her culture. She described speaking of her experiences with Prof. Rizzoni as "torture." (Huang dep. p. 138) Ms. Huang remained silent about Prof. Rizzoni's alleged sexual harassment, only giving voice to her experiences when he exerted his considerable power over her through his alleged retaliatory behaviors that resulted in the loss of everything she had worked for over the prior three years.

**Conclusion**

Ms. Huang's allegations describe a professor who, from the outset, reinforced his power over her through repeated efforts to be alone with her at times of his choosing, and to consistently engage in acts of unwanted touching. He reportedly made frequent statements about his commitment to her success while touching her against her will, which then escalated into threats and efforts to undermine her success when she grew increasingly resistant to his behavior.

Ms. Huang has provided detailed documentation of her experiences with Prof. Rizzoni, replete with copies of emails, texts, and recollections of their conversations in which the threat of retaliation for not meeting with him on weekends was explicit.

In its investigation, OSU ignored or discounted: significant information provided by Ms. Huang; the impact of Ms. Huang's fear of retribution; the significance of the power imbalance between Ms. Huang and Prof. Rizzoni; and the fact that Ms. Huang was in a high-risk, vulnerable category as a PhD student dependent on Prof. Rizzoni for the completion of her degree, her financial support, and her very ability to remain in the United States. The investigators simply drew all inferences in Prof. Rizzoni's favor, notwithstanding a detailed set of allegations from Ms. Huang that should have been carefully considered throughout the investigation. Moreover, they ignored a substantial body of research that would have warranted a different analysis.

Prof. Rizzoni's alleged sexual harassment was not about having a romantic or sexual relationship with Ms. Huang. Rather, it should have been considered as a possible power tool through which he could subordinate her. The OSU Report was fundamentally flawed by its failure to analyze this as a case about power. It, instead, tried to demonstrate that Prof. Rizzoni's reported unwanted touching was not sexual, notwithstanding Ms. Huang's allegations of where she was touched on several occasions, and the frequency of other unwanted touching on many occasions. As such, the OSU Report discounted the nature of the repeated touching that was so deeply offensive and painful to her.

As described throughout this report, it is my opinion that:

➢ The University's investigation into Ms. Huang's claims discounted or entirely ignored information provided by Ms. Huang and diminished her experiences by only partially addressing claims that they did address; and

➢ The investigators ignored the considerable available information demonstrating that sexual harassment involves a power dynamic that is perpetuated when those in positions of power and privilege are protected by deeply entrenched institutional dynamics that fail to hold perpetrators accountable, and leave victims too fearful of retribution to report the misconduct – research that is directly applicable to how Ms. Huang describes her own experiences.

s/
Lauren Stiller Rikleen

March 2, 2021

31

**Appendix A: List of Reviewed Documents**

- Huang v. OSU and Rizzoni, Complaint

- Huang v. OSU and Rizzoni, Order on Motion to Dismiss

- Huang v. OSU and Rizzoni, Answer to Complaint

- Giorgio Rizzoni – Another Harvey Weinstein

- Rizzoni Rebuttal related to Sexual Harassment Allegations

- Rizzoni Rebuttal related to Academic Matters

- Rebuttal and Meng Huang Statement

- OSU Case Report regarding Investigation of Complaint by Meng Huang

- Depositions of:

  1. Kristi Hoge

  2. Jonathan Parry

  3. Rizzoni: Day 1, Day 2, Day 3

  4. Meng Huang

  5. Adithya Jayakumar

  6. Vishwanath Subramaniam

- Plaintiff's Objections and Responses to Defendants' First Set of Combined Discovery Requests

- Defendant OSU's Responses to Plaintiff's First Set of Interrogatories and Requests for Production of Documents

- Defendant Rizzoni's Responses to Plaintiff's First Set of Interrogatories and Requests for Production of Documents

- Defendant Rizzoni's Amended Response to Plaintiff's Second Request for Production of Documents

- Defendant OSU's Responses to Plaintiff's Second Request for Production of Documents

- Defendant Rizzoni's Responses to Plaintiff's Second Request for Production of Documents

- Plaintiff's First Supplemental Responses to Defendants' First Set of Interrogatories and Requests for Production of Documents

- Plaintiff's Second Supplemental Responses to Defendants' First Set of Interrogatories and Requests for Production of Documents

- Defendant Rizzoni's Responses to Plaintiff's Requests for Admissions

- Defendant OSU's Responses to Plaintiff's Requests for Admissions

- OSU Training Power Points re Mandatory Reporting Obligations

- The following documents produced during discovery:

