# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO


MENG HUANG,                           )

                                      )

          Plaintiff,                  )

                                      )

     VS.                              )   No. 2:10-CV-01976-JLG-CMV

                                      )

OHIO STATE UNIVERSITY and             )

GIORGIO RIZZONI,                      )

                                      )

          Defendants.                 )

_____      )




     TELECONFERENCE DEPOSITION OF DYCHE ANDERSON

                  VIDEOTAPED

          TUESDAY, NOVEMBER 10, 2020

               10:00 A.M. ET

                  VIA ZOOM




     REPORTED BY:  ANTHONY JUDE CORDOVA, RPR, CSR

     JOB NO. 328349

Page 2

1          BE IT REMEMBERED THAT, on November 10, 2020,

2     commencing at the hour of 10:00 a.m. ET of the said day,

3     before me, ANTHONY JUDE CORDOVA, RPR, CSR, a Certified

4     Shorthand Reporter and Notary Public in the state of

5     Pennsylvania, remotely appeared Dyche Anderson, produced

6     as a witness in the above-titled court and cause, who,

7     being by me first duly sworn, was examined in said

8     cause.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         - - - -

 2                      APPEARANCES

 3

 4       FOR THE PLAINTIFF:

 5       Bruce C. Fox, Esq.

 6       OBERMAYER REBMANN MAXWELL & HIPPEL

 7       500 Grant Street, Suite 5240

 8       Pittsburgh, PA  15219

 9       412.288.2461

10       Bruce.fox@obermayer.com

11

12       FOR THE DEFENDANTS:

13       Christina L. Corl, Esq.

14       PLUNKETT COONEY

15       300 East Broad Street, Suite 590

16       Columbus, OH  43215

17       614.629.3018

18       Ccorl@plunkettcooney.com

19

20

21

22

23

24

25       APPEARANCES CONTINUED:
```

Page 4

```
 1      FOR THE WITNESS:

 2      Ronald G. Linville, Esq.

 3      BAKER HOSTETLER

 4      200 Civic Center Drive, Suite 1200

 5      Columbus, OH  43215

 6      614.462.2647

 7      Rlinville@bakerlaw.com

 8

 9      ALSO PRESENT:

10      Chester Wong - Videographer

11      Ian Rowe - Video Technician

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  INDEX:

2  Examination by Mr. Fox                                    6

3

4  EXHIBITS:

5  EX 125  Email                                            21

6  EX 126  Email                                            55

7  EX 127  Evaluation                                       28

8  EX 128  Email                                            59

9  EX 129  Email                                            61

10  EX 130  Email                                            77

11  EX 131  (skipped)                                        --

12  EX 132  Email                                            79

13  EX 133  Comments on dissertation proposal               80

14  EX 134  Email                                            82

15  EX 135  (skipped)                                        --

16  EX 136  Email                                            87

17  EX 137  Email                                            87

18  EX 138  Email                                            90

19  EX 139  (skipped)                                        --

20  EX 140  Email                                            98

21  EX 141  Email                                            99

22  EXS 142-145  (skipped)                                   --

23  EX 146  Email                                           108

24  EX 147  Project Progress Report                         110

25  EX 148  Project Progress Report                         112

1                    DYCHE ANDERSON,

2              Being by me first duly sworn,

3          Was examined and testified as follows:

4                      - - - -

5                     EXAMINATION

6                      - - - -

7    BY MR. FOX:

8    Q.      Good morning, Mr. Anderson.  My name is Bruce

9    Fox, and as you know, I represent the plaintiff in this

10   case, Meng Huang.  I'll be asking you a series of

11   questions today that relate to the facts of this case,

12   and let me just give you the ground rules for the

13   deposition.  I don't know if you've ever been deposed

14   before or testified before in any case but --

15   A.      I have not.

16   Q.      -- pretty straightforward.  Okay.  Basically, if

17   I ask you a question, make sure that you understand the

18   question.  If you need clarification, please let me know

19   and I'll be happy to rephrase each question that's put

20   to you.  Also, if you'd like to take a break at any

21   point during the deposition, just let me know.  I'm

22   happy to do that at any point.  We don't want this to be

23   an endurance contest and just indicate that and we can

24   take a break.

25              It's also important for you to respond verbally

1    to all the questions that are posed.  Even though we

2    have a video of this deposition, we also have a court

3    reporter who is taking a written transcript.  So, we

4    want to make sure that all your answers are captured

5    verbally.  So, a nod of the head or a shake of the head

6    wouldn't be picked up that way.

7              Finally, it's important for you to make sure

8    that I just complete my question before you attempt to

9    answer it.  That's not normally the way we communicate

10   as human beings in conversation -- we're always trying

11   to complete the other person's thoughts or sentences --

12   but that makes it difficult for the court reporter if we

13   end up talking over each other.  So, we'll try to avoid

14   that.  I'll try to avoid interrupting you, certainly, as

15   well.

16             Alright.  Do you understand all those ground

17   rules?

18   A.       Yes, I do.

19   Q.       Okay.  And we may also -- let me -- we may end

20   up using this video of your testimony in front of a

21   court or a jury in case you're not available for trial

22   or for whatever reason, just so you're aware of that, as

23   well.

24   A.       Okay.

25   Q.       Okay.  Could I just have your address, please?

1   A.      It's 46520 Strathmore -- S-T-R-A-T-H-M-O-R-E --

2   Road in Plymouth, Michigan.

3   Q.      Thank you.  Could you briefly describe for me

4   your education after you graduated from high school?

5   A.      I have a Bachelor's Degree in chemical

6   engineering from Michigan Technological University and

7   Master's Degree also in chemical engineering from New

8   Mexico State University.

9   Q.      Okay.  And when did you roughly -- do you recall

10  when you received those degrees?

11  A.      I graduated, got my Bachelor's in '81.  I went

12  straight to graduate school.  I didn't get finished

13  until '87.  Long story.

14  Q.      Okay.  That's often the case for some of us.

15  Did you have a concentration -- what was your

16  concentration with your undergraduate degree?

17  A.      At Michigan Tech for chemical engineering, at

18  that time, there were no specialties, just you had your

19  degree in chemical engineering only.

20  Q.      Okay.  And then for your graduate degree in

21  '87 --

22  A.      My --

23  Q.      -- what did you concentrate on?

24  A.      My thesis topic was in enhanced oil recovery.

25  Q.      Okay.  Okay.  Then if you could just describe to

1    me briefly your work history?

2    A.      Okay.  From 1984 through 1987, I worked as a

3    programmer for a computer-aided design company called

4    Haldine & Associates in El Paso, Texas.  From 1987 until

5    1996, I worked as a battery engineer for the Naval

6    Surface Warfare Center in Crane, Indiana.

7    Q.      Alright.

8    A.      Since I came to Florida in 1996, I was

9    originally hired to be the battery engineer for the

10   electric Ranger.  As time went on, because I was the

11   only one who knew about software and batteries, I moved

12   into the battery controls, battery management area and

13   almost exclusively that for the last 20 -- 20 years.

14   Since 2005, I'm a technical specialist in battery

15   controls and battery management.  Title has changed

16   somewhat.  During that time period between 2008 and

17   2019, I was also supervisor of the research group in

18   that area.

19   Q.      Okay.  And have you been located in the same

20   place during your entire employment with Ford?

21   A.      Yes.

22   Q.      And where is that?

23   A.      Dearborn, Michigan.

24   Q.      Okay.  And what is your current title with Ford?

25   A.      Technical -- pardon me.  Technical expert for

1   battery management.

2   Q.      Okay.  And how long have you held that title?

3   A.      This is kind of -- because of a reorganization,

4   it changed from battery controls to battery management

5   in 2019.  The roles, my --

6   Q.      Okay.

7   A.      -- specialty did not change, just the title.

8   Q.      Okay.  So, from 2014 to 2019, were you doing

9   basically the same thing?

10  A.      Yes.

11  Q.      Okay.

12  A.      The only difference was --

13  Q.      Could you describe for --

14  A.      Sure.  My role is since 2008, I have been in

15  research and advanced engineering at Ford responsible --

16  or working on battery controls and battery management

17  algorithms and hardware in the research advanced

18  engineering since 2008.  So, it's really where we go

19  next.  I do not work on -- directly on product programs,

20  rather, I work on technologies that may be used in the

21  future.  So, responsible -- does that help?

22  Q.      Yeah.  That's very helpful.  Is it true that

23  you're one of the leading internal experts on electric

24  battery technology at Ford?

25  A.      Yes.

Page 11

1    Q.      Okay.  Now, can you describe for me generally

2    Ford's relationship with Ohio State University as you

3    understand it?

4    A.      I think, yes, I can.  Ford has research at many

5    universities.  There are a handful of them of which Ohio

6    State is one which we refer to as alliance universities.

7    With alliance schools, they're preferred in their

8    funding and there are preset terms for intellectual

9    property as opposed to if I went to a non-alliance

10   school, there would not be those preset terms.  One

11   however --

12   Q.      Okay.

13   A.      Okay.  So, in a given year, there's always

14   competition for university projects and those are --

15   although it goes to the alliance universities primarily,

16   it's still based on the merits of the project.  No

17   university is guaranteed a certain amount of funding.

18   Q.      I see.  How many alliance universities does Ford

19   have a relationship with approximately, if you know?

20   A.      About half a dozen.

21   Q.      Okay.  And is OSU one of the main ones?

22   A.      OSU is -- I'm not sure right now if they're at

23   the first tier or the second tier on that.  There were

24   some changes last year and I'm not a hundred percent,

25   but they're one of the leading universities.  There's

Page 12

1  only six in the US.  So, Michigan is probably the most

2  --

3  Q.    Okay.  And how long have you been working, Mr.

4  Anderson, with OSU during the course of your career at

5  Ford?

6  A.    The only project I had directly, the first one,

7  was this project with Dr. Rizzoni.  We were certainly

8  aware of each other.  We never had a project together.

9  Q.    Okay.  I see.  Okay.  And what project is that?

10  Is there a way you refer to that project?

11  A.    The short term is remaining battery life or

12  remaining useful life.

13  Q.    Okay.

14  A.    It's got a very long title, of course, like most

15  university projects.

16  Q.    Right.  Okay.  We'll call it remaining battery

17  life, then, for purposes of my questions.  When did the

18  remaining battery life project commence?

19  A.    I believe it was officially in April of 2015

20  when -- a formal project start date, and, in earnest,

21  that fall when we had a graduate student assigned.

22  Q.    Okay.  In the fall.  So, your graduate student

23  assigned the fall of 2016; correct?

24  A.    '15.

25  Q.    '15?

Page 13

1    A.      Yep.

2    Q.      And who was that student?

3    A.      That was Meng Huang.

4    Q.      Okay.  And did you have any -- had you ever met

5    or spoke with Meng prior to that project?

6    A.      No, I had not.

7    Q.      Okay.  And you mentioned you had known Giorgio

8    Rizzoni before that but hadn't actually worked with him

9    on a project?

10   A.      I was aware of him and his work, but I'd never

11   worked with him.  I may or may not -- I may have met him

12   in a talk someplace but --

13   Q.      Okay.  Now, who decides -- who decides which

14   student will be assigned to work on a particular project

15   like this?

16   A.      Faculty.

17   Q.      Okay.  So, the selection is made by OSU;

18   correct?  Do you have any collaborative role with them

19   with review of candidates or is a candidate just

20   presented to you by OSU?

21   A.      It's just presented to me by the university,

22   yes.

23   Q.      Okay.  Now, how was this particular project, the

24   remaining battery life project, funded?

25   A.      It was funded under a university research

1  program process which is one of -- there are two ways we

2  fund universities at Ford, the URP and an alliance, the

3  university research project, which is about 40 or

4  $50,000 a year.

5  Q.     Okay.  And what's the other way of funding?

6  A.     It's called an alliance project which can only

7  go to those six alliance universities and that's more

8  dollars per year, but also we pay overhead and we do not

9  pay overhead in the URP.

10  Q.     I see.  Okay.  Do you know, do you have any

11  general sense as to how much funding is provided by

12  OSU -- or by Ford to OSU over any length of time, like

13  on an annual basis, for example?

14  A.     No.  I do not know.

15  Q.     Okay.  Are you in charge of establishing the

16  budget that's for a particular project or do you have

17  any role in that?

18  A.     For a university research project, we -- there's

19  just a maximum -- with this one was a maximum of 40 or

20  $50,000, it recently went up, and I have never seen a

21  URP in this country that's been anything less than the

22  maximum, so, no.  But with a larger one, we would then

23  work with the university, their budget request, we would

24  have to approve or say this doesn't make sense.

25  Q.     Okay.  Now, prior to working with Meng, how many

1  interns have you worked with over the course of your

2  career at Ford?

3  A.      About five or six.

4  Q.      Okay.  And over what length of time, would you

5  say?

6  A.      There was certainly -- I was counting this stuff

7  the other day.  I believe there were a total of five

8  since -- since 2008.

9  Q.      Okay.  And do you routinely evaluate their

10  performance when you work with them on URP projects?

11  A.      On URP projects, since they are -- if they're

12  just a URP project, that is the responsibility of the

13  faculty.  We can have -- I can have feedback, of course,

14  but that's not normal.  If they're an intern working as

15  a Ford employee, that's when I have the direct feedback.

16  Q.      Okay.  And Meng -- Meng became an intern at

17  Ford; correct?

18  A.      Correct.  2017.

19  Q.      And prior to her, how many interns would you

20  have supervised or been involved with at Ford?

21  A.      About five.

22  Q.      Okay.

23  A.      Four or five.  Yes.

24  Q.      Okay.  Do you supervise -- are you the -- were

25  you the person at Ford who supervised Meng in her

Page 16

1  internship?

2  A.      Yes, I was.

3  Q.      And she had two consecutive internships; is that

4  correct?

5  A.      That is not quite correct.  The first summer of

6  2016, she was at Ford as a visiting scholar and that's

7  slightly different in that a visiting scholar is someone

8  who we allow to sit with us for a summer.  In this case,

9  she had her own desk and office but she was not a Ford

10 employee nor was I -- did I direct have supervisory

11 responsibility.

12 Q.      Okay.  Then when was she an intern during that

13 period of time?

14 A.      In the summer of 2017.  June through August, I

15 believe.  It might be May.

16 Q.      Okay.  Okay.  And during that latter period of

17 time, were you the person at Ford who supervised her?

18 A.      Yes, I was.

19 Q.      Okay.  And let's just go back to during this

20 time that she was a visiting scholar.  What was your

21 level of contact with her then during the time that she

22 was there, like for example on a weekly basis or daily

23 or --

24 A.      We pretty much talked daily.  Her office was

25 adjacent to mine.  Long reviews were not necessarily

1  every day, certainly less the level of contact that an

2  intern would have, and she could come and go if -- when

3  she wanted to.

4  Q.      Okay.  What was the scope of her assignment, if

5  you want to call it that, if that's a correct term, when

6  she was a visiting scholar at Ford?

7  A.      Her term as visiting scholar would have been to

8  work on her -- on her URP research and her doctoral --

9  her doctoral research just with closer contact to us to

10  learn more about batteries.

11  Q.      Okay.  And in your daily communication with her

12  during the time that she was a visiting scholar at Ford,

13  what types of things would you generally discuss with

14  her?

15  A.      We would talk somewhat about my -- about the

16  philosophy of battery controls, how it works.  I often

17  teach classes on that, so what does state of charge

18  mean, what does power capability mean, some of those

19  things.  Then in terms of by her approach would give her

20  feedback on what she was doing also.

21  Q.      Okay.  Do you recall when -- when you initially

22  met her?

