UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | |
|---|---|
| MENG HUANG, | ) |
| PLAINTIFF, | ) CASE NO. 2:19-cv-1976 |
| vs. | ) Volume III of IV |
| GIORGIO RIZZONI, | ) |
| DEFENDANT. | ) |

TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE JAMES L. GRAHAM
WEDNESDAY, MAY 3, 2023; 9:04 A.M.
COLUMBUS, OHIO

FOR THE PLAINTIFF:
    The Pattakos Law Firm LLC
    By:  PETER PATTAKOS, ESQ.
         GREGORY GIPSON, ESQ.
    101 Ghent Road
    Fairlawn, Ohio 44333

FOR THE DEFENDANT:
    Plunkett Cooney
    By:  CHRISTINA CORL, ESQ.
    716 Mt. Airyshire Boulevard, Suite 150
    Columbus, Ohio 43235

- - -

Proceedings recorded by mechanical stenography, transcript produced by computer.

*Allison A. Kimmel, FAPR, RDR, CRR, CRC*
*Federal Official Court Reporter*
*85 Marconi Boulevard*
*Columbus, Ohio 43215*
*614.719.3225*

Vol. III, Pg. 405

1  the same thing. They give you the option of having video.
2  At that time, the functionality was not quite as
3  developed as it is today. So you can project, say, for
4  example, a PowerPoint presentation, and everyone would see it,
5  but people would be on audio. That is correct.
6  Q. Okay. And it is your testimony that my client is lying,
7  that she lied under oath for the past two days when she
8  described that you would constantly touch her --
9  A. Yeah.
10 Q. -- assault her, grab her breasts, wrap your hands around
11 her, et cetera, et cetera, et cetera, while you were in your
12 office on those Webexes, correct?
13 A. Yes, it is. Yes, I said.
14 Q. Okay. She's lying?
15 A. It never happened, so you draw the conclusion.
16 Q. Okay. You heard my client testify yesterday about an
17 incident at the Bravo restaurant, the Italian restaurant?
18 A. Yes.
19 Q. And she alleges that happened on September 18th, 2015,
20 correct, sir?
21 A. I'll take the date from you as being accurate, yeah.
22 Q. You have no reason to believe it's inaccurate, correct?
23 A. I have no reason to believe it's inaccurate.
24 Q. You don't dispute that you went to a restaurant with her
25 on that day, do you, sir?

Vol. III, Pg. 406

1   A.   Not at all. I do not dispute that.
2   Q.   Okay. Is it common for you to go to restaurants with
3   your students?
4   A.   It happens. It's not uncommon. There are circumstances
5   where I'll take students out for lunch. We'll go out for
6   dinner together.
7        More often than not, we'll go out for dinner together
8   when we have a sponsor, one of the companies visiting town.
9        That would be an opportunity for them to get to spend a
10  little bit of time also socially with the sponsors.
11       In this particular instance, it was just some -- you
12  read the way the thing was explained, you understand what
13  happens.
14  Q.   Sir, I want you to tell me your version of what
15  happened.
16  A.   My version is exactly the same thing that was reported.
17  That is, I had just flown in from Chicago. We wanted to have a
18  meeting. We had the meeting at the end of the day. And at
19  that point, as the meeting was over, we said let's go get a
20  bite to eat together, and we went down the street.
21       This restaurant, which doesn't exist anymore, is what
22  today is called the Lennox, if you are familiar with the area.
23       So from the Kinnear Road Center for Automotive Research,
24  it's like less than a mile. That's it.
25  Q.   So it's exactly as she described it?

Vol. III, Pg. 407

1  A.  The act of going to the restaurant and having a bite to
2  eat and a drink together is exactly as she described it.
3      The elaborations on all the other things are, I think,
4  great works of fantasy, but the fact that we had a dinner
5  together there is true.
6  Q.  This was a Friday evening, correct, sir?
7  A.  It was a Friday evening, yeah.
8  Q.  Okay.  And you had just got back from traveling overseas
9  the day before, correct?
10 A.  No.  I had just come back from a conference in Chicago
11 the same day I landed at Port Columbus.  I don't know the exact
12 time, but give or take 4:00 p.m., something like that, and we
13 had agreed.
14     You have all the documentation there.  We had agreed.
15 Let's meet and talk about your research progress.  I can swing
16 by CAR directly from the airport, and so that's what I did.
17 Q.  So you went directly from the airport to pick my client
18 up?
19 A.  Not to pick my client up.  To meet her at the Center for
20 Automotive Research.  Bring up -- I mean, read what you have in
21 front of you.
22 Q.  How do you know what I have in front of me, sir?
23 A.  I don't know.  You are asking me the question on the
24 subject.  I figure you would be prepared and have it in front
25 of you.