  1. OSU 336 – 355

  2. OSU 665 – 666

  3. OSU 9677 – 9678

  4. OSU 11537 – 11538

  5. OSU 9787 – 9788

  6. OSU 12666

  7. OSU 10429

**Appendix B: List of Cited Authorities**

Association of American Universities, *Campus Climate Survey on Sexual Assault and Sexual Misconduct*, prepared by Westat (September 2015)

Rachel Arnow-Richman, *Of Power and Process: Handling Harassers in an At-Will World*, 128 Yale L.J. Forum 85 (2018)

Nancy Chi Cantalupo, William C. Kidder, *A Systemic Look at a Serial Problem: Sexual Harassment of Students by University Faculty*, Utah Law Review: Vol. 2018: No. 3, Article 4 (2018)

Chin-Lung Chien*, Beyond Authoritarian Personality: The Culture-Inclusive Theory of Chinese Authoritarian Orientation,* Front Psychol. 30 June 2016
https://doi.org/10.3389/fpsyg.2016.00924

Sumi K. Cho, *Converging Stereotypes in Racialized Sexual Harassment: Where the Model Minority Meets Suzie Wong*, 1 J. Gender Race & Just. 177 (1997-1998)

Deborah Epstein, Lisa A. Goodman, *Discounting Women: Doubting Domestic Violence Survivors' Credibility and Dismissing Their Experiences*, 167 U. Penn. L. Rev. 399 (2019).

Chai R. Feldblum, Victoria A. Lipnic, *U.S. Equal Employment Opportunity Commission Select Task Force on the Study of Harassment in the Workplace* (2016)

Marisela Huerta, Lilia M. Cortina, Joyce S. Pang, Cynthia M. Torges, Vicki J. Magley, *Sex and Power in the Academy: Modeling Sexual Harassment in the Lives of College Women*, Pers. Soc. Psycol. Bull. 32(5):616-628 (May 2006)

500 Women Scientists Leadership, *When It Comes to Sexual Harassment, Academia is Fundamentally Broken*, Scientific American, August 9, 2018:
https://blogs.scientificamerican.com/voices/when-it-comes-to-sexual-harassment-academia-is-fundamentally-broken/

Paula A. Johnson, Sheila E. Widnall, Frazier F. Benya, eds., *Sexual Harassment of Women: Climate, Culture, and Consequences in Academic Sciences, Engineering, and Medicine*, (Washington DC; National Academies Press, 2018)

Amir Karami, Cynthia Nicole White, Kayla Ford, Suzanne Swan, Melek Yildiz Spinel, *Unwanted Advances in Higher Education: Uncovering Sexual Harassment Experiences in Academia with Text Mining*, Information Processing & Management, Volume 57, Issue 2, (March 2020)

Anna-Maria Marshall, *Idle Rights: Employees' Rights Consciousness and the Construction of Sexual Harassment Policies*, Law & Society Review, Vol 39, No. 1, 83 (March 2005).

T.E. Page, A. Pina, *Moral Disengagement as a Self-Regulatory Process in Sexual Harassment Perpetration at Work: A Preliminary Conceptualization*, Aggression and Violent Behavior, 21, pp. 73-84 (2015)

Michele Paludi, Rudy Nydegger, Eros DeSouza, Liesl Nydegger, Kelsey Allen Dicker, *International Perspectives on Sexual Harassment of College Students: The Sounds of Silence*, Ann. N.Y. Acad. Sci. 1087: 103-120 (2006)

Lauren Stiller Rikleen, *Faragher-Ellerth at 20: How Far Have We Come? And Where Do We Need to Go?* Labor and Employment, American Bar Association, Vol. 46, No. 3 (Spring 2018)

Lauren Stiller Rikleen, *This is Why Organizations Should Not Investigate Themselves*, Cognoscenti-WBUR, (May 14, 2019)

Vicki Schultz, "*Open Statement on Sexual Harassment from Employment Discrimination Law Scholars*," Stanford Law Review Online 71, no. 17 (2018), https://www.stanfordlawreview.org/online/open-statement-on-sexual-harassment-from-employment-discrimination-law-scholars/

Ruth Simpson, Claire Cohen, *Dangerous Work: The Gendered Nature of Bullying in the Context of Higher Education*, Gender Work and Organization, Vol 11 (2) (March, 2004)

Carly Parnitzke Smith, Jennifer J. Freyd, *Institutional Betrayal*, American Psychologist (September 2014)