23  A.      I don't remember exactly.  I think it was -- I

24  think she and Professor Rizzoni came up once or twice

25  beforehand, but I don't remember the exact dates.

Page 18

1    Q.     Okay.  And what were your initial impressions of

2    her; do you recall?

3    A.     They were quite positive, so she had -- my

4    impressions were she had --

5    Q.     Okay.  And --

6    A.     -- she has an experience working in the

7    automotive industry which gives a different perspective

8    to an intern than those who have never worked as a

9    professional before.

10   Q.     Okay.  It was your understanding she worked at

11   Bosch before?

12   A.     And GM China, I believe, also.  And it's Bosch,

13   by the way.

14   Q.     Bosch.  I'm sorry.

15   A.     Yeah.

16   Q.     Thank you.  And during the time that she was a

17   visiting scholar, did you continue to form an impression

18   of her quality as a scholar and as a Ph.D. student?

19   A.     She seemed capable as a Ph.D. student, so that

20   was -- yeah.  I'm trying to remember from back in 2016,

21   so I have no negative -- no negative recollections

22   whatsoever.

23   Q.     Okay.  And then just some overview questions.

24   Have you been asked to serve on students' candidacy exam

25   committees --

Page 19

1   A.      Yes, I have.

2   Q.      -- for Ph.D. students?

3   A.      Yes, I have.

4   Q.      Okay.  How frequently have you been asked to do

5   that?

6   A.      The first -- well, this would have been the

7   second one, once at the University of Michigan and about

8   five -- about eight years ago, roughly.

9   Q.      Okay.  And do you think you are qualified to

10  serve on candidates exam committees?

11  A.      The professors told me I was.

12  Q.      Okay.

13  A.      I say yes because I'm familiar with the work

14  that the student is doing, so yes.

15  Q.      Okay.  Now, can you describe for me generally

16  your impressions of Professor Rizzoni after -- after you

17  met him?

18  A.      Oh.  He's comes across as highly capable.  He

19  reminds me of my own advisor in undergraduate school who

20  always had a lot of different things going on.  So --

21  Q.      A lot of different things going on?

22  A.      Yes.  Yes.

23  Q.      Okay.  Have you worked with any of Professor

24  Rizzoni's other interns?

25  A.      Yeah.  I have worked with -- so, let me

Page 20

1  understand this question.  I have worked with his former

2  graduate students, a number of them, at Ford.  I worked

3  with other Ohio State -- yes, I have worked -- I've had

4  some -- I've had some dealings with one of his other

5  direct graduate students while they were graduate

6  student or post doc.

7  Q.     Okay.  Who was that, if you recall?

8  A.     It was Kaveh -- and I'm trying to remember his

9  last name -- it's long -- and he was the one who -- he

10 finished up the role after -- he finished the URP

11 project for Professor Rizzoni.  He has also been an

12 intern at Ford and I dealt with him then for somebody

13 else.

14 Q.     Okay.  Okay.  Did you ever deal with anyone else

15 who worked under Professor Rizzoni's supervision?

16 A.     There was also a post doc who came in during

17 that last time period and I have -- from China and I

18 have forgotten his name.

19 Q.     Okay.

20 A.     Yes.

21 Q.     Alright.  I'd like to turn to the exhibits now,

22 if we could.  We're just going to go through them I

23 think because that's probably the easiest way, and the

24 first one that I marked is Exhibit 125.

25            THE VIDEO TECH:  Counsel, this is the tech.  Do

Page 21

1    you want me to pull this up and share this on screen?

2    A.      That would work, yes.

3    Q.      Okay.  Whatever's easier for you, Mr. Anderson.

4            THE VIDEO TECH:  Please stand by.  The exhibit

5    should now be on screen.

6            (Exhibit 125 was marked for

7            identification.)

8    Q.      Okay.  I just asked you, Mr. Anderson, if you

9    recall seeing this email?

10   A.      I have -- I have seen it, yes.

11   Q.      And was this the email by which you were

12   introduced to Meng?

13   A.      I don't remember whether this was the first one.

14   I think that -- I don't know -- I don't think this was

15   the first one, but I -- I could be wrong on this.

16   Q.      Okay.  But you received this email before you --

17   you had met her or had any contact with her?

18   A.      I believe so.

19   Q.      And it states in the first line:  Meng Huang is

20   continuing in Alex's and Jim's footsteps and is rapidly

21   becoming engaged in all aspects of battery research,

22   mostly computational at the moment, extending Jim,

23   slash, Alex's model to include thermal dynamics, but I

24   can see that she may be doing some experiments in the

25   near future.  She would benefit immensely from some

1    experience at Ford.  Do you see this -- do you see an

2    opportunity for an internship next summer?  Let me know

3    if I can do anything to facilitate this.  Thanks,

4    Giorgio.  And it's directed to you and Jim -- I may get

5    this pronunciation wrong, Mar -- also -- Martucci?  Is

6    that Martucci?

7    A.       Marcicki.

8    Q.       Marcicki?  Okay.  Now, where Professor Rizzoni

9    states Meng is continuing in Alex's and Jim's footsteps,

10    do you know who they were?

11    A.       Very much so.  Very much so.  Yes.  Jim is Jim

12    Marcicki and Alex is Alex Bartlett.  They were both

13    doctoral students of Professor Rizzoni funded by Ford --

14    by Ford money.  They were not under me at the time.

15    That was under another part of our research organization

16    which was at the time separate, but they're both -- I

17    still talked with both of them on a frequent basis.  So,

18    it was -- Jim came first, then Alex, then Meng.

19    Q.       Okay.  And did they perform to a high standard,

20    as well?

21    A.       Extraordinarily high standards.

22    Q.       Okay.  And are they -- are they currently

23    employed at Ford?

24    A.       Yes, they are.

25    Q.       Okay.  And did Meng continue in their footsteps

1    and perform to an extraordinarily high standard?

2    A.    So, when I -- I cannot comment too much on Jim

3    and Alex's work at Ohio State. I can only comment on

4    their work at Ford which I know better. But they were

5    both -- they had both performed well enough to be

6    offered jobs at Ford.

7    Q.    Okay. Was the same true of -- was the same true

8    of Meng?

9    A.    She performed very well, yes, to the point where

10    we -- yes, we did.

11    Q.    And to the point where you liked her so much

12    that she was offered a job at Ford?

13    A.    Yes, she was.

14    Q.    And so let me ask you what -- do you recall what

15    happened next after you received this email from

16    Professor Rizzoni?

17    A.    Yes. That would have happened in October and

18    that's a little before we start going through our

19    internship process, but what eventually happened which

20    is normally done in the wintertime, this is the right

21    time to start the conversation. So, because of funding,

22    there was no way for us to fund her as an intern that

23    summer, so we brought her in as a -- so, Professor

24    Rizzoni generously funded her as a visiting scholar.

25    Q.    Okay. And did anyone else work with her in her

1    role as visiting scholar closely other than you?

2    A.      Yes.  Mr. Mike Beeney.

3    Q.      Okay.  Did you consult with him on a regular

4    basis about her performance?

5    A.      Yes.  He reported to me, as well, at the time.

6    Q.      And what was his position at Ford?

7    A.      Research engineer.

8    Q.      Okay.  And was he equally pleased with Meng's

9    performance in the visiting scholar role?

10   A.      Again, that's not when we rate the performance

11   on.  It's a learning experience for us.  So, that's

12   simply a -- there was no reason not to -- there were no

13   issues with her that summer.

14   Q.      Okay.  Then -- then she came back the following

15   summer as you testified as an intern; correct?

16   A.      Yes.

17   Q.      How did that come about?

18   A.      We like to have our graduate students who are

19   working on projects come in as paid interns if we can.

20   One reason was -- the biggest reason we do it is it

21   helps us evaluate them as future employees and we were

22   able to fund her under our departmental internally

23   funded internship dollars which is the only way we can

24   as opposed to a corporate internship which you have to

25   be a US citizen or permanent resident, but we can fund

1    nonresidents under that project, under that method.

2    Q.      Okay.   And when -- when you brought her in, were

3    other persons' approval at Ford required to bring her in

4    as an intern other than you?

5    A.      Oh, yes.   I had no authority for that.   No.   It

6    has to go -- it had to go through -- there was -- okay.

7    There would have been so many intern slots based on

8    available money to our department at the time and, my

9    manager Mr. Chris Davey would have made -- I believe

10   would have made the final decisions, either that or his

11   director Mr. Craig Stevens, but I believe it was Mr.

12   Davey.

13   Q.      Okay.   And did you make a recommendation that

14   Meng be brought on as the summer intern?

15   A.      Yes.

16   Q.      To everyone?

17   A.      Yes.

18   Q.      Okay.   And what was the basis for your

19   recommendation?

20   A.      Her work on the U -- on the URP project.

21   Q.      Were there any -- any competing candidates

22   for -- for the internship position?

23   A.      To the best of my recollection, we had five

24   internships -- supplemental interns that summer, and I'm

25   trying to -- I do not remember whether there was a five

Page 26

1    out of six or we got all -- we had six candidates or

2    five for all the positions, but I just don't -- do not

3    recall.

4    Q.       Okay.  Do you know where she ranked among the

5    candidates or if there was a ranking?

6    A.       There was not a ranking.

7    Q.       Okay.  Okay.  So, when -- when did she come

8    aboard?  Was that in approximately May of 2017 or --

9    A.       Approximately.

10   Q.       -- June?

11   A.       May or June.

12   Q.       Okay.  And how long was she with you in her

13   internship role?

14   A.       I believe it was 11 weeks which is the standard

15   length.

16   Q.       Okay.  And was she again right -- right next to

17   your office?

18   A.       Yes.  Yes.  We had moved in the meantime and so

19   we were -- we were kitty-corner from each other.

20   Q.       Okay.  And did you have daily contact with her

21   regarding matters relating to her internship?

22   A.       Yes.  Yes, I did.

23   Q.       Okay.  What -- what types of things would you

24   routinely discuss with her?

25   A.       Everything -- well, so her -- her role that

Page 27

```
 1   summer, her main part of her task was to look at our --
 2   one of our projects and see how other research might
 3   integrate into it.  It was something we could not let
 4   her do as a -- as a non -- nonemployee.  So, we would be
 5   explaining to her the details of what we -- what we had,
 6   how our -- how our project worked along with Mr. Beeney
 7   and Dr. Araujo Xavier, but --
 8           MR. FOX:  Okay.  Mr. Court Reporter, we can take
 9   the exhibit down now.  There we go.  Thank you.
10   Q.      So, during your frequent meetings, her
11   understanding and knowledge about the technology that --
12   or about the matters she was working on with -- in your
13   daily meetings with Meng during her summer internship,
14   were you able to evaluate her understanding and scope of
15   knowledge about the matters she was working on?
16   A.      Yes, I was.
17   Q.      What was your evaluation?
18   A.      It was very, very, very, very positive.
19   She caught -- she caught on to things that were very --
20   only someone with deep understanding would be able to
21   understand.
22   Q.      Okay.  And were -- were you impressed with
23   her -- with her work ethic?
24   A.      Yes, I was.
25   Q.      Were you impressed with her focus and
```

Page 28

1    commitment?

2    A.      Yes, I was.

3    Q.      Were you impressed with her seriousness of

4    purpose?

5    A.      Yes, I was.

6    Q.      Were you impressed with her earnestness and

7    honesty?

8    A.      Yes, I was.

9    Q.      Okay.  Did anyone do any written evaluation of

10   her performance during her summer internship?

11   A.      Yes.  I did.

12   Q.      Okay.  And do you recall what -- what form that

13   written evaluation took?

14   A.      Yes.  It's actually in an electronic form on a

15   company template.  So, there were performance

16   objectives.

17   Q.      Okay.  Let me show you what's been marked as --

18   I'd like to just skip ahead.  Skip Exhibit 126 and move

19   on to Exhibit 127.

20           (Exhibit 127 was marked for

21           identification.)

22   Q.      Mr. Anderson, does this appear to be the written

23   evaluation that we were just discussing?

24   A.      Yes, it does.

25   Q.      Okay.  And did you -- did you fill out this

1   written evaluation for Meng?

2   A.      Yes, I did.

3   Q.      Okay.  What -- what's the purpose of -- it's

4   called a Ford Motor Company Intern, slash, Co-Op

5   Performance Evaluation Guide.  What is the purpose of

6   this performance evaluation?

7   A.      The purpose of this is to document their

8   performance.  A large part of it would be, then, for

9   future employment purposes, so do we want to have that

10  person back again, but it's -- I'll slow down.  But it's

11  also a feedback to the employee so we can tell him or

12  her how they -- how they -- how they did in the

13  summertime.  We will give direct feedback to the

14  employee or the intern.

15  Q.      Okay.  If we could just take a look at the

16  document, if you could help me work through it a little

17  bit, I think it might be helpful if we could turn to the

18  third page of the document, numbered page 3 which is

19  entitled Objectives Form.

20  A.      Yes.

21  Q.      And just -- can you just identify that page?

22  A.      Yes.  I can -- can you zoom up -- can you zoom

23  in a little, please?  Thank you.  So, the first

24  objective was the main portion and it says look at the

25  -- now I have a question.  This was a -- there is some

Page 30

1   pro -- proprietary stuff in here.  The fact that we were

2   doing electrochemical model-based research project was

3   Ford confidential, so -- but really what to look at

4   was -- was look at the structure of -- of this other

5   technology that was being developed and the structure of

6   her model and -- but we're trying to see were they

7   compatible.

8           MR. LINVILLE:  Doug.  Doug, hold up just a

9   second.  It's Bruce Fox; correct?

10          MR. FOX:  That's correct, Ron.  Yep.

11          MR. LINVILLE:  So, I'm -- I'm not intimately

12  familiar with your protective order that's in place.  I

13  know it's in place.  To the extent that he's talking

14  about anything that would be of a proprietary nature, do

15  we have the ability to mark that in the deposition as

16  confidential?

17          MR. FOX:  We can certainly indicate that on the

18  record that this will be treated as confidential

19  pursuant to the confidentiality stipulation the parties

20  have entered into in this case.

21          MR. LINVILLE:  And it's -- it's an order filed

22  with the Court; correct?

23          MR. FOX:  I believe that's correct.  Yes.

24          MR. LINVILLE:  Okay.  Thank you.

25          MR. FOX:  Opposing counsel can correct me if I'm

Page 31

1   wrong, but I know there was a stipulation and we almost

2   always file such stipulations with the Court.

3          MR. LINVILLE:  Okay.

4          MS. CORL:  We have an agreed protective order

5   that is a -- it is a Court order.

6          MR. LINVILLE:  Okay.  Great.  Then, just so I

7   don't interrupt, we'll just -- once the -- if you

8   transcribe the deposition, probably the easiest thing

9   would be for us as he's reviewing it just to identify

10  those portions which we want marked as confidential

11  pursuant to that order.

12         MR. FOX:  Sure.  Fair enough.

13         MR. LINVILLE:  Okay.  Thanks.

14         MR. FOX:  Sure.

15  BY MR. FOX:

16  Q.     Okay.  Mr. Anderson, if you could skip ahead

17  two pages where it looks like the objectives section is

18  filled in with notes headed final progress and then

19  there's a rating.

20  A.     Uh-huh.

21  Q.     That's numbered page 5 of 12.

22         MR. FOX:  We could put that up, please.

23  Q.     Okay.  What -- what does this page represent?

24  A.     This is her final rating on the performance she

25  did during the summer.  The interns were ranked in two

1    different ways, between this and their final

2    presentation which was also in that document separately.