Vol. III, Pg. 408

1  Q.  Are you asking me to read my client's report that --
2  you've reviewed my client's report, correct?
3        THE COURT:  No dialogue like this.  Just ask questions
4  and, Dr. Rizzoni, you just answer them.
5        MR. PATTAKOS:  Okay.
6        THE COURT:  All right.
7  BY MR. PATTAKOS:
8  Q.  Dr. Rizzoni, you've reviewed my client's report, written
9  report that she submitted to Ohio State, correct?
10 A.  Yes, he did.
11 Q.  And you were offered an opportunity to respond to that
12 report in writing, correct?
13 A.  Yes, I was.
14 Q.  And you did so, correct?
15 A.  I most certainly did.
16 Q.  Okay.  I'm going to place a document for your view.  Not
17 the jury's.
18 A.  Yeah, that's not a document I wrote.
19 Q.  No, this is the document -- this is my client's report
20 that you reviewed.  It's a page from it, is it not, sir?
21 A.  Yeah, yeah.  I remember that page.
22 Q.  Okay.  Is this what you were just instructing me to
23 review, that this is what you are referring to --
24      THE COURT:  We're not going to get into what he
25 thought you were referring to.  Let's start --

```
                                                        Vol. III, Pg. 409
 1            THE WITNESS:  This is what the plaintiff --
 2            THE COURT:  No, no.  Stop right there.  Different
 3   subject.  Different question.
 4            MR. PATTAKOS:  Different question.  Okay.
 5      BY MR. PATTAKOS:
 6      Q.   Do you dispute that these photos that are pictured here
 7   are accurate and were taken on that day?
 8      A.   I do not dispute that.
 9      Q.   Okay.  This looks like about where you were sitting and
10   what you were eating?
11      A.   Yeah, it does.
12      Q.   And the glasses of wine that you ordered?
13      A.   It looks like I see one, two glasses of wine, indeed.
14      Q.   Okay.  My client says that you ordered two glasses of
15   wine without her asking, she said under oath yesterday.  Is
16   that true?  Did you do that?
17      A.   I don't remember that detail.  Going to dinner and
18   asking for some food and a glass or two of wine is a normal
19   occurrence.  So I don't remember whether -- how this occurred
20   specifically.
21           What I see from the picture is that there are two plates
22   with food on them, and in front of each of them there is a
23   glass of white wine.
24           So that's it.  That's a fact.  Okay.  I don't dispute
25   that fact.
```

*Allison A. Kimmel, FAPR, RDR, CRR, CRC*
*Federal Official Court Reporter*
*85 Marconi Boulevard*
*Columbus, Ohio 43215*
*614.719.3225*

Vol. III, Pg. 410

1  Q. Okay. Do you dispute my client's testimony that you
2  took a sip from one of the glasses of wine and then handed it
3  to her and asked her to have a sip of it? Do you dispute that?
4  A. I don't -- I don't think I would ever do that, and I
5  don't recall doing it. Why would I do that if there are two
6  glasses of wine?
7  Q. But you do dispute that -- her testimony that you put
8  your hands on her thighs and rubbed her legs, you do dispute
9  that?
10 A. Yes, I do.
11 Q. Okay. Do you remember that she was wearing a summer
12 dress on that day?
13 A. I don't remember what she was wearing in 2015. I don't
14 remember what I was wearing in 2015.
15 Q. You don't dispute that she was wearing a summer dress
16 that day on September 18th, 2015, do you, sir?
17 A. If it was summer, she may well have been wearing a
18 summer dress. I mean, what else are you going to say? You
19 know, sure. She was not wearing a parka.
20 Q. And you dispute my client's testimony that you said to
21 her, after you touched her thighs and she pushed you away,
22 "Meng, I pay for your monthly stipend. You better listen to
23 me. Otherwise, we may have a problem"?
24 A. I very, very strongly doubt that I would ever say
25 anything like that, but I don't have any recollection of

*Allison A. Kimmel, FAPR, RDR, CRR, CRC*
*Federal Official Court Reporter*
*85 Marconi Boulevard*
*Columbus, Ohio 43215*
*614.719.3225*

```
                                            Vol. III, Pg. 411
 1   exactly what went on in a conversation on September 18th, 2018
 2   [sic].
 3       Q.   2015, sir.
 4       A.   2015.  Whatever the date was.
 5       Q.   Did you pay cash?
 6       A.   I don't remember.  I may have.  You know.
 7       Q.   You don't know sitting here today whether you paid cash
 8   or not?
 9       A.   I do not remember whether on September 18th, 2015, I
10   paid for a dinner in cash or not.  Cash is a legal tender in
11   the United States.  So what if I did?
12            THE COURT:  All right, Doctor.  You answered the
13   question.  Go ahead.
14       Q.   Here's why I ask that question, sir.
15            THE COURT:  No, no, no.  Let's move on to --
16            MR. PATTAKOS:  I'll ask another question.
17            THE COURT:  That's enough about cash or credit.  Let's
18   go on to something else.
19   BY MR. PATTAKOS:
20       Q.   Had you paid -- this would have been something you could
21   have expensed, a dinner with a student, correct?
22       A.   No.  We are both employees of The Ohio State University,
23   and the university does not reimburse expenses for meals
24   between ourselves.
25            It would have to be a third person who was there for a
```

Vol. III, Pg. 412

1  business reason outside the university.
2       So this was not a reimbursable expense.
3  Q.  If my client were lying about this incident, you could
4  have proven that with a receipt showing that you used some
5  other means of paying, correct, sir?
6  A.  So what if I had used other means of paying?  What
7  difference does it make?  I paid for the dinner.  That part of
8  it is clear.
9       Whether I paid with cash, a credit card, or manual
10 labor, what difference does it make?
11 Q.  You could have proven that my client was a liar,
12 correct, sir?
13      THE COURT:  Different subject.
14      MR. PATTAKOS:  Okay.
15      THE COURT:  Move on.
16 BY MR. PATTAKOS:
17 Q.  Sir, was your wife out of town that day, that Friday
18 evening?
19 A.  I don't remember.  But if I came back from Chicago and
20 decided to have a quick bite with the plaintiff out, it's
21 probably because --
22      THE COURT:  Dr. Rizzoni, you can answer that question
23 yes or no.
24      THE WITNESS:  I don't know.  I don't remember.  I
25 mean, we could go back and look at our calendar.  She may have

*Allison A. Kimmel, FAPR, RDR, CRR, CRC*
*Federal Official Court Reporter*
*85 Marconi Boulevard*
*Columbus, Ohio 43215*
*614.719.3225*