Victor E. Sojo, Robert E. Wood, and Anna E. Genat, *Harmful Workplace Experiences and Women's Occupational Well-Being: A Meta-Analysis*, Psychology of Women Quarterly (2015)

Delese Wear and Julie Aultman, *Sexual Harassment in Academic Medicine: Persistence, Non-Reporting, and Institutional Response*, Med. Educ. Online (2005)

**Appendix C: CV of Lauren Stiller Rikleen**

**PROFESSIONAL EXPERIENCE**

**Rikleen Institute for Strategic Leadership**

**President**                                                                                January 2011 – Present

The Rikleen Institute offers sophisticated and customized training, speaking, and consulting services designed to create a more dynamic, inclusive, and strategically aligned workplace.

**Boston College - Center for Work and Family, Carroll School of Management**

**Executive-in-Residence and Visiting Scholar**                          January 2011 – 2017

The Boston College Center for Work and Family links academic research and corporate practice to create workplace cultures that support individual and organizational success.

**Bowditch Institute for Women's Success**

**Executive Director**                                                     March 2006 – December 2010

The Bowditch Institute for Women's Success provided speaking, training, and consulting services to create a more diverse and inclusive workplace.

**Bowditch & Dewey, LLP**

**Partner**                                                            January 1990 – December 2010

**Of Counsel**                                                              May 1988 – December 1989

Martindale-Hubbell AV® Rated Attorney

Founded firm's environmental law practice group.  Extensive practice included negotiation, regulatory compliance, enforcement, and litigation.  Also provided services as a mediator.

**EDUCATION**

**BOSTON COLLEGE LAW SCHOOL, J.D.**

Newton, Massachusetts

**BRANDEIS UNIVERSITY, B.A.,** *Magna cum Laude*

Waltham, Massachusetts

**CLARK UNIVERSITY**

Worcester, Massachusetts


**SELECT PUBLICATIONS**

**Books:**

*The Shield of Silence: How Power Perpetuates a Culture of Harassment and Bullying in the Workplace*

(Published by the American Bar Association, Chicago, IL, 2019)

*Ladder Down:  Success Strategies for Lawyers from Women Who will be Hiring, Reviewing and Promoting You*

(Published by Thomson/LegalWorks, New York, 2016)

*You Raised Us - Now Work With Us:  Millennials, Career Success, and Building Strong Workplace Teams*

(Revised and Updated edition Published by Ankerwycke, Chicago, IL (2016); Hardcover Published by the American Bar Association, Chicago, IL (2014)

*Success Strategies for Women Lawyers*

(Published by the ARK Group, London, 2010)

*Ending the Gauntlet:  Removing Barriers to Women's Success in the Law*

(Published by Thomson/LegalWorks, New York, 2006)

**Book Chapters:**

**Human Capital in the New Legal Ecosystem**
*Gen Z in COVID's Cross-Hairs – Conversations to Strengthen Multi-Generational Teams* (ARK Group, 2020)

**HBR Guide for Women at Work**

*Overcome bias; Project confidence; Negotiate for more* (Boston: Harvard Business Review Press, 2019), 189-193

**Her Story**

*Lessons in Success From Lawyers Who Live It,* ed. Teresa Marie Beck, Jacqueline Mecchella Bushwack, Shayna Michele Steinfeld (Chicago: American Bar Association, 2017), 10-14, 299-303.

**Private Practice: Partners, Associates, and Corporate Counsel**

*Breaking Barriers: The Unfinished Story of Women Lawyers and Judges in Massachusetts,* ed. Patti B. Saris, Margot Botsford & Barbara F. Berenson (New York: Massachusetts Continuing Legal Education, Inc., 2012), 267-73.

**Working to Advance Women – Continuing the Legacy**

*Reaching the Bar: Stories of Women at All Stages of Their Law Careers,* ed. Robin Saxe (New York: Kaplan Publishing, 2009), 191-98.