3    Q.      Okay.  I just want to go through them one by

4    one, if we could.  The first objective is identified as

5    follows:  Confirmation that the electrochemical

6    model-based battery controls model presently under

7    development has the proper structure to accommodate a

8    remaining battery life model, specifically that being

9    developed by Ms. Huang in the URP aging modeling state

10   of -- and then it looks like that part is cut off a

11   little bit.

12   A.      Yes.

13   Q.      Next to that, it states final progress and it

14   states:  Ms. Huang found areas where the existing model

15   may have issues predicting future behavior and

16   recommended changes, specifically the addition of a

17   model for the anode.  She described why the model needed

18   to be changed tracing back from engineering effects to

19   basic principles such as one of the key -- then it

20   appears that it's cut off.  Did you supply those

21   comments regarding Meng's final progress --

22   A.      Yes, I did.  I'm sorry.  Yes, I did.

23   Q.      You supplied the other comments, as well;

24   correct?

25   A.      Yes, I did.

1    Q.      Okay.  And in making your notes as to final

2    progress on this point, what -- what were you saying

3    essentially when -- when -- when -- when you recorded

4    this?  What are you saying about her progress on this

5    objective?

6    A.      I was saying she did an outstanding job.  The

7    nine scale which is the top rating we could give her in

8    this -- in this format meant she exceeded all -- all the

9    expectations for that particular objective.

10   Q.      Okay.  And if -- if we could just turn to the

11   next objective.  If the model is inadequate, the intern

12   would be expected to propose changes to solve the

13   problem.  Your notes say under final progress:  Ms.

14   Huang proposed the addition of an anode model to the

15   existing Ford model in order to accommodate a remaining

16   battery life model.  She also pointed out that need not

17   be done before the remaining battery life functionality

18   is added in.  Then you also give her a nine in that

19   category.  What -- what did you mean by -- by the notes

20   that I just read to you?

21   A.      What -- what -- in a -- what -- what she pointed

22   out was that the model that we were -- was being

23   developed would not adequately -- would not adequately

24   capture degradation mechanisms in the battery,

25   particularly those in the anode.  As a reminder, a

1    battery has two electrodes.  The positive electrode is

2    the cathode.  The negative electrode is the anode.  So,

3    in this case, degradation of the graphite anode was not

4    captured in the Ford model and it needed to be captured

5    to properly integrate her model.

6    Q.      Okay.  And for that, you gave her a nine, as

7    well; correct?

8    A.      Yes.

9    Q.      And then the next objective is identification of

10   potential changes required to the OSU model to better

11   confirm with real world needs.  In your comments for

12   final progress, you said:  Not only did the intern

13   identify the few changes needed, but she also developed

14   a validation methodology for the OSU model.  Critical

15   work was performed to determine if a dual or

16   single-particle model was most effective for a dual

17   cathode chemistry such as the NMONMC blend found in the

18   LG cell used -- and then it looks like it's cut off a

19   little bit.  Can you explain what -- what you meant by

20   making that comment?

21   A.      Yes.  In the -- the single-particle model was a

22   model that does not have -- does not have the electrodes

23   separately while a dual-particle model looks at -- I'm

24   sorry.  Let me start over on this.  Please scratch that.

25           You have a cathode positive electrode used in

1    such vehicles as the Chevy Volt and the former Focus,

2    Ford Focus electric vehicle that used a blended

3    chemistry for the cathode of a nickel manganese oxide

4    and nickel manganese blends.  So, the question was --

5    was did we need to set -- do you need to model them as

6    one or do you -- or did you have to split them into two

7    for the model.  I wish I had all the rest of my cutoffs

8    which I know I have but I mean -- of the comments there.

9    That would help me.

10   Q.      Okay.  And you -- okay.  I understand.  And you

11   gave her a rating of seven for that.  That was a pretty

12   high rating, too, wasn't it?

13   A.      Yes, it was.

14   Q.      Okay.  Then the next objective is review

15   portions of the models from the electrochemical

16   model-based battery controls.  GTDS project is requested

17   including those not necessarily related to the aging

18   model.  What is meant -- what -- what did you mean by

19   that objective?

20   A.      The first part was to look at the model as it

21   corresponded to integrate with her own model, and we

22   also wanted to -- this was more a stretch objective to

23   look at the rest of our model and to see -- have her put

24   in her comments on that.

25   Q.      Okay.  And then under final progress notes, you

1    stated as follows:  Multiple reviews were conducted.

2    The most significant was Ms. Huang finding calibration

3    issues with the existing model.  Simply because she

4    said, quote, this value doesn't look right, unquote, an

5    investigation showed she was correct and proper value

6    was developed.  Can you explain what you meant by those

7    notes?

8    A.      Calibration in our terminology is a parameter

9    such as saying the radius is 3 even though you may not

10   know exactly what it is, and she looked at it and said

11   that it -- one of them just doesn't look right.  So, we

12   looked in and sure enough the value was wrong, and

13   they -- the -- the other engineers developed the proper

14   value for that, corrected the value based on her

15   comments --

16   Q.      Okay.

17   A.      -- by the way, was to look at a value and say

18   that doesn't make sense.

19   Q.      Why did you say it was an outstanding

20   contribution?

21   A.      It requires a high amount of technical ability,

22   knowledge to look at a value and to say the value looks

23   wrong.  That is not something a casual observer can

24   detect.  You have to have a strong knowledge of what the

25   range of values should be.

Page 37

1  Q.      Okay.  Then I'd like to turn to the next page

2  which is numbered page 6 out of 12 which is headed Notes

3  About Student's Strengths.  Then there's a column on the

4  left entitled Internship Overall, and the column on the

5  right, it says presentation on the upper hand -- on the

6  upper half of the page.  Then on the lower part of the

7  page, there's a section Optional Notes About Student's

8  Areas for Improvement with the same responding

9  categories.

10        For internship overall in the upper left-hand

11  corner, it's stated:  Outstanding technical capability.

12  Very enthusiastic.  Strong analytical mind.  A hard

13  worker.  Strong capability of communicating complex

14  technical information in a manner which nonexperts can

15  understand.  Easy to work with.  I just -- I just want

16  to break that down a little.  Those were your comments;

17  correct, Mr. Anderson?

18  A.      Yes, they were.

19  Q.      Okay.  Why did you say that Meng had outstanding

20  technical capability?

21  A.      Well, for example, as I just mentioned, she was

22  able to look at a calibration value and say it

23  doesn't -- doesn't look right.  You need a strong

24  capability to do that.  That's something she hadn't

25  developed herself.

1   Q.     And why did you say -- next you said she was

2  very enthusiastic.  Why did you say that?

3   A.     She came in.  I -- this is hard to remember, but

4  she had enthusiasm in what she did.  I -- some interns,

5  they're sort of there.  Some are very present and

6  enthusiastic, dive into their work and get a lot done.

7   Q.     Okay.  And she was one -- one of those that got

8  a lot done?

9   A.     Yes.

10   Q.     Okay.  And then you next said she -- she had a

11  strong analytical mind.  Why -- why did you say that?

12   A.     Again, she was able to -- to look at things and

13  make -- and analyze the good and the bad and what was

14  going on without having to ask too many questions.

15   Q.     Okay.  And you further observed she was a hard

16  worker --

17   A.     Yes.

18   Q.     -- is that correct?

19         Was she -- was she ever like not around or

20  unavailable unaccountably to do the work?

21   A.     No.  She -- for interns -- we had to push her

22  out at the end of the day.  Interns, we are not -- they

23  are not allowed to work overtime, so we have to sort of

24  push them out every day, go home.

25   Q.     Okay.  She was reluctant to leave every day is

1    what --

2    A.      Yes.

3    Q.      -- you're telling me?

4    A.      Yes.

5    Q.      Okay.  And you said further she had strong

6    capability of communicating complex technical

7    information in a manner which nonexperts can understand.

8    Why did you say that?

9    A.      My department at the time, I was the battery

10   controls group in an area that was -- everybody else was

11   not battery except for my little team.  So, my -- my

12   colleagues who she had to communicate to knew next to

13   nothing about batteries and she could explain her work

14   where everyone understood what she was talking about.

15   Q.      Okay.

16   A.      Yes.

17   Q.      And you thought her capabilities of doing that

18   were -- were very strong, as you said; correct?

19   A.      Yes.

20   Q.      And that was despite the fact that English is

21   not her native language?

22   A.      That's correct.

23   Q.      You further said she -- she was easy to work

24   with.  Can -- can you tell me why you said that and

25   maybe give me some examples?

1  A.      The examples are difficult from -- but it was a

2  -- 11 weeks where she was in every day, was not a

3  problem, very collaborative in her work -- in her

4  working, had always proposed ideas.  It was just a

5  pleasant person to have in the office which is something

6  that Ford looks for.

7  Q.      Okay.  So, she -- she fit in pretty well with

8  your corporate culture as a congenial and hardworking

9  person; is that fair?

10  A.      That is absolutely correct.

11  Q.      Okay.  Then under presentation, the next column

12  on the -- over on the right, you said:  The ability of

13  Ms. Huang to communicate technical information to

14  nonexperts cannot be understated.  It was outstanding.

15  Exclamation points.  Some of the slides she developed

16  were so good that they will be incorporated into

17  existing presentations.  Why did you go out of your way

18  to say that about her, that her ability to communicate

19  technical information to nonexperts cannot be

20  understated?

21  A.      She developed a slide in her Power Point present

22  -- presentation that showed various factors about

23  battery degradation, what causes them and -- at four

24  different levels and it was easily the best I'd ever

25  seen, and it was so good that I have incorporated it in

Page 41

1    one of my standard presentations on battery controls

2    that I give to the company, one of my battery training

3    classes.  It has been incorporated.  But she developed

4    two different perspectives from it, one more technical

5    detail, one in a higher level and it was just very easy

6    to understand.

7    Q.      Okay.  Then you had some comments below under

8    notes about student's area -- areas for improvement.

9    Were there areas for improvement that you listed?

10   A.      I -- I -- you can see what I listed.  It was the

11   communication skills which as a nonnative English

12   speaker and then a little fast in the presentation,

13   still probably slower than me, but --

14   Q.      Okay.  But those -- were those minor areas in --

15   A.      Very minor.  Uh-huh.  Sorry.

16   Q.      And then if we could turn to the next page

17   entitled Management Presentation Form, can you just

18   describe for me what that page represents?

19   A.      Yes.  At the conclusion of every internship, an

20   intern has to provide a presentation of what she did

21   this summer to a management team of which I was one of,

22   and the comments on these pages are combination of my

23   comments plus other people's comments, and we sat

24   together afterwards and rate -- rated her on it, as

25   well.  So, that's what this is.

Page 42

1  Q.      Okay.  Do you recall the other people, who they

2  were that participated in developing this?

3  A.      I'm trying to remember all -- my -- my manager

4  Mr. Chris Davey was in the room.  Who else was filling

5  out the forms I don't remember anymore.  I'd be guessing

6  so that I'm not certain.

7  Q.      Okay.  Just approximately how many people do you

8  think contributed to these ratings?

9  A.      I believe there were three others besides

10  myself.

11  Q.      And what -- what types of positions would they

12  have been in at Ford?  Would they also have been closely

13  involved in the relevant research regarding remaining

14  battery aging?

15  A.      No.  They were not.  They were -- I was the only

16  one.  I was -- they were all in my organization but

17  they -- at the time but none of them were battery people

18  in any way, shape or form.  Either --

19  Q.      Okay.

20  A.      -- functional safety.

21  Q.      Okay.  And so for the first category,

22  understanding of and performance to objectives, there's

23  -- there's a rating scheme of one to nine.  What -- what

24  rating did you give her for that?

25  A.      Well, it's a nine.

1  Q.      Okay.  And you said under please provide a brief

2  rationale for your rating above, you said:  Clearly

3  defined the objectives and presented evidence on how she

4  met the objectives.  Of special note was how she

5  included how she validated her work.  What did you mean

6  by that?

7  A.      Okay.  Well, first of all, these management

8  presentations are in a specific template.  So, the first

9  thing they're supposed to do is to explain -- is

10 describe what they were supposed to be doing that summer

11 and how they did it.  What the special -- under the

12 validation, she included not only what she was -- when

13 she didn't meet the objectives, but also the fact that

14 she was making an attempt to validate her work which is

15 unusual for someone of that stage to -- interns to catch

16 that.

17 Q.      Okay.  And then the next -- the next category is

18 Overview of Processes, Resources and Teamwork Used to

19 Meet Objectives.  Demonstrates an understanding of

20 processes used to meet objectives, knowledge of key

21 resources to meet objectives and ability to recognize

22 the importance of teamwork in meeting objectives.  Then

23 there are various subcategories under that and the first

24 one is -- well, there are -- there are definitions of

25 what each -- each of the subparts of the ratings refer

Page 44

1   to for ineffective, effective and highly effective and

2   then there's a rating.  Did you again give Meng the

3   highest rating of a nine for that category?

4   A.      Yes, I did, and I'll just be clear.  That rating

5   was done by consensus of myself and the other people who

6   were management evaluators.

7   Q.      Okay.

8   A.      Yes.

9   Q.      And they -- they had worked with her throughout

10  the internship, as well; correct?

11  A.      No.  They had for the most part not.  Most of

12  them had -- they -- she was aware who they were.  She

13  may have known who they were and talked to them on

14  occasion, but there was no -- no day-to-day.

15  Q.      Okay.  But they were in a position to evaluate

16  her; correct?

17  A.      In the -- of the presentation.  This is of the

18  presentation.

19  Q.      Yes.  Okay.  And can you just describe for me

20  the presentation that she did?

21  A.      Boy.  This is harder.  It was -- I don't believe

22  I have seen a copy of that in -- in three years outside

23  of the one slide which I kept.  So, again, she went

24  through what she did.  This was -- this line item would

25  have been the re -- the resources, you know, look at

1    what she had to do in terms of the teamwork.  The

2    restrain from criticism comment was key.  I'm not going

3    to go into details on that, but that was -- she handled

4    it well, a case where something else cut a corner and it

5    cost people, cost technology, it cost people so -- and

6    she handled it very tactfully.

7    Q.      Okay.  And you said she did a very good job of

8    explaining how the processes work and the teamwork

9    required, and this is a category that -- that rated her

10   in -- in her ability to work on the team --

11   A.      Yes.

12   Q.      -- and the importance of teamwork; is that

13   correct?

14   A.      That's correct.  Sorry.  Talking too fast.  Yes.

15   Q.      And was -- was Meng -- was Meng a team -- a team

16   player in your view?

17   A.      Very much so.  Yes.

18   Q.      Okay.  The next category is Communication and

19   Presentation Skills, and for that one, you said:

20   Outstanding presentation.  Some of the work she created

21   explained topics in a manner easy to understand by

22   nonexperts and were so good that they will be used in

23   future presentations.  The speaking rate was too fast,

24   only negative in this area for an outstanding

25   presentation.  And you gave her a category of eight for

Page 46

1    that; correct?

2    A.      Could you scroll that down, please?

3    Q.      I guess scroll to the right, you can see the

4    category.

5    A.      Okay.  Now there we are.  Okay.  We're fine now.

6    Thank you.

7    Q.      Okay.  So, for that category, you gave a rating

8    of eight?

9    A.      Yes, I did.

10   Q.      Okay.  And does your rationale pretty much sum

11   it up why you gave her such a high rating?

12   A.      Yes.

13   Q.      Okay.  Then the next category is Description of

14   Relationship Between Internship, slash, Work Assignment

15   and Ford's Vision, demonstrates a clear understanding of

16   Ford's vision and its relationship to the internship

17   work assignment, and for that you gave her another very

18   high rating of eight; is that correct?

19   A.      That is correct.

20   Q.      And you said for your rationale:  A very nice

21   use of mapping her actions to One Ford Behaviors.  The

22   context of the project in terms of the series of -- of a

23   series of projects was well understood and explained.