**Reports:**

**Survey of Workplace Conduct and Behaviors in Law Firms**

The Women's Bar Association of Massachusetts                                      2018

**Report of the Ninth Annual NAWL National Survey on Retention and Promotion of Women in Law Firms**

National Association of Women Lawyers                                      2015

**Closing the Gap: A Roadmap for Achieving Gender Pay Equity in Law Firm Partner Compensation**

American Bar Association's Gender Equity Task Force                                      2013

**Power in Law: Lessons from the 2011 Women's Power Summit on Law and Leadership**

[Co-authored with Linda Bray Chanow]

University of Texas School of Law Center for Women in Law                   January 2012

**Recent Articles:**

**Nine Steps to Building a Truly Effective Women's Affinity Group**
*The American Lawyer*                                      September 29, 2020

**Top Tips for Organizations to Make Progress Toward Inclusivity**
*ABA Journal*                                      July 2, 2020

**The Legal Profession's Reckoning**
*Above the Law*                                      May 7, 2020

**Federal Courts' #MeToo Response Is a Guide for State Courts**
*Law360*                                      April 17, 2020

**Effective Strategies to End Gender Bias, Stop Harassment, and Retain Talent**

38

*ABA GPSolo Magazine*                                      March/April 2020

**What Prince Andrew's Fall From Grace Tells Us About The Systems That Protect Abusers**
*WBUR Cognoscenti*                                         December 5, 2019

**New Revelations Reveal the Need for NBC to Confront its Past and Change its Culture**
*Medium*                                                   November 19, 2019

**When It Comes to Unconscious Bias, Are Judges at Risk?**
*ABA Journal*                                              October 31, 2019

**Jeffrey Epstein: Look for the Enablers**
*Medium*                                                   July 17, 2019

**Gender-Discrimination Suits Against Law Firms Offer Plaintiffs a Voice**
*American Lawyer*                                           June 12, 2019

**#MeToo Backlash Contradicts Research on Gender Bias**
*ABA Business Law Today*                                   June 7, 2019

**How Bystanders Can Stand Up to Sexual Harassment in the Law Office**
*ABA Journal*
                                                           June 6, 2019

**Charting Paths to Ending Workplace Misconduct**
*American Bar Association TYL Magazine*                    May 2019

**Exploring the Shield of Silence**
*e-newsletter of the National Conference of Women's Bar Associations*   April 2019
*Republished on LinkedIn*

**Trump Is wrong. There Is Nothing Surprising about Christine Blasey Ford's Accusations.**
*Boston Globe*                                             September 21, 2018

**Fear-Fueled Silence, Power Imbalance Perpetuate Bad Behavior at Law Firms**
*ABA Journal*                                              August 21, 2018

**The Cost to Law Firms of Ignoring Harmful Workplace Behavior**
*The American Lawyer*                                      July 9, 2018

**Survey of Workplace Conduct and Behaviors in Law Firms**
*The Women's Bar Association*                              June 2018

**Faragher-Ellerth at 20, How Far Have We Come? And Where Do We Need to Go**
*American Bar Association Labor and Law Employment*                    Spring 2018

**This Is Why Organizations Should Not Investigate Themselves**
*WBUR Cognoscenti*                    May 14, 2018

**Commentary: Tony Robbins Claims He Wants to Help #MeToo. Here's How He Can Start**
*Fortune Online*                    April 10, 2018

**There Are Strict Rules For NFL Cheerleaders. The Players? Not So Much**
*WBUR Cognoscenti*                    April 4, 2018

**The Porter Scandal Is The Latest Reminder Of What We Miss When Women Go Missing From Leadership Roles**
*WBUR Cognoscenti*                    February 15, 2018

**Nassar And Sandusky Are Likely Not An Anomaly**
*LinkedIn Pulse*                    February 5, 2018

**Ending Sexual Harassment: Hear Women's Voices and Take Positive Action**
*Thin Difference*                    October 24, 2017

**Why Women Need to Stop Believing in Ivanka Trump**

*Fortune Online*                    September 1, 2017

**'Nevertheless, She Persisted': Elizabeth Warren, And A Galvanizing Moment For American Women**
*WBUR Cognoscenti*                    February 10, 2017

**What Mary Tyler Moore Meant to Boomer Women**
*Next Avenue*                    January 26, 2017

**Dear Millennials, Hillary Clinton Is Not a Power-Hungry Leader**
*Fortune Online*                    October 25, 2016

**The Workplace's New Anita Hill Moment**
*Medium*                    October 14, 2016

**How To Deal With Sexism When You Want a Promotion**
*Fortune Online*                    September 8, 2016

**Is Gender Bias a Reason to Quit Your Job?**
*Fortune Online*                    June 17, 2015

**Workplace Bias: Women Aren't the Only Victims**
*Fortune Online*                                                    March 18, 2015