24   What were you referring to there when you said -- when

25   you use the term One Ford Behaviors?

Page 47

1    A.      At Ford Motor Company, we rate our people, all

2    of us, not only on what they do but how they -- what

3    they do but also how they do the job.  They're equally

4    rated in any -- any employee's overall evaluation so --

5    we followed at the time anyway, they were called One

6    Ford Behaviors, and it's a very long list of things, but

7    that was -- and so she said this -- what I did her

8    mapped this behavior -- this Ford behavior and this

9    other One Ford Behavior.  So, that was very well done in

10   terms of the -- how she does her job.

11   Q.      Okay.  And what -- what-- when it -- when it

12   talks about Ford's vision in here -- in this -- in this

13   category, what's meant by Ford's vision?

14   A.      What is -- what is meant -- again, this is a

15   standard corporate terminology, but they want to know

16   does the employee understand why we're doing what we're

17   doing and for longer term projects how it fits into

18   everything, both how -- both how and what we do our

19   jobs.

20   Q.      Okay.  And she understood and exhibited behavior

21   which confirmed that she understood what Ford's vision

22   was; is that fair?

23   A.      That is correct.

24   Q.      Okay.  And then if we could turn to the next

25   page, page 9 of 12, there -- there's a further category,

1   Foster Functional and Technical Excellence, for which

2   you gave her a very high rating of eight; correct?

3   A.      That is correct.

4   Q.      And then you stated your rationale as follows:

5   Ms. Huang has outstanding technical proficiency.  She

6   has shown it in both her URP work and her internship

7   this summer.  She has a very good grasp of the why and

8   how her work makes a difference.  Ms. Huang understands

9   the need for process and has been organize -- organizing

10  her work without being asked to help in this manner and

11  has found issues caused by others not following good

12  process.

13          Okay.  When you said she -- you said she has

14  outstanding technical pro -- proficiency and you were

15  confirming that she showed it both in her URP work and

16  in her internship; correct?

17  A.      Yes.

18  Q.      You stated.  And you also said she had very good

19  grasp of the why and how her work makes a difference --

20  I guess that's self-explanatory -- and she understood

21  the need for process and had been organizing her work to

22  help in this manner.  What -- what -- what -- did you

23  mean by that?  Can you elaborate on that a little bit,

24  what -- what -- how she had been organizing her work and

25  how that demonstrated her understanding of the need for

1    process?

2    A.      For the process issue, there have been --

3    sometimes people -- when we talk about processes, we

4    talk about developing requirements, doing the work

5    towards those requirements, doing open validation

6    methods for the -- make sure all of the work matches the

7    requirements, and sometimes people get sloppy, and when

8    people get sloppy in their work such as just started

9    doing the -- doing the -- understanding the

10   requirements, sometimes mistakes happen.  So, this is

11   why process is important to many of us.

12          It's the whole systems engineering philosophy

13   that is common in both -- in most of industry today.

14   So, when I talked about the others not following the

15   process, I mentioned earlier that -- that she had found

16   a calibration value that was incorrect because it didn't

17   look right.  Well, someone else didn't follow proper

18   process and got a little sloppy and got a bad value and

19   she -- and she just went and caught it.

20   Q.      Okay.  And then the next category is working

21   together, and for that, you gave her a rating of nine;

22   correct?

23   A.      That is correct.

24   Q.      And for your rationale, you said:  Worked

25   extraordinarily well with the engineers in the section.

Page 50

1    Found ways to criticize the work of former employees she

2    found issues without being negative or mean.  Works

3    extraordinarily well in a collaborative environment.  As

4    a foreign national, she is modifying her behaviors to

5    better fit in without compromising her values.  Her

6    realization to contributions made by anyone are welcome.

7    Will go a long way in her career.  I just want to ask

8    you about you said -- you said that she modified her

9    behaviors to better fit in without compromising her

10   values.  What -- what did you mean by that?  What was

11   the basis for that observation?

12   A.      Well, first, could I please ask to scroll down,

13   please, so I can see it?

14   Q.      Oh.  I'm sorry.

15   A.      Yeah.  Thank you.

16   Q.      Okay.  Take your time to read it.

17   A.      Okay.  Now could you please restate the question

18   now that I've read it?

19   Q.      Sure.  Sure.  You noted that as a foreign

20   national, she -- she was modifying her behaviors to

21   better fit in with -- without compromising her values.

22   What -- why did you observe that about her, that -- that

23   she would not compromise her values?

24   A.      I'm trying to remember this.  Something

25   obviously happened that was the way -- she was a

1  different way, but I do not remember what it was right

2  now.

3  Q.      Okay.  Now, Ford never asked her to compromise

4  her values in any way, did it?

5  A.      Absolutely not.

6  Q.      Okay.  And that's -- that would be totally

7  unacceptable in the culture at Ford as you've described

8  it; correct?

9  A.      Correct.

10  Q.      And Ford has a sexual harassment policy, does it

11  not?

12  A.      Yes, it does.

13  Q.      And do -- do -- in your experience, do people in

14  your group adhere to that policy?

15  A.      Yes, we do.

16  Q.      Okay.  I'd next like to go to the next category,

17  Role Model Ford Values, for which you gave Meng a rating

18  of eight.

19  A.      Scroll down, please.

20  Q.      Turn to the next page.

21  A.      Okay.

22  Q.      Okay.  And you said Ms. Meng took the One Ford

23  Behaviors to heart even showing the One Ford Behaviors

24  card on her final presentation and underlining the

25  behaviors where she believed she made the most

Page 52

1    contributions.  Her work and her actions also followed

2    those guidelines.  Integrity is important to her.  Why

3    did you -- why did you point that out, Mr. Anderson?

4    A.    Quite honestly, this -- I'm trying to remember

5    what -- why I said the integrity portion because I truly

6    do not remember, unfortunately.

7    Q.    But, nonetheless, you observed that integrity

8    was one of her signature traits?

9    A.    And I think it was also on the One Ford Values

10   card, as well, under role model four values.  If you

11   look at the top left, it says models, initiative,

12   courage, integrity and good corporate citizenship.

13   Q.    I see that.

14   A.    Yes.

15   Q.    And then it further states under the highly

16   effective categories works to ensure that results never

17   come at the expense of doing the right thing,

18   demonstrates a can-do, find-a-way attitude when

19   confronted with challenges, advocates Ford's company

20   culture and values.  Meng met all those high

21   standards --

22   A.    Yes, she did.

23   Q.    -- is that right?

24   A.    I'm sorry.  Yes, she did.

25   Q.    And then if we could turn to the next category,

Page 53

1   Deliver Results, in which you again gave her the highest

2   rating of nine?  Correct?

3   A.      That is correct.

4   Q.      You said:  Not only did Ms. Huang deliver on her

5   objectives, she also found issues with one of our other

6   projects.  She caught a calibration value and said this

7   doesn't look right.  She was correct and then worked

8   with the project engineers to find the correct value.

9   Her end of summer presentation was so good that some

10  slides will be incorporated into other presentations and

11  she sent a -- then I guess -- I guess it's cut off.  But

12  I think you've already covered what you meant by those

13  comments, so I don't think I have a further question for

14  you other than did you make those comments about her for

15  this category?

16  A.      Yes, I did.

17  Q.      Okay.  Then it -- the next page is entitled

18  Overall Performance Evaluation.  We could turn there,

19  and then it looks like there -- there are a series of --

20  series of ratings that are combined to yield an overall

21  performance score; is that correct?

22  A.      That is correct.

23  Q.      And Meng was given an overall performance score

24  of 8.5; correct?

25  A.      That is correct.

Page 54

```
 1    Q.      And you signed or -- or affixed the

 2    signification of your signature at the bottom of the

 3    page; correct?

 4    A.      I believe so.  I cannot see that, so --

 5    Q.      Okay.  If we could scroll down?

 6    A.      Alright.

 7    Q.      Okay.

 8            MR. LINVILLE:  Bruce, it's Ron again.  I don't

 9    know when a good time is, but at some point, a bathroom

10    break would be appropriate for me.

11            MR. FOX:  Ron, I was just thinking the same

12    thing, actually.  So, why don't we do that now?

13            MR. LINVILLE:  Okay.  How long do you want to

14    take?

15            MR. FOX:  How long do you need?  Five, ten

16    minutes?  Whatever --

17            MR. LINVILLE:  Five minutes will be fine.

18            MR. FOX:  Okay.  Very good.

19            (There was a pause in the proceedings.)

20    BY MR. FOX:

21    Q.      Okay.  So, I just wanted to ask you a few

22    questions about various comments that were made by

23    Professor Rizzoni about Meng.  Do you think that Meng

24    was a self-centered and stubborn person based upon your

25    experience with her?
```

Page 55

1    A.      In my experience with her, she was not self --

2    not in my -- not in terms of her employment at Ford, no.

3    Q.      Was she someone who didn't know how to listen to

4    advice?

5    A.      Not when working for me.

6    Q.      Was she someone who was deceptive in terms of

7    how she would present herself to people?

8    A.      I did not see that.

9    Q.      Did you -- do you believe that you had high

10   standards for your requirements for her, Mr. Anderson?

11   A.      Yes.  Yes, I did.

12   Q.      Okay.  I'd like to show you what's been marked

13   as Exhibit 126, please.

14           (Exhibit 126 was marked for

15           identification.)

16           THE VIDEO TECH:  Counsel, please stand by.  The

17   exhibit should now be on the screen.

18   Q.      Okay.  Let me just ask you first before we begin

19   the exhibit, do you know Lori Herman, Mr. Anderson?

20   A.      Yes.

21   Q.      What is her position at Ford?

22   A.      She works in our university relations

23   organization and one of her responsibilities is dealing

24   with Ohio State.

25   Q.      Okay.  And is she -- is she close with Professor

1   Rizzoni?

2   A.      I think so.  I don't know -- yeah.

3   Q.      Okay.  I just want to show you an email that --

4   the second entry on the -- this first page of the email

5   which is an email from Professor Rizzoni to Lori, Lori

6   Herman, complaining about Meng.  He first says:

7   Confidential, please stop paying attention to Meng.  Did

8   Lori Herman -- let me ask you this.  Did Lori Herman

9   ever tell you about this email?

10  A.      No.  She did not.

11  Q.      Okay.  And then it further says:  It's not clear

12  to me what she is doing with her life but she is the

13  worst Ph.D. student that I had ever had, not

14  technically, but her attitude is completely wrong.  Did

15  Lori Herman ever tell you that Professor Rizzoni had

16  said that about Meng?

17  A.      She did not.

18  Q.      Further states:  She has no business applying

19  for jobs.  She has made minimal progress in her

20  research, just enough to keep Dyche happy but way below

21  my standards and there is no way to predict when she

22  till take the Ph.D. candidacy exam.  She is a

23  self-centered and stubborn person who does not know how

24  to listen to advice.  She also knows how to be very

25  personable.  Don't be fooled.  Did Lori Herman tell you

1   that Professor Rizzoni had spoken that way to her about

2   his student?

3   A.      No, she did not.

4   Q.      What -- what -- what is your reaction to seeing

5   these statements about Meng now?

6           MS. CORL:  Objection.

7   BY MR. FOX:

8   Q.      You can answer.

9   A.      I was surprised at seeing this and this was -- I

10  was really surprised at the -- at this email.  I do not

11  know what was going on with this or why this note --

12  these notes were written.

13  Q.      Where he mentioned that she had made minimal

14  progress in her research and contended that just enough

15  to keep Dyche happy but way below my standards, do you

16  have any idea what -- what he meant by that or whether

17  that's remotely true?

18  A.      The first year of any research project is often

19  slow and it was slow, not as fast as we liked that first

20  year of the project.  I expect -- I have come to expect

21  that historically.  So, this was year -- after year one

22  of the project but it wasn't awful.  We were making

23  progress.  So, the rest of it I don't know but I can't

24  comment on it.

25  Q.      Okay.  Does it seem consistent in any way

1  with -- with -- with your knowledge of Meng based upon

2  your experience with her?

3  A.      It does not seem consistent.

4  Q.      And do you understand that this -- this email

5  that -- that we're looking at now was part of a thread

6  that arose from Meng's inquiries about a potential job

7  opening at Ford?

8  A.      I'm sorry.  Say that again, please.

9  Q.      Yeah.  If you look at the rest of the email --

10 in fairness, maybe we should just scroll down a little

11 bit so you could review the whole email.  I just want to

12 ask you it appears to be a thread that was generated as

13 a result of Meng's inquiries regarding job opportunities

14 at Ford.

15 A.      Yeah.  That's what it appears to be, so I was

16 not aware of this.

17 Q.      Okay.  And Rizzoni apparently told Lori Herman

18 to stop paying attention to Meng.

19       MR. LINVILLE:  Hey, hey, hey, Bruce, it's Ron.

20 I think the witness had said he never saw this before,

21 so I'm going to object to continued questions about it.

22 I mean, if -- you can ask him about the things you've

23 been asking about, but I don't think it's fair to ask

24 him what the parties to the emails meant when he said he

25 never saw them before.

Page 59

1          MR. FOX:  Okay.  Yeah.  I didn't intend to ask

2    that.  But we can move on.  That's fine.

3          (Exhibit 128 was marked for

4          identification.)

5    BY MR. FOX:

6    Q.     Okay.  Next, I'd like to show you what has been

7    marked as Exhibit 128.

8          MR. FOX:  So, if we could put that up on the

9    screen?  And then if we could scroll down so Mr.

10   Anderson can read the whole email?

11   Q.     And then if you've read that page, Mr. Anderson,

12   we could scroll to the next page for context.

13         MR. LINVILLE:  I don't believe you scrolled all

14   the way to the bottom.  There you go.

15         MR. FOX:  There we go.

16   BY MR. FOX:

17   Q.     Okay.  Does this email chain make reference to a

18   teleconference?

19   A.     Yes, it does.  One of our every other week or so

20   project meetings.

21   Q.     Okay.  And were those referred to as the webex

22   project meetings?

23   A.     Yes.

24   Q.     And those would occur on a regular basis

25   biweekly?

Page 60

1    A.      Yes.

2    Q.      And who would participate in those conferences?

3    A.      Professor Rizzoni, Ms. Huang, Mike Beeney and

4    myself.

5    Q.      Okay.  And then if you read -- if we scroll back

6    to the first page, there's an email from Professor

7    Rizzoni to yourself.  Do you recall seeing that email?

8    A.      Yes, I do.

9    Q.      Okay.  And it says in the email:  Just between

10   you and me, Meng has been acting strange lately and has

11   been rather out of touch.  Do you recall him telling you

12   that?

13   A.      Yes, I do.

14   Q.      What was your reaction to that contention that

15   Professor Rizzoni made?

16   A.      This was news to me, I think, but it was -- when

17   she -- she had been with us until mid -- early to mid

18   August and she took a break, got back, but it was --

19   this was the -- I'm not sure I'm going to answer the

20   question properly but it was just -- you know, my

21   reaction was uh-oh, what's wrong, you know.  So --

22   Q.      Did you have any conversation with him about

23   this email that you can recall?

24   A.      No, I did not, I think, outside of what would be

25   in the email chain.

Page 61

1    Q.     Okay.  Did he -- did he reveal to you at this

2    point or any other point he had been systematically

3    harassing Meng over a period of time?

4    A.     No.

5           MS. CORL:  Objection.  Objection.  Assumes facts

6    not in evidence.

7    BY MR. FOX:

8    Q.     And you had no idea that he was engaged in such

9    behavior; isn't that correct?

10          MS. CORL:  Same objection.

11   BY MR. FOX:

12   Q.     You can answer.  Counsel for OSU is just stating

13   an objection for the record.  You had no idea?