## SELECT AWARDS AND RECOGNITIONS

*Have Been Listed In:*

    **Best Lawyers in America**

    **Chambers USA America's Leading Business Lawyers**

    **Massachusetts Super Lawyers**


**Margaret Brent Women Lawyers of Achievement Award**                                    2017

ABA Commission on Women in the Profession


**Top Women of Law, Circle of Excellence**                                    2016

Massachusetts Lawyers Weekly


**Friend of the Division Award**                                    2011

American Bar Association, Law Student Division


**Woman of the Year**                                    2011

Boston College Law School, Women's Law Center


**Leading Women Award Recipient**                                    2010

Girl Scouts of Eastern Massachusetts


**Women of Justice, Top Women of Law Award Recipient**                                    2009

Massachusetts Lawyers Weekly


**The Barbara Gray Humanitarian Award**                                    2007

MetroWest Voices Against Violence

| | |
|---|---|
| **The Top Ten Lawyers** | January 2006 |
| Women's *Business Boston* | |
| | |
| **75th Anniversary Alumni Award Medal** | 2006 |
| Boston College Law School | |
| | |
| **Lelia J. Robinson Award** | 2005 |
| Women's Bar Association of Massachusetts | |
| | |
| **Alumni Award for Excellence in Law** | 2004 |
| Boston College | |
| | |
| **Athena Award** | 2001 |
| MetroWest Chamber of Commerce | |
| | |
| **Business Leader of the Year Award** | 1997 |
| MetroWest Chamber of Commerce | |
| | |
| **The Who's Who of Top Women Lawyers** | December 7, 1995 |
| *Boston Globe* | |
| | |
| **MetroWest Woman of the Year** | 1991 |
| *Middlesex News* | |

**SELECT COMMUNITY AND PROFESSIONAL LEADERSHIP**

***Bar Leadership***

    **AMERICAN BAR ASSOCIATION**

| | |
|---|---|
|     **Standing Committee on Publishing Oversight** | 2020 - present |
|     **Women's Caucus, Co-Chair** | 2010 - present |
|     **ABA Rule of Law Initiative, Board Member** | 2017 - 2020 |

| | |
|---|---|
| **Advisory Council for the Initiative on Achieving Long-Term Careers for Women in Law / Summit Planning Subcommittee** | 2017 - 2018 |
| **Standing Committee on Bar Activities & Services, Member** | 2015 - 2018 |
| **Section of Civil Rights & Social Justice** | |
|     **Past Chair** | 2016 - 2017 |
|     **Chair** | 2015 - 2016 |
|     **Chair-Elect** | 2014 - 2015 |
|     **Vice-Chair** | 2013 - 2014 |
|     **Chair and Co-Chair, Women's Committee** | 2011 - 2013 |
| **Presidential Appointments Committee, Member** | 2015 |
| **Presidential Task Force on Gender Equity, Member** | 2012 - 2015 |
| **Commission on Sexual Orientation and Gender Identity,** | |
|     **Member** | 2011 - 2014 |
| **Board of Governors, Member** | 2008 - 2011 |
| **House of Delegates, Member** | 2008 - 2011 |
| **Commission on Women in the Profession** | |
|     **Member** | 2005 - 2008 |
|     **Editorial Board of *Perspectives* Magazine, Member** | 2005 - 2008 |

**ABA JOURNAL BOARD OF EDITORS**

| | |
|---|---|
|     **Member** | 2014 - 2020 |

**AMERICAN BAR FOUNDATION**

| | |
|---|---|
| **Special Advisor, Board of Directors** | 2013 - 2016 |
| **Co-Chair, MA State Fellows** | 2012 - 2017 |
| **Fellow** | 2001 - present |

**BOSTON BAR ASSOCIATION**

| | |
|---|---|
| **President** | September 1998 – August 1999 |
| **President-Elect** | 1997 – 1998 |
| **Vice President** | 1996 – 1997 |
| **Secretary** | 1995 – 1996 |

**BOSTON BAR FOUNDATION**

| | |
|---|---|
| **Member, Board of Trustees** | 1997 – 2006; 2008 – 2013 |

*Women's Organizations*

**MASSACHUSETTS WOMEN'S POLITICAL CAUCUS**

| | |
|---|---|
| **Member, Board of Directors** | 2004 – 2018 |

**COUNCIL FOR WOMEN OF BOSTON COLLEGE**

| | |
|---|---|
| **Founding Member** | 2003 – Present |

**THE COMMONWEALTH INSTITUTE**

**Member, Advisory Board**

2005 - 2009

*Higher Education*

**CLARK UNIVERSITY**

| | |
|---|---|
| **Board of Trustees, Member** | 1998 – 2008 |
| **Secretary and Member of Executive Committee** | 2001 – 2007 |
| **President's Council, Member** | 1993 – 1996 |
| **Board of Visitors, Member** | 1989 – 1993 |