14   A.     I was aware of nothing.

15          MR. FOX:  Okay.  Okay.  We can take the exhibit

16   down.  Okay.  Okay.  I'd like to turn next to

17   Exhibit 129.  If we could put that up on the screen,

18   please?

19          (Exhibit 129 was marked for

20          identification.)

21          THE VIDEO TECH:  Yes, Counsel.  Please stand by.

22   The exhibit should now be on the screen.

23   A.     I see it.  Thank you.

24   Q.     Okay.  Let me -- before we begin the exhibit,

25   let me ask you were you asked to be on Meng's -- I think

Page 62

1   we touched on this a little bit earlier, that you were

2   asked to be on Meng's candidacy exam committee; is that

3   correct?

4   A.      Yes, I was.  Informally, yes.

5   Q.      How did -- tell me about that.  How did that

6   occur?

7   A.      I think it was in -- earlier in the fall, there

8   was a note that that -- would be on the -- on the

9   committee and Professor Rizzoni indicated that there was

10  some paperwork to fill out.  I don't know what it is.

11  But, anyway, I assumed I was on it and I was sent the

12  dissertation to review and I reviewed it and sent that

13  comment -- dissertation proposal -- I'm sorry -- to

14  review.  I reviewed it and sent my comments back.

15  Q.      Okay.  And we'll -- we have that document.

16  We'll get to that a little bit later in the deposition.

17  But you never -- you never in fact were -- were involved

18  in her candidacy exam as it -- as it turned out;

19  correct?

20  A.      That is correct.

21  Q.      And how -- how did you learn that you were being

22  excluded?

23  A.      I -- this -- I -- this is to the best of my

24  recollection but --

25          MS. CORL:  Objection.  Just one second.

Page 63

1    Objection.  Assumes facts not in evidence.  You can

2    answer.

3            MR. FOX:  Counsel, please don't interrupt the

4    witness when he's in the middle of an answer.  You can

5    state your objection, but please do it before he

6    answers.  Please --

7            MS. CORL:  Counsel, I'm doing it as quickly as I

8    can with the technology.  So, everyone's just going to

9    have to take a deep breath and be a little patient.

10   BY MR. FOX:

11   Q.      Mr. Anderson, would you like the question read

12   back?

13   A.      Please.

14           (The record was read back by the court

15           reporter.)

16   Q.      Let me restate it.  Let me restate the question,

17   then.  Did you learn you were being excluded from the

18   candidacy exam?

19   A.      I was never invited to the candidacy exam.  I am

20   trying to recall more details than that but --

21   Q.      Okay.  How did -- how did you learn that Meng

22   had taken the candidacy exam in your absence?

23   A.      She was -- she had told me that -- and both she

24   and Professor Rizzoni had told me when -- that her exam

25   was coming up, and the exam itself, that's up to the

Page 64

1    university whether I'm there or not.  So, it's not

2    necessarily a horrible big deal to me, and then I was

3    told and I wished her the best of luck and then I found

4    out the results the following -- the following -- the

5    following week.  We had to reschedule some meetings

6    because of our preparation.  So --

7    Q.      Okay.  How did you find out the results?

8    A.      I received an email from Professor Rizzoni.

9    Q.      Okay.  Okay.  I'd like to return to Exhibit 129

10   and I'd like you to review it.  So, if we could scroll

11   accordingly through the document, you can let us know

12   when -- when the technical assistant should scroll

13   forward after you've read a certain portion we -- to get

14   through the document.  That would be helpful.

15   A.      So, can we go bottom up?  It might be easier.

16   Q.      Sure.

17   A.      Yeah.

18   Q.      Yep.

19   A.      Okay.  You can scroll up, please.  Okay.  You

20   can scroll up, please.  Okay.  Scroll up, please.

21   That's a repeat.  Scroll up, please.  Okay.  Scroll up,

22   please, if there's any more.  Is that it?  Okay.  Okay.

23   That looks like it.

24   Q.      Okay.  And this email chain begins with

25   Rizzoni's email to you dated November 15, 2017, and was

Page 65

1    that after a webex meeting that Meng did not attend in

2    Rizzoni's -- with Professor Rizzoni in his -- in his

3    private office; do you know?

4    A.      That was the day after a meeting.  Because these

5    were teleconferences and not with video, I would never

6    have any idea whether they were in the same room or

7    separate rooms, but it was the day after a meeting and

8    both were present in the meeting.

9    Q.      Okay.  And were you aware or -- or -- or did you

10   become aware that he would take the opportunity to grope

11   her during these meetings?

12   A.      I would have no idea whether anything like that

13   happened or not.  It was only on -- these were only tele

14   -- these were only on audio.

15   Q.      Okay.  And do you recall any -- any of these

16   webex meetings where there -- there was any kind of

17   expression of -- of -- of concern by Meng or where --

18   where she indicated her -- her -- her fear and just --

19   just general discomfort with what was going on in these

20   meetings?

21   A.      She never indicated that to me directly in those

22   terms.

23   Q.      Okay.  Were you -- do you recall any webex

24   meetings where there was any outbursts by Meng?

25   A.      Yes, I do.

1    Q.      Okay.  Tell -- tell me about that.

2    A.      That was --

3    Q.      First of all, when did that happen?

4    A.      That was this week.  I believe it was on the

5    14th but -- of November and there was an outburst in the

6    meeting very severe by Ms. Huang to the point where Mike

7    Beeney and I were in a small conference room, we muted

8    our -- we just muted our -- our voice and just sat back

9    for a while until things settled down.  It was quite --

10   it was quite a strong outburst.  I do not remember all

11   the details anymore, but it was a severe -- it was a

12   major outburst.

13   Q.      Okay.  Do you recall that Meng was

14   extraordinarily upset and -- and that was -- was

15   apparently expressing it at that time?

16   A.      That would be the -- what we would indicate from

17   the way she was yelling, yes.

18   Q.      Okay.  Was this your first sense that something

19   might be amiss between her and her -- her Ph.D. advisor

20   Professor Rizzoni?

21   A.      We knew that something might be going on in the

22   relationship.  We didn't know what because since she --

23   after the internship that was beginning with the note

24   you mentioned earlier on the 4th, we sensed something

25   was wrong, but we had no idea of any magnitude, the

1    issue, why it was such a way.

2    Q.      Okay.  Prior to this incident, have you ever

3    seen Meng behave in any way that was uneven or emotional

4    or anything like this which you experienced or which you

5    heard during this call?

6    A.      Not like that, no.

7    Q.      This was completely out of character based upon

8    your experience with her --

9    A.      Exactly.

10   Q.      -- is that correct?

11   A.      Yes.  That's correct.  Based on my experience,

12   she was -- yes, that's correct.

13   Q.      Do you remember anything that was said by anyone

14   on the call?

15   A.      Not now, no.

16   Q.      Do you remember if she was really expressing

17   her -- her opposition to being forced to meet with

18   Rizzoni in -- in -- in his private office?

19   A.      I do not remember directly, no.

20   Q.      Okay.

21   A.      I can't remember what the reason was anymore.

22   Q.      Okay.

23   A.      Yeah.

24   Q.      Okay.  So, returning to Exhibit 129, if we

25   could -- if we could scroll to the beginning of the

Page 68

1    email which is the last page?  Okay.  This is an email.

2    I really -- I really don't want to read it into the

3    record, but this is an email where Professor Rizzoni is

4    complaining to you that Meng's behavior is inexcusable

5    and -- and he goes on and suggests that she was refusing

6    to meet with him.  Do you see that?

7    A.       Yes, I do.

8    Q.       Okay.  Does that refresh your recollection at

9    all as to -- as to what Meng's position was at this

10   point in the relationship about private meetings with

11   Rizzoni?

12   A.       Yes, I do.  I believe she said she did not and I

13   think that's -- I believe she said she did not want to

14   be alone with Professor Rizzoni in his office on --

15   especially on Sunday -- on Sundays.

16   Q.       Okay.  And in -- in -- in response to Rizzoni's

17   email, did you -- did you talk to your wife?

18   A.       Yes, I did.

19   Q.       Okay.  And --

20   A.       Pardon me.  Not in response to this email.  In

21   response to the -- after the outburst that evening, said

22   boy, we had an outburst today and then we talked about

23   that.  It was not a response to this email.  It was in

24   response to the meeting itself.

25   Q.       Okay.  And did -- did you seek your wife's

Page 69

1    perspective and -- and opinion as to what might perhaps

2    have happened?

3    A.      Yes, I did.

4    Q.      And do you think it was good to get a woman's

5    perspective on that?

6    A.      My wife was also -- is a woman and a college

7    professor, so it's a double --

8    Q.      Okay.

9    A.      It's a double thing that she has different

10   opinion, perspective that I do not have.  Yeah.

11   Q.      Okay.  And what -- what -- what did your wife

12   tell you?

13   A.      She told me -- I'm trying to remember

14   everything.  She -- one was she told me that it might

15   be -- depression might be a cause, and the other one,

16   she said that she could see why a woman might not want

17   to be alone with a professor in his office on a -- on a

18   -- on a Sunday morning.

19   Q.      Okay.  And did -- did you then transmit her

20   comments to Professor Rizzoni?

21   A.      I believe that's above -- the page above that,

22   yes.

23           MR. FOX:  If we could scroll up, please, to the

24   next-to-the-last page of the exhibit?

25   A.      Go back down.  Can you scroll down a couple more

1    lines, please?  Thank you.

2    Q.      Okay.  So, in sending this email, were you

3    diplomatically trying to suggest to Professor Rizzoni

4    that you understood what Meng's concerns might be?

5    A.      I was saying on this these are my wife's

6    comments.  First I had the -- the first portion would

7    have been based on the outburst and I had no idea there

8    was other kind of tension or what was later, you know,

9    at the time, but I was -- you know, that was -- I --

10   that was not considered professional behavior.  So, that

11   was the behavior on that first point.  The other two, I

12   was -- were my wife's comments and plus some additional

13   on my own on the -- on the depression side.

14   Q.      Okay.  And you mentioned your personal

15   experience that you described in the email that was --

16   was very, very, very distressing?

17   A.      Yes, it was.

18   Q.      Okay.  And I just want to return -- so, if -- if

19   we could go to the first page?  Was it your

20   understanding that Professor Rizzoni could decide

21   whether and when Meng could graduate?

22   A.      That is pretty much the way it worked with the

23   graduate students is that the advisor has to be happy

24   with everything.

25   Q.      Okay.  And did -- did you understand that there

1    was a significant power differential based upon your

2    observations and knowledge of the relation -- between

3    Professor Rizzoni and Meng?

4    A.      Any power differential would be just as exists

5    with any graduate student and his or her advisor.  There

6    is that kind of control.

7    Q.      Okay.  Now, did Rizzoni say -- if we could just

8    turn to the last paragraph of his email to you, did he

9    say that as long as Meng acted respectfully and took

10   advice from him, that she could graduate?

11   A.      That's what the email seems to say, yes.

12   Q.      Okay.  That didn't happen, did it, the part

13   about him allowing her to graduate?

14   A.      She was -- after she failed the candidacy exam,

15   she was dropped from his -- he was no longer her -- he

16   was no longer her advisor.  That was --

17   Q.      Okay.  Just to skip ahead a little bit, did --

18   did he talk to you about his -- did he talk to you --

19   did you have any personal conversations with Professor

20   Rizzoni about his dropping Meng from the Ph.D. program

21   and failing her on the candidacy exam?

22   A.      The candidacy exam, I believe, was on a Friday.

23   I found out on Monday.  I found out on Monday, and then

24   that Wednesday, he was in Dearborn for a meeting of the

25   CAR consortium and we had already previous -- already

1    set up that we wouldn't be able to discuss for a while,

2    he told me some things, he told me that, and then we

3    were -- that week, that Wednesday the -- I believe it

4    was December the 13th.

5    Q.      Okay.  Do you -- do you recall what he -- what

6    he told you when you said he told you some things about

7    this?

8    A.      Well, he handed me the comments of the various

9    professors in terms of their -- the email, he handed me

10    the pieces of paper, the email, the comments of the

11    other professors on the committee of her performance on

12    the candidacy exam.

13    Q.      Okay.  What -- what did he say?  Do you recall

14    anything he said or --

15    A.      I'm trying to recover too much.  I was --

16    because of -- I don't remember everything he said that

17    day.

18    Q.      Okay.  That's fine.  Do you remember any -- any

19    later discussions you -- you had with him about -- well,

20    let me ask you this.  Did he -- did he discuss with you

21    at that point why -- well, let me ask you this first.

22    Did you understand that he refused to let Meng take the

23    candidacy exam a second time?

24    A.      That was part of the discussion.  I -- I was

25    told by -- I can't remember whether it was Ms. Huang who

Page  73

1  told me that on Monday I think first.  I could be wrong.

2  Q.      Okay.  Did he reveal to you at that time that he

3  was violating OSU policy in taking that position?

4  A.      I had no idea what OSU policy was on that.  He

5  didn't --

6  Q.      Had you ever heard of a candidate -- a Ph.D.

7  candidate being denied the opportunity to retake a

8  candidacy exam?

9          MS. CORL:  Objection.

10  A.      I'm so rarely in that environment that I

11  wouldn't know what policy was.

12  BY MR. FOX:

13  Q.      Okay.  Fair enough.  And then just to skip

14  ahead, did you have any further direct conversations

15  separate from email with Professor Rizzoni about --

16  about the subject of Meng's continuation in the Ph.D.

17  program?

18  A.      That was the last time I spoke with him until he

19  came back in April.

20  Q.      Okay.  And when did that conversation occur?

21  A.      The conversation on the 13th of December which

22  was when he was in Dearborn.  I did not speak to him

23  again until -- until April or May.

24  Q.      And then -- then when you spoke with him in

25  April or May, did you remember what that conversation

1    was?

2    A.      It was strictly on the project.  We never spoke

3    about this incident ever again.

4    Q.      Okay.  Did -- was the project reassigned to

5    someone else?

6    A.      Yes, it was.

7    Q.      And who was involved in that decision?

8    A.      Professor Rizzoni.

9    Q.      Okay.  That was -- that was his decision?

10   A.      Yes.

11   Q.      Who -- who was it assigned to?  Do you -- do you

12   recall?

13   A.      Kaveh I mentioned earlier and I'm trying to

14   remember his last name -- I can look it up -- but then

15   there's another post doc who came in briefly to assist,

16   as well, but it was mainly Kaveh.

17   Q.      Okay.  Was the project completed?

18   A.      Yes, it was.

19   Q.      And it was -- it was completed based upon the

20   foundational work that Meng had done?

21   A.      No.  They started over.

22   Q.      Okay.  Why -- why did they start over?

23   A.      The other graduate student had done some -- I

24   don't know all the reasons why.  I was never told.  But

25   I believe it was in part because the other graduate

Page 75

1  student had done some similar kind of work for lead acid

2  batteries in cars and so he repeated his research

3  direction on -- for -- for this battery.

4      Q.       Okay.  And was -- did -- did you talk to Meng

5  about her -- her feelings about being kicked off this

6  project that she had devoted herself to?

7      A.       She was obviously not happy about it and she was

8  trying to seek to continue her research with a different

9  advisor.

10     Q.       Okay.  And why was she not happy about it?

11  What -- what did she tell you as best you can recall?

12     A.       There was issues on whether she would be able to

13  get her documents from what she had previously done.

14  I'm trying to remember all the details but it was --

15  there were details in terms of who -- would she be

16  allowed to have the access to the work at -- with a

17  different advisor.

18     Q.       Okay.  Did you -- did you ever take any position

19  on -- on behalf of Ford that you didn't want her having

20  access to anything -- any of her work or any data

21  related to the work?

22     A.       I did not.  The direction would have come from

23  our university programs office.

24     Q.       Do you know if any -- any such direction came --

25     A.       I believe --

Page 76

1  Q.      -- actually came?

2  A.      Yes.  I believe there was an email saying that

3  -- then go back up -- that -- that we had no objections

4  to it.

5  Q.      Okay.  You -- you had no objection to Meng

6  continuing with -- with having access; correct?

7  A.      That is correct.

8  Q.      So, to your knowledge, Rizzoni -- Professor

9  Rizzoni was the only one standing in her way as best as

10 you can recall?

11         MS. CORL:  Objection.  You can answer.

12 A.      As best as I can recall but --

13 Q.      Okay.  You know, now -- now might be a good

14 time -- since I do have a fair number of exhibits -- let

15 me say this.  I don't think this is going to be all day.

16 I don't think so.  I think, you know, we can probably

17 wrap it up in another -- no more than an hour and a

18 half, maybe two hours max, but I think it might be a

19 good time just to take a short lunch break, if that's

20 alright with you, Mr. Anderson.  Whatever amount of time

21 you like.

22 A.      Lunch breaks are never a problem for me.

23 Q.      Okay.

24         MR. LINVILLE:  Half hour?

25 A.      Yeah.

Page 77

1          MR. LINVILLE:  We'll see you back at 12:30.

2          (There was a pause in the proceedings.)

3          (Exhibit 130 was marked for

4          identification.)

5          MR. FOX:  Okay.  I would like to start off with

6    Exhibit 130.  So, if that could be put up on the screen?

7    It's a one-page document.

8          THE VIDEO TECH:  Yes, Counsel.  Please stand by.

9    The exhibit should now be on the screen.

10   BY MR. FOX:

11   Q.     Okay.  If you could just take a moment to review

12   this exhibit, Mr. Anderson?

13   A.     Okay.

14          MS. CORL:  Bruce, can you say the Exhibit number

15   one more time?

16          MR. FOX:  Sure.  It's 130 and it's Bates stamped

17   Huang 415.

18   A.     I'm ready any time, so --

19   BY MR. FOX:

20   Q.     Okay.  Okay.  So, the email -- this is an email

21   from Professor Rizzoni to Meng and you're copied on it

22   along with Mike Beeney.  Do you recall seeing this email

23   before?

24   A.     Yes, I do.

25   Q.     Okay.  And it makes reference to the first line

Page  78

1    that says:  Dyche and I had a good conversation today.

2    I filled him in on the plan for your dissertation and

3    candidacy exam I sketched out last September 10th and we

4    discussed it in some detail.  Let me read on.  We both

5    concur that the plan is viable.  I also sent Dyche a

6    copy of your first draft of the dissertation proposal

7    and I look forward to seeing his comments and

8    suggestions.  Do you -- do you recall the conversation

9    that you -- you had with Professor Rizzoni that's being

10   referred to there?

11   A.      Vague.  I remember having conversation about it

12   a little bit, yes.

13   Q.      Okay.  Do you recall that he filled you in on

14   the plan for Meng's dissertation and her candidacy exam?

15   A.      Yes, I do.

16   Q.      And did you discuss it in some detail?

17   A.      We discussed the dissertation plan more or -- if

18   I remember correctly, he had a whole bunch of stuff on

19   the board that we should talk about technically.

20   Q.      Okay.

21   A.      Yes.

22   Q.      Okay.  And did -- did you -- did you and Rizzoni

23   concur that the plan for Meng's dissertation and

24   candidacy exam was viable?

25   A.      Yes.

1    Q.      And did you supply -- or did -- did you receive

2    a copy from Rizzoni of the first draft of the

3    dissertation proposal as indicated here?

4    A.      Yes, I did.

5    Q.      Okay.  And did you then review the dissertation

6    proposal?

7    A.      Yes, I did.

8    Q.      And did you make comments about it?

9    A.      Yes, I did.

10           (Exhibit 132 was marked for

11           identification.)

12           MR. FOX:  Okay.  Let's turn to -- skip ahead to

13   Exhibit 132.  If you could put that up?

14           THE VIDEO TECH:  If Counsel could stand by?

15           MR. FOX:  Sure.

16           THE VIDEO TECH:  The exhibit should now be on

17   the screen.

18   BY MR. FOX:

19   Q.      Okay.  Exhibit 132 is a one-page document Bates

20   stamped OSU 18602.  This appears to be an email exchange

21   between yourself and Meng.  Do you recall this email

22   exchange?

23   A.      Yes, I do.

24   Q.      Okay.  And you had indicated in your below email

25   that you -- you -- you had reviewed -- you had received

Page 80

1    Meng's dissertation proposal and you -- you were

2    attaching your comments; correct?

3    A.      That is correct.

4    Q.      And you said there:  My comments are attached.

5    Pretty much all minor, some very picky.  In general, I

6    felt it was good.  Was -- was that true?

7    A.      I felt that with my caveat that I wrote there,

8    yes.

9    Q.      Okay.  And you said in your caveat note that:

10   I'm not familiar with the OSU requirements for

11   dissertation proposal so some of my comments may not be

12   applicable?

13   A.      Uh-huh.

14   Q.      And you copied Professor Rizzoni on that; right?

15   A.      I did.

16   Q.      And he never suggested to you that any of your

17   comments were inappropriate or inapplicable, did he?

18   A.      Not that I recall.

19   Q.      Okay.  And I'd like to next show you

20   Exhibit 133.

21           (Exhibit 133 was marked for

22           identification.)

23           THE VIDEO TECH:  Please stand by.

24           MR. FOX:  Will you put that up on the screen?

25           THE VIDEO TECH:  The exhibit should be on the

Page 81

1   screen.

2          MR. FOX:  Okay.  Can we just scroll through

3   quickly so the witness can see the whole document?

4   Q.      Okay.  Does Exhibit 133 represent your written

5   comments on Meng's dissertation proposal?

6   A.      It represents my comments and her response to

7   them in the italics.

8   Q.      Okay.  And you state at the very beginning:  In

9   general quite good, I believe all my comments are minor;

10  correct?

11  A.      Correct.

12  Q.      And did you review -- it looks like Meng -- Meng

13  carefully responded to each of your comments, did she

14  not?

15  A.      That's what it looks like, yes.

16  Q.      And do you recall that you reviewed her

17  comments?

18  A.      I believe I did.

19  Q.      Okay.  Do you think they were good comments?

20  A.      I think they were good comments.  Sometimes she

21  made changes, sometimes she didn't.  Yeah.

22  Q.      Okay.  Are you aware if Professor Rizzoni ever

23  prepared any -- any written comments like -- like you

24  did in response to Meng's dissertation proposal?

25  A.      I would -- I can only assume he did.  That would

Page 82

1    be between the professor and his student, so I wouldn't

2    be copied.

3    Q.    Okay.

4    A.    Yeah.

5    Q.    But you don't recall seeing any -- anything in

6    writing from him?

7    A.    No, I did not.

8    Q.    Alright.

9    A.    Yeah.

10    Q.    Okay.  Did you have any -- any further

11    discussion with Meng after she supplied her -- her --

12    her responses to your comments?

13    A.    I don't recall whether I did or did not.

14    Q.    Okay.  Then I'd like to show you Exhibit 134.

15          (Exhibit 134 was marked for

16          identification.)

17          THE VIDEO TECH:  Please stand by.  The exhibit

18    should now be on the screen.

19    BY MR. FOX:

20    Q.    Okay.  Exhibit 134 is a one-page document Bates

21    stamped Ford 511.

22    A.    Could we scroll down to see the beginning,

23    please?  Oh.  That's it.  Okay.

24    Q.    Yeah.  That's it.  So, this is an email exchange

25    in which you emailed Meng on December 6, 2017 and said:

Page 83

1   Meng, Giorgio tells me your candidacy exam is this

2   Friday.  I'm sure -- I'm sure you don't need it but I

3   wish you the best of luck; correct?

4   A.      Correct.

5   Q.      Okay.  And Meng responded saying:  Hi, Dyche.

6   Thank you.  Sorry about yesterday.  I totally forgot we

7   had this one-time webex scheduled out of regular hour.

8   I thought my only webex this week was with Mike this

9   afternoon.  I just texted him and we will talk in around

10  one hour.  This is now the end of the semester and

11  everything's getting crazy, so I sometime will be out of

12  reach given that I do not sit in front of my laptop and

13  check emails all the time.  So, please, please, do not

14  take this absent thing personally.  We will talk soon.

15  Do you recall receiving that email from Meng?

16  A.      Yes, I do.

17  Q.      And were you -- were you -- were you happy with

18  her explanation?

19  A.      Yes, I was.  I -- could you scroll up, please?

20  Am I missing something?  Okay.  That's it.  When the

21  graduate student is getting ready for candidacy exams, I

22  understand and -- I understand this kind of stuff.  Yes.

23  Q.      Okay.  And let me ask you this.  You were

24  wishing her luck.  That was a kind gesture.  But did you

25  really think she needed much luck to pass this candidacy

Page 84

1    exam?

2    A.      No, I did not.

3    Q.      Okay.  What -- what -- so, after -- after you

4    sent this, what -- what was your next news about Meng

5    and the candidacy exam?

6    A.      That would have been on -- I believe on Monday,

7    December 11th when I received an email from Professor

8    Rizzoni saying that she had not passed it.  I think that

9    is correct.

10   Q.      And were -- were you surprised when -- when you

11   saw that email?

12   A.      Yes, I was.

13   Q.      Why was that?

14   A.      Based on her performance especially in the

15   summer with me, I saw no reason why technically she

16   would not be able to pass the candidacy exam, but then

17   again, I wasn't there, so, you know.

18   Q.      Okay.

19   A.      Yeah.

20   Q.      Did you then have a discussion with -- with Meng

21   about Rizzoni's treatment of her?

22   A.      So, when you say then, do you mean after I found

23   out her -- the result of the candidacy exam?

24   Q.      Yes.  Subsequent to that.

25   A.      Yes.  She called me on the -- she called both

Page 85

1    Mr. Beeney and myself on the afternoon of the 11th and

2    that's when she mentioned -- that's when she started

3    talking about the relationship.

4    Q.    Okay.  And how long was your conversation with

5    her?

6    A.    It was quite long.  I'm guessing at least an

7    hour.

8    Q.    Okay.  And we have some email reporting on that

9    and I'll get into that, but, you know, just want to ask

10   what -- what you remember like about the conversation

11   starting with what -- what was -- what -- what was your

12   perception of her emotional state when you had this

13   conversation with her?

14   A.    If I recall correctly, she was in tears most of

15   the time.

16   Q.    And what -- what did she tell you generally?

17   A.    That's when she told me she was -- in that

18   conversation that she was being sexually harassed.

19   Q.    And did -- did you try to provide her with

20   comfort and support?

21   A.    I tried to, yes.  I mean, she told me I was like

22   the father figure, that she couldn't tell -- I -- now,

23   forgive me if I -- we had conversations two days in a

24   row.  I may forget which one is in which day.  But at

25   some point, she told me that she was ashamed to go back

Page 86

1    to China without a degree and that she couldn't tell her

2    parents because if she did, her father would come and

3    confront him, and so we had -- we had -- we had a long

4    talk.  She -- part of it was a shoulder to cry on for

5    her, but we had some very long talks both days.

6    Q.      Okay.  Were you deeply affected by your

7    conversations with her?

8    A.      I was stunned that -- I had no idea there was

9    any -- that was the first I heard of any allegation of

10   sexual harassment.

11   Q.      Okay.  Did you believe her?

12   A.      I didn't know what to believe.  I -- she felt --

13   sounded believable, yes.

14   Q.      Okay.  And did you prepare, then, a report to

15   anyone about her based upon your conversations with her

16   about her being harassed?

17   A.      After the phone con -- our telephone

18   conversation, I immediately contacted Ford human

19   resources and personnel employee relations to see what I

20   should do.  Since I knew that she had been a Ford

21   employee, I would have to report it.  So, I asked them

22   what I should do and they recommended that I report it

23   and tell her what to do, so -- and then I did report it

24   the next day.

25   Q.      Okay.  And did you report it in -- in -- in a

Page 87

1    recitation -- in an email?

2    A.      In an email to Ohio State.  I looked up the

3    email address online.

4    Q.      Okay.  And then I'll get into that email next,

5    but did Ford conduct any of its -- did it conduct its

6    own investigation of any kind after that?

7    A.      No.  There was no reason for Ford to.

8    Q.      Okay.  So, I'd like to show you what --

9    actually, I'd like to show you Exhibit 136.

10           (Exhibit 136 was marked for

11           identification.)

12           THE VIDEO TECH:  Please stand by.  The exhibit

13   should now be on the screen.

14   BY MR. FOX:

15   Q.      Okay.

16   A.      Okay.

17   Q.      I'll let you scroll through this.

18           MR. LINVILLE:  There's more to the exhibit.  You

19   need to scroll all the way to the bottom.

20   BY MR. FOX:

21   Q.      Okay.  Have you had a chance to review it, Mr.

22   Anderson?

23   A.      Yes, I have.

24   Q.      Okay.  And is this an email exchange that --

25   that you had with Meng right after your discussions with

Page 88

1    her?

2    A.      It was right after my discussions with human

3    resources.  The day, time, if you can scroll up, please,

4    see the date -- the timestamp on that.

5    Q.      Yep.

6    A.      Okay.  So, that would have been Tuesday, and so

7    I would have had to go to human resources and get their

8    response, and that, of course, takes time, and then get

9    back to her and then do some digging on my own, and so

10   it took -- we talked Wednesday -- I talked with her on

11   Monday afternoon, and then Tuesday morning I went -- I

12   started all this process.

13   Q.      Okay.  And in the email, you -- you -- you

14   supplied information to Meng, and in bullet points on

15   the first page, you conveyed that she needed to report

16   the behavior to the appropriate university place and you

17   further conveyed that it's illegal to retaliate against

18   someone for making such a complaint, et cetera; correct?

19   A.      Correct.

20   Q.      And you conveyed to her that your personnel

21   relations person suggested that you do some digging and

22   that you would point her to the proper places on campus

23   and that you offered to report it -- report the

24   misconduct if she didn't want to; isn't that correct?

25   A.      And that's -- it's almost correct.  I said I

1   would do it period because after we had discussion, so

2   that was -- I did.

3   Q.      Okay.  And then you also forwarded to her some

4   excerpts from OSU's relevant policies governing sexual

5   harassment; correct?

6   A.      Correct.

7   Q.      And you obtained them from the -- the OSU

8   website?

9   A.      Correct.

10  Q.      And you also forwarded to her a section

11  regarding confidentiality; correct?

12  A.      I believe so, yes.

13  Q.      And retaliation, as well?  Correct?

14  A.      Correct.

15  Q.      And was that in reaction to Meng's informing you

16  that she was concerned about Rizzoni retaliating against

17  her if this were reported?

18  A.      I'm trying to remember whether she -- whether

19  the retaliation was in there based on what she told me

20  or that's simply part of the section.

21  Q.      Okay.  And you -- you had offered to talk to her

22  at the conclusion of the email, gave her some available

23  times, and you also gave -- gave her your cell phone

24  number, and then you indicated in the first line of the

25  email you had canceled a 3:30 meeting and you said so

Page 90

1    whenever's convenient for you.  Did you then talk to her

2    after you sent this email?

3    A.      Yes, I did.

4    Q.      And was that -- was that the second conversation

5    you had with her?

6    A.      Yes, it was.

7    Q.      Okay.  Do you recall any -- anything specific

8    about that conversation?

9    A.      This is when she told me that she had gone to

10   the department chair on behalf of the engineering

11   department to report the issue and that you needed to

12   call in human resources or the appropriate parties to go

13   on from that.  Again, it was a very long conversation,

14   at least an hour so -- and she was again in tears much

15   of the time and very, you know, despondent.  So --

16   Q.      Okay.  And did -- she didn't say anything that

17   gave you any reason to doubt that what she was saying

18   was true, did she?

19   A.      No, she did not.

20   Q.      Okay.  And then I'd like to next show you

21   Exhibit 137.

22           (Exhibit 137 was marked for

23           identification.)

24           THE VIDEO TECH:  Please stand by.  The exhibit

25   should now be on the screen.

Page 91

1    A.      Uh-huh.

2            MR. FOX:  Okay.  If we could just scroll

3    through, please, so the witness can see the context of

4    the document?

5    A.      Can you stop there, please?  Okay.  Next page,

6    please?  Scroll down a little more, please.  Okay.  Is

7    there any more or is that it?  Oh.  There's a little

8    more.

9    Q.      Yeah.  That's the end of the document.

10   A.      Okay.

11   Q.      Okay.  Can you identify this document, Mr.

12   Anderson?

13   A.      Yes.  This is the email I sent to the Ohio State

14   sexual harassment office or whatever it's called.

15   Q.      Okay.  What did you do to compile the content of

16   the email?

17   A.      Those are the emails that I had received from

18   either -- either sent or received from Dr. Rizzoni or

19   Ms. Huang in the preceding couple of months plus the --

20   my records of the -- from two days of telephone

21   conversations with her which would have been my mental

22   notes.

23   Q.      Okay.  And then did -- did you relay as best as

24   you could the content of your telephone conversations

25   with Meng?

Page 92

1    A.      The best -- best of my ability, yes.

2            MR. FOX:  Okay.  And then at the bottom of

3    page 4, if we could turn there?  Next-to-last page.

4    Yeah.  If we could just scroll down to the bottom of the

5    page?

6    Q.      Okay.  I just want to ask you about the last --

7    the very last line on the -- last two lines on the page.

8    A.      Okay.

9    Q.      Ms. Huang was an outstanding employee this

10   summer.  Her final presentation which all interns give

11   was so good that my manager asked me in our review,

12   quote, when do we hire her, unquote.  Who was -- who was

13   the -- who was your manager who asked you that question?

14   A.      Mr. Chris Davey.

15           MR. FOX:  Okay.  And then if we could just

16   scroll into the next page, the final page?

17   Q.      And I just want to ask you about the second

18   paragraph there where you said:  I also believe Ms.

19   Huang may be in need of counseling due to the stress of

20   this incident but may be too proud to seek help.  Why

21   did you make that observation?

22   A.      She had been in tears for a better part of three

23   hours of phone conversations over two days and very --

24   very -- as I recall, she was -- you know, she was very

25   down after being sold she failed the candidacy exam.

1   So --

2   Q.      Okay.  And you -- and you said you thought she

3   may be too proud to seek help.  Do -- do you recall

4   what -- what that was based upon?

5   A.      Common for many people to feel that way

6   including myself.

7   Q.      As you mentioned -- as you mentioned before?

8   Correct?

9   A.      Yes.

10  Q.      Okay.  And you understood her to be a person of

11  a -- from a different culture that may have affected

12  her -- her desire to seek help?

13  A.      That is correct.

14  Q.      Now, what happened after you sent this report to

15  sexualharassment@osu.edu?

16  A.      We were contacted after the holidays.  We had a

17  discussion with OSU which -- telephone conversation

18  following up on this.  I believe it was January the 4th

19  was the following -- followup conversation.

20  Q.      Okay.  With whom did you speak on January 4th?

21  A.      If I -- if I recall correctly, it was Mr.

22  Jonathan Perry from Ohio State, there may have been

23  another person on the line, and I was in the office of

24  the Ford employee relations person.

25  Q.      Who -- who was that?  Do you recall?

Page 94

1    A.      Chris -- yeah.  I know.  The question is

2    pronouncing his last name.  Basmadjian or something like

3    that.  It should be in one of my notes, but, yes, Chris

4    Basmadjian, is the closest I can come, I can say it.

5    Q.      Okay.  By the way, did anyone -- did -- did you

6    or Mr. Basmadjian take notes of that call?

7    A.      I did not.

8    Q.      Okay.

9    A.      I do not know about -- I do not know about Mr.

10   Basmadjian.

11   Q.      Okay.  How long did the -- how long did the call

12   last?

13   A.      I'm trying to recall.  I would be guessing in

14   the order of an hour, but that's just a guess.

15   Q.      Okay.  And were -- were you asked if -- if -- if

16   you would consent to recording the call?

17   A.      I do not recall that either way.

18   Q.      If you had -- if you had been asked if you would

19   consent to recording the call, would you have had any

20   problem with that?

21   A.      I would have asked Mr. Basmadjian for what Ford

22   policy would have been on that.

23   Q.      Okay.  Assuming there was no policy prohibiting

24   it, you would have been okay with that personally?

25   A.      I would have been okay.  Yes.

1    Q.      Okay.  What -- what -- what questions do you

2    recall Mr. Perry asking you?

3    A.      I'm having a problem with remembering that.

4    Q.      Okay.  Did he ever ask to meet with you in

5    person?

6    A.      No, he did not.

7    Q.      Did he ask you any questions about your overall

8    view of Meng as you've described in this deposition?

9    A.      I'm trying to remember.  I was quite sick at the

10   time so -- it turns out, so I don't remember.

11   Q.      Okay.  Was there any followup by him after that?

12   A.      That was the last I heard.  That was the last I

13   heard.  So --

14   Q.      Okay.

15   A.      But there may have been a followup email saying

16   thank you for your time or something like that but

17   nothing -- nothing besides that.

18   Q.      Okay.  So, nothing really stands out in your

19   mind about -- about the interview?

20   A.      No.

21   Q.      Okay.  Would you have been willing to meet with

22   him personally if -- if -- if he would have requested

23   it?

24   A.      Yes.

25   Q.      You thought that the matter was of that level of

1    significance --

2    A.     You had --

3    Q.     -- meet with him?

4    A.     Yes.

5    Q.     Okay.  Now, did -- did you have further

6    interactions with -- with Meng?

7    A.     After that, we had very occasional

8    communications.  She would -- she would not talk about

9    the case which is good, but she would occasionally talk

10   about how are you doing or about employment

11   opportunities at some point.

12   Q.     Okay.  Did she try to reach out to you about

13   continuing her -- her research with -- with you?

14   A.     Yes, she did, and I told her, I said in this

15   note that would be very difficult -- or the previous

16   note, I believe, it was very, very difficult based on

17   the fact that the contract was with Professor Rizzoni

18   and not with -- not with her.

19          MR. FOX:  Okay.  Let's -- if we could turn to

20   Exhibit 138, please?

21          (Exhibit 138 was marked for

22          identification.)

23          THE VIDEO TECH:  Yes.  Counsel, please stand by.

24   The exhibit should now be on the screen.

25          MR. FOX:  Okay.  If we could just scroll through

Page  97

1   the exhibit a little bit?

2   A.      Okay.  Go back.  Can you stop there for a

3   minute?  Okay.

4   BY MR. FOX:

5   Q.      Okay.  This Exhibit 138 appears to be an email

6   exchange between you and Meng.  Alex Bartlett appears to

7   be copied on the first email.  Did -- did -- if we look

8   at the email beginning -- the chain at the beginning of

9   the bottom of the first page, it's an email from -- from

10  Meng to you informing you that OSU MAE department has

11  provided me funding and supported me to continue my

12  research based on the results I've achieved over the

13  years, et cetera, and then she further advised you that

14  CAR is currently holding my work station with the

15  research resources.  Do you see that?

16  A.      Yes, I do.

17  Q.      And she further states that the acting director

18  of CAR, Maryn Weimer, alleged that Ford owns the model

19  during a meeting last Friday 26 -- January 26, 2018, and

20  she says I am informed that CAR will not give back my

21  access to the work station with the data model before

22  the IP issue is clarified from the Ford side.  Then she

23  goes on.  But then you responded to her email, did you

24  not?

25  A.      Yes, I did.  Scroll up.  Okay.

Page 98

1    Q.      Do you recall responding to her?

2    A.      I'm trying to remember whether I responded or

3    whether I forwarded it over to the university programs

4    office for a formal response on the issue.  Based on the

5    nature of the business, I may have had -- that question

6    may have had to go through them.

7    Q.      Okay.  You didn't do anything to block her

8    request for access, did you?

9    A.      Oh, no.  That was -- no.

10   Q.      Okay.  Do you recall having any communication

11   with Maryn Weimer on this?

12   A.      I do not believe I did.

13   Q.      Okay.  Do you -- do you -- do you know who she

14   is or do you recall having any conversation with her?

15   A.      No, I do not.  No.  No, I don't.

16           (Exhibit 140 was marked for

17           identification.)

18           MR. FOX:  Okay.  Okay.  I'd like to turn to

19   Exhibit 140.  And if we could just scroll through this

20   so the witness has time to read it?  Maybe starting from

21   the -- backwards working forwards.

22   A.      That's the same email.  If you would scroll up,

23   please?  Okay.  Some more.  Okay.

24   Q.      Okay.  So, I just want to direct your attention

25   to the second email.  This seems to confirm what you

Page 99

1    just said.  You say:  Lori, Meng called me about the

2    issue and I asked her to repeat what she told me in a

3    note.  She's being allowed to continue with her research

4    under a different advisor and CAR won't let her get at

5    her computer.  Given this, I see no -- I see no reason

6    not to allow her to have the model.  Was that your --

7    was that your email?

8    A.       Yes, it was.

9    Q.       Okay.  And then you were advised in response of

10   the email from Lori Herman, the top of the page, not to

11   respond, that she was working with Ford legal and would

12   provide the official Ford response; correct?

13   A.       Correct.

14            (Exhibit 141 was marked for

15            identification.)

16            MR. FOX:  Then can we just turn to the next --

17   to Exhibit 141?  You could scroll down.  Scroll through

18   the document a little bit, please.  A little more

19   slowly.

20   A.       Okay.

21   Q.       Okay.  Do you recall this email exchange?

22   A.       Yes, I do.

23   Q.       Okay.  Without reading it into the record,

24   what -- what -- what does this email exchange deal with?

25   A.       This email does -- as a university -- as an

Page 100

1   alliance -- because of the alliance between Ford and

2   Ohio State, work that we fund them Ford owns the

3   intellectual property to.  So, because of that and her

4   not working -- no longer working directly on a Ford

5   project, they were at -- Ohio State was -- was making

6   sure it was okay before that information was passed on

7   and Ford said, if I remember correctly, no problem.

8   Q.      Okay.  And Meng -- Meng was explaining in the

9   email some of the difficulties that she was having with

10  -- with access?

11  A.      Yes.

12  Q.      And did you -- were you instructed that you --

13  you could not -- could not respond -- comment on the OSU

14  issues and you told her that; right?

15  A.      Correct.  I was told I could not -- that was a

16  legal issue I could not respond on.

17  Q.      Okay.  And then Meng just in the first -- if we

18  could go back to the first page, Meng says in -- in her

19  email to you, first paragraph email -- of her email, if

20  you could just read that where she's saying hope all is

21  well, please see Lori -- Lori Herman's reply below, she

22  only copied Ford PR manager Chris Basmadjian and on her

23  reply to me but left you, Mike, Alex, Jim and Ted Miller

24  out of this message.  She claimed that she had already

25  responded to Maryn Weimer at OSU CAR on Friday

Page 101

1    afternoon, February 2, but it seems that she didn't tell

2    you about this during your talk on -- on Monday,

3    February 5th.  Do you recall anything about that, those

4    communications?

5    A.      A little bit.  Not too much.  I'm reading what

6    I'm seeing.  That's about it.

7    Q.      Okay.  And then Meng further in the next

8    paragraph expresses some opinion about CAR's ongoing

9    retaliations against my research as she put it.  Do you

10   see that?

11   A.      Yes, I do.

12   Q.      Okay.  But you -- you weren't able to have any

13   further dialogue with her about these issues because you

14   had been instructed not to; correct?

15   A.      That is correct.

16   Q.      Okay.  So, then, I believe you testified earlier

17   that Rizzoni -- after the assault and harassment

18   allegations were reported and investigated, Rizzoni came

19   back to OSU and you resumed some dialogue with him?

20   A.      Yes.  We were starting the project over again.

21   Correct.

22   Q.      Okay.  And he acted like nothing had ever

23   happened; right?

24   A.      He never talked about -- he said that one note

25   which was shown earlier where he says he never wanted to

1    talk about it again and he never talked about it again.

2    Q.      Okay.

3    A.      Yes.

4    Q.      Did you later work with him on any projects

5    after that?

6    A.      It's kind of weird that I am at the request of a

7    manager and the secondary investigator on an active

8    project but I haven't been able to participate much in

9    the project at all.  So, I guess, no, not active

10   participation, no, but officially, yes.

11   Q.      Okay.  Do you have any knowledge of who -- who

12   Rizzoni's Ph.D. advisees are now?

13   A.      Right now?

14   Q.      Yes.

15   A.      No, I do not.

16   Q.      Or during -- since the time that -- since 2017?

17   A.      The only ones I could name by name what we

18   talked about earlier are Kaveh -- and again I apologize

19   for forgetting his last name -- and then Ms. Huang.

20   Yeah.

21   Q.      Would it -- would it surprise you to know that

22   Rizzoni continued to actively recruit young women from

23   China after -- after he was reinstated?

24          MS. CORL:  Objection.  Assumes facts not in

25   evidence.

Page 103

1        MR. FOX:  Okay.  Let me -- I'll withdraw the

2   question.  I'll withdraw it.

3   BY MR. FOX:

4   Q.      I believe that you testified earlier that based

5   upon your -- your experience with Meng and everyone's

6   experience who worked with her at Ford, she -- she was

7   offered a position for full-time employment; is that

8   correct?

9   A.      That is correct.

10  Q.      And that was -- that was late last -- last year?

11  A.      That is correct.

12  Q.      Okay.  And what was -- what was your role in

13  that, Mr. Anderson?

14  A.      Okay.  In -- earlier that year, they -- they

15  told -- Ford said that a technical specialist could no

16  longer be a supervisor as well or manager as well.  So,

17  I had to give up half of my job but I chose -- in spring

18  of 2019, Ford reorganized the entire company, and at

19  that time, I was told the company instituted a policy

20  where technical specialists such as myself could no

21  longer have -- be supervisors or managers as well.  We

22  had to indicate a preference.  So, I kept the technical

23  portion of my job and left the -- someone else took over

24  the administrative portion of my job, the supervisory

25  portion, and we worked closely together, and I was on

Page 104

1    the interviewing committee and certainly recommended

2    that we talk to -- that we interview Ms. Huang as one of

3    the two interviewers when she did interview.

4    Q.      Okay.  And how -- how did she do during the

5    interview?

6    A.      She did well.

7    Q.      Did you expect anything different from her?

8    A.      No.

9    Q.      And then did -- did -- did -- did she -- let me

10   ask you this.  After the interview, did she -- did you

11   have further conversations with her?

12   A.      Not until we made her -- casual conversations

13   which we -- right away, like I typically would do,

14   thanks for the interview and so on and so forth.  Now,

15   afterwards, until we -- there wasn't much until we made

16   her the offer.

17   Q.      Okay.  Then what -- what -- what was the offer

18   for?  What was -- what was the position?  A battery

19   controls research engineer?

20   A.      Correct.

21   Q.      Okay.  And then after you made her the offer,

22   did you then have some conversations with her about the

23   offer?

24   A.      Yes, I did.  I had a very long conversation on

25   it with her one day, probably an hour, and I was in the

Page 105

1   Secretary of State's office, so I remember this well,

2   and trying to -- anyways, what she was saying, that we

3   had made her the offer, she told me that she was worried

4   about accepting because she felt the Professor Rizzoni's

5   long arm would reach in and affect her performance, and

6   I told her that that would not happen, she would be

7   evaluated only on the work that she did at Ford and

8   outside comments would not be tolerated and I encouraged

9   her to accept the position.

10  Q.      Okay.  When she said that his long arm would

11  reach, what -- what -- what did she say about that?

12  A.      She felt that his comments he would make would

13  cause her performance ratings to be negatively impacted.

14  Q.      Okay.  So, she thought he could continue to

15  exercise influence over her career direction?

16  A.      That's what she stated, yes.

17  Q.      Okay.  Did you understand that -- did she

18  express to you that she still felt traumatized by what

19  he had done to her?

20  A.      I don't recall.

21  Q.      Okay.  And you made the assurances that you just

22  stated, but did she appear to still be apprehensive

23  about taking a job offer that had been -- that had been

24  extended to her by Ford given -- given her history with

25  Rizzoni?

Page 106

1   A.     She -- she made that comment and I was trying to

2   convince her for the better part of an hour to take the

3   job.

4   Q.     Okay. Were you able to do so?

5   A.     I thought she would. She then provided -- made

6   a counteroffer which Ford responded and they never heard

7   from her again.

8   Q.     Okay. And the way she left it with -- with you

9   in -- in your conversation with her was that she -- she

10   would think it over?

11   A.     Well, she did make a counteroffer. I don't

12   remember whether that was before or after the

13   conversation, but again in terms, in terms.

14   Q.     Okay. So, you're not sure if it was before or

15   after your conversations?

16   A.     No. I do not remember.

17   Q.     Okay. And you didn't take any notes of that

18   conversation, did you?

19   A.     No. I was in the secretary -- getting my

20   driver's license renewed waiting in line.

21   Q.     Okay.

22   A.     It was just time for her to call.

23   Q.     Yes. Who -- who -- who else interviewed with

24   Meng other than yourself --

25   A.     Doctor --

Page 107

1    Q.      -- for the --

2    A.      Yeah.

3    Q.      -- engineer?

4    A.      Donell Washington was the person.

5    Q.      Okay.  Was James Martucci -- I'm sorry.  I'm

6    mispronouncing that, but was he involved, James

7    Martucci?

8    A.      No.  He was not involved.  I -- he was not

9    involved in the interviews.

10   Q.      Okay.  Did -- did -- did he -- did he say that

11   he wanted to sit at the interview?

12   A.      He volunteered his services if -- if it was

13   needed, and we only needed to have two interviewers, so

14   we just went for the two.  That was Dr. Washington's

15   decision.

16   Q.      Okay.  What -- what was -- did -- did -- did

17   Donell Washington after interviewing Meng share your

18   enthusiasm about her?

19   A.      Yes.  He was -- he was the hiring manager, so he

20   would have had to make the decision to make her an

21   offer.

22   Q.      Okay.  And who is Ted -- Ted Miller?

23   A.      He is the senior manager for the battery

24   research activities right now.  At the time, he was my

25   boss's boss.

Page 108

1    Q.       Okay.  Was he aware of the professor -- the

2    sexual harassment allegations regarding Professor

3    Rizzoni?

4    A.       He was not in my chain of command.  We were in

5    different organizations at the time, but he was

6    apparently aware of it based on comments in the email

7    that he made to me.

8    Q.       Okay.  I'd like to show you Exhibit 146 which

9    may be that email.

10            (Exhibit 146 was marked for

11            identification.)

12            MR. FOX:  Why don't we turn to the -- just

13   scroll to the next page so we can see the whole email

14   exchange.  Give the witness a moment.

15   A.       Okay.  Okay.  Go ahead.

16   Q.       Is this the email exchange you're referring to?

17   A.       Yes.

18   Q.       Okay.  And this email exchange between you and

19   Ted Miller where Ted Miller is using the term, quote,

20   very complex situation, unquote.

21   A.       I believe -- I believe I used it first.

22   Q.       You used it first and he --

23   A.       Yes.

24   Q.       -- picked up on it; correct?

25   A.       Yes.

1   Q.    Okay.  And that's -- that's -- the very complex

2   situation is obviously referring to the allegations of

3   harassment by Professor Rizzoni; is that correct?

4   A.    Correct.

5   Q.    Okay.  Do you know how Ted Miller knew about

6   that?

7   A.    When the lawsuit was filed -- this is my best

8   guess -- it was in the Ohio -- on the front pages of the

9   Ohio State and Columbus newspapers and there were a lot

10   of Ohio State grads who work for us and they saw this

11   and I was -- I know this because they came to me asking

12   about it right away including my name was on that, too,

13   so I'm guessing that's how, and because that both Jim

14   Marcicki and Alex Bartlett worked for Ted at one time,

15   I'm guessing that's how he heard.

16   Q.    Okay.  And was there a position open for Meng at

17   that time?

18   A.    There was -- that note was a generic question.

19   There was not an opening in that 2018 for her specialty

20   which is battery controls and Ted had nothing under

21   that.  So, she would -- and there was not a position for

22   her in the research side in 2018.

23   Q.    Okay.  And would you assume at this point as of

24   the date of your email exchange with Ted Miller that

25   the -- the sexual harassment allegations were -- were --

1    were widely known with -- within the organization?

2    A.      I think they were known because of the number of

3    Ohio State people we have, yes.

4            (Exhibit 147 was marked for

5            identification.)

6    Q.      Okay.  And I'd like to next show you

7    Exhibit 147.

8            MR. FOX:  Will you just scroll through it for

9    context?

10   Q.      Could you identify the exhibit, tell me what it

11   is?

12   A.      Yes.  It's -- every university project has an

13   annual report they have to submit under a standard

14   template that's prepared by the principal investigator

15   at Ford, in this case myself, and the university

16   principal investigator, in this case Dr. Rizzoni.  So,

17   this would have been the one, I believe, from 2017.

18   Q.      Okay.

19   A.      Very -- very top.

20   Q.      Okay.  You provide the content for this where

21   indicated?

22   A.      Yes.  Most of it is very -- project management

23   issues, you know, so that's -- and much of it's boring

24   as all get-out.

25   Q.      Okay.  I don't disagree.  I'd like you to turn

1    to the last page, if you could.

2    A.      Yeah.

3    Q.      And I just want to ask you who wrote those

4    comments once we're there.

5    A.      Okay.

6    Q.      Yes.  So, MI -- the heading MIC comments in that

7    paragraph, do you know who wrote that -- those comments?

8    A.      Yes.  That would have been Mr. Bob Taenaka,

9    T-A-E-N-A-K-A, and Bob is the senior technical leader

10   for batteries in electrified power train engineering at

11   Ford where he's the product -- the product development

12   side, the people who put stuff into cars as opposed to

13   research with my input.  So, every project has to have a

14   management integration champion and I -- so, probably

15   this was a combination of both Bob and myself writing

16   this.  I mean, he had to write the final words but it

17   looks a lot like my input, too.

18   Q.      Okay.  And it was stated that whoever wrote it

19   supported the continuation of the project and looked

20   forward to its end product deliverables upon completion

21   of year three?

22   A.      Correct.

23   Q.      Okay.  And he has identified Mr. Taenaka on the

24   first page as a management integration champion?

25   A.      Correct.

Page 112

1    Q.      Correct?

2    A.      Yeah.

3            (Exhibit 148 was marked for

4            identification.)

5    Q.      Okay.  Okay.  I'd like to show you next

6    Exhibit 148.  Appears to be a similar type document.

7    A.      Could you stop there, please?  Okay.  I -- just

8    to go -- previous comments, I mentioned Kaveh Khodadadi.

9    That's how you spell his name in line 6 -- number 16.

10   Q.      Yeah.  Actually, I was -- I was going to ask you

11   that.

12   A.      Yes.

13   Q.      It's on the last line there; correct?

14   A.      Correct.

15   Q.      And while we're there, while we're on that

16   portion of it, it also refers to Mr. Xin Lin.  I'm

17   mispronouncing it, I'm sure.  But was that a visiting

18   scholar?

19   A.      He was either a visiting scholar or post doc at

20   Ohio State.  I forget which -- what his status was.

21   Q.      Okay.  And while we're on that paragraph, I did

22   want to ask you another question.  It says:  In

23   addition, a small amount of funding was used for

24   Professor Emeritus Yann Guezennec and Mr. Kaveh -- Kaveh

25   Khodadadi.  Who -- who decides to split -- to split the

Page 113

1   -- to split and how to split the URP funding with

2   another professor?

3   A.      Oh.  Professor Rizzoni.

4   Q.      Okay.  Also, while we're on that page, just

5   right before that under paragraph 14, there are a number

6   of publications listed there and the last publication is

7   -- under number 4 is 2019 IEEE Prognostics and System

8   Health Management Conference, et cetera.  It's a long

9   title but --

10  A.      Yes.

11  Q.      -- were you aware that's something that Meng had

12  authored?

13  A.      Yes.

14  Q.      And it's indicated there that it was nominated

15  for the best paper award; correct?

16  A.      Correct.

17  Q.      Were you aware that Meng's publication had

18  actually received the best paper award?

19  A.      Subsequent to writing because it happened later,

20  but yes.

21  Q.      Okay.  Is that surprising you?

22  A.      No.

23  Q.      And I'd like to skip ahead to paragraph 20.  Are

24  those -- okay.  Are those Rizzoni's comments in

25  paragraph 20?

Page 114

1    A.       Yes.

2    Q.       And then if we could -- so, the date of this

3    report is apparently -- we could scroll forward to the

4    first page.

5    A.       I believe it was April 30, 2019.

6    Q.       That's correct.  That date appears to the

7    right -- top right-hand corner of the first page and --

8    and Rizzoni is also listed as the faculty project

9    investigator; correct?

10   A.       That was the -- that's the principal

11   investigator.  That is --

12   Q.       Principal investigator?  Okay.

13   A.       Yes.

14            THE VIDEO TECH:  The page is not at the top on

15   the screen.

16            MR. FOX:  Yeah.  If we could just scroll up to

17   the top?  There we are.  Okay.

18   A.       Can I make a comment in here?

19   Q.       Sure.

20   A.       There is information on this that is also not --

21   very sensitive on this that even if you notice in the

22   note that we do not send all this to the university PI

23   agent.  So --

24            MR. FOX:  Okay.  We'll stipulate this is also

25   subject to the confidentiality order issued by the

Page 115

1    Court.

2    A.     That would apply to any of those for these

3    progress reports.

4          MR. FOX:  Okay.  Certainly, the exhibit -- so,

5    just for the record, it's Exhibit 138 and -- I'm

6    sorry -- 147 and 148.

7    Q.     Did you have any interaction with -- with Lori

8    Herman after Meng reported to her -- the sexual

9    harassment complaints to you, did you have any

10   discussion or dialogue with her about Meng's complaints?

11   A.     I believe we ran into each other once after the

12   court -- after it was announced and the lawsuit was

13   filed, just casually, we were in the hallway and she --

14   and we were both named in the lawsuit and -- but nothing

15   about the -- nothing really on the details.  Oh, look,

16   we're mentioned in this, you know, and I made -- neither

17   of us knew -- neither of us knew really what happened,

18   so there was --

19   Q.     Okay.

20   A.     Yeah.

21   Q.     Did you have any discussions with Chris Davey

22   about -- about her allegations?

23   A.     I told him her -- him that allegations had been

24   made, certainly, and then that the project was -- and

25   then the project was on hold, so I had to keep him up on

Page 116

1   that part of it, but I -- I'm sure I took -- again, it's

2   been a while, but I told him what -- there were issues

3   with the project, the project was going to go into some

4   sort of change because of that, and then he just -- we

5   just let the process play out in terms of the

6   allegations.  So --

7   Q.      Okay.  I just want to ask you just to return to

8   just a moment ago we talked about the funding split for

9   the project to another -- with another professor.  Do

10  you recall the reason for that in this case?

11  A.      Yes, I do.  The professor was a professor

12  emeritus.  He was retired.  So, he was brought in as a

13  consultant.

14  Q.      Okay.

15  A.      And I think -- yeah -- so -- and provided very

16  valuable input.  I mean that's -- I remember that part

17  of it.

18  Q.      Okay.  Did -- did anyone request from you --

19  well, let me ask you this.  When -- when you were

20  interviewed by Jonathan Perry, did he request from you

21  any email or other documents?

22  A.      No, he did not.  Not that I recall.

23  Q.      Would you have been willing to supply him with

24  any -- any email that you -- you had with either Meng or

25  Professor Rizzoni?

1   A.      I would have assuming our corporate policy --

2   you know, HR people would have said okay, but yes.

3   Q.      Did he ask you if you had any -- any -- any

4   notes of any kind about any of the -- any of the

5   relevant events?

6   A.      I don't recall him asking that.

7   Q.      Did he ask to see any -- any of the ratings or

8   evaluations of -- of Meng that you had filled out?

9   A.      I believe he -- I don't recall him asking for

10  that.

11          MR. FOX:  Okay.  Bear with me a moment.  Let me

12  just review my notes and let me take a five-minute

13  break.  I think I may be completed with my questioning,

14  Mr. Anderson.

15          (There was a pause in the proceedings.)

16          MR. FOX:  Mr. Anderson, thank you very much, Mr.

17  Anderson.  We appreciate your taking time out and

18  appearing.  I have no further questions.

19          THE WITNESS:  Okay.

20          MS. CORL:  Mr. Anderson, it's your lucky day.  I

21  don't have any questions, either.

22          MR. LINVILLE:  If they're ordering, Dyche will

23  read it.

24          THE WITNESS:  Can I ask a question?  It's

25  procedural.  In terms of the -- in terms of the -- what

Page 118

1    is protected information in terms -- in terms of the

2    exhibits, is there a good way to do it for me to make

3    sure that everything is properly marked?

4         MR. LINVILLE:  Yes.  Dyche, you and I will talk

5    about that.

6         THE WITNESS:  Okay.  Okay.

7         MR. FOX:  Thanks again.  Thanks again very much.

8    We do appreciate it, Mr. Anderson.

9         THE WITNESS:  Yes.

10        MR. FOX:  Thanks again.

11        THE WITNESS:  You're welcome.

12        THE COURT REPORTER:  Christina, transcript?

13        MS. CORL:  Yes.  If the original is ordered,

14   I'll take a copy, yes.  Thank you.

15        THE COURT REPORTER:  Send you the original,

16   Bruce?

17        MR. FOX:  Yes.  Yes, Tony.  And if you could

18   just attach the exhibits in PDF form as usual, that

19   would be great.

20        (The deposition ended at 1:51 p.m.)

21

22

23

24

25

Page 119

1              CERTIFICATE OF REPORTER

2

3        I, ANTHONY JUDE CORDOVA, a Certified Shorthand

4    Reporter and Notary Public, hereby certify that the

5    witness in the foregoing deposition was by me duly sworn

6    to tell the truth in the within-entitled cause;

7        That said deposition was taken down in shorthand

8    by me, a disinterested person, at the time and place

9    therein stated, that review was not waived, and that the

10   testimony of the said witness was thereafter reduced to

11   typewriting, by computer, under my direction and

12   supervision;

13       I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the event of

16   this cause, and that I am not related to any of the

17   parties thereto.

18

19

20

21

22

23   _____

24   Anthony Jude Cordova, RPR, CSR